IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

# CASE NUMBER 24-11032

---

## UNITED STATES OF AMERICA,
*PLAINTIFF-APPELLEE,*

## V.

## RAYNALDO RIVERA ORTIZ, JR.,
*DEFENDANT-APPELLANT.*

---

ON DIRECT APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

## INITIAL BRIEF OF APPELLANT

JASON D. HAWKINS
FEDERAL PUBLIC DEFENDER

KEVIN JOEL PAGE
ASSISTANT FEDERAL
PUBLIC DEFENDER
525 South Griffin
Suite 629
Dallas, Texas 75202
(214) 767-2746

*Counsel for Dr. Ortiz*

## CERTIFICATE OF INTERESTED PERSONS for

### *United States v. Ortiz*, Case No. 24-11032

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Appellant: | Dr. Raynaldo Rivera Ortiz, Jr. |
| Defense Counsel: | Federal Public Defender for the Northern District of Texas<br>AFPD John M. Nicholson (district court)<br>AFPD Marti R. Morgan (district court)<br>AFPD Kevin Joel Page (appeal) |
| Prosecutors: | Patrick R. Runkle, DOJ, Consumer Protection (district court)<br>Rachel Baron, DOJ, Civil (district court)<br>Yolanda Dee McCray Jones, DOJ Civil, Consumer Protection (district court)<br>AUSA John J. De La Garza (district court)<br>AUSA Errin Martin (district court) |
| Movant: | James Nicholas Bunch, Haynes and Boone, LLP (counsel for Movant in district court) |
| District Judge: | Hon. David C. Godbey |

/s/ Kevin Joel Page
Counsel for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

The record in this case is voluminous, complicated and exceedingly technical. The defendant received 190 years imprisonment. Oral argument is essential to a fair resolution of the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................. i

STATEMENT REGARDING ORAL ARGUMENT ....................................... ii

TABLE OF AUTHORITIES ....................................................................v

JURISDICTIONAL STATEMENT ................................................... 1

ISSUES PRESENTED FOR REVIEW .......................................... 1

STATEMENT OF THE CASE ........................................................ 3

I.     Facts............................................................................................4

II.    Procedural History....................................................................14

    A.  Pretrial .................................................................................14

SUMMARY OF THE ARGUMENT ............................................. 26

A.     Sufficiency claims ................................................................ 26

B.     Procedural claims ................................................................. 29

ARGUMENT AND AUTHORITIES .............................................31

I.     The evidence is insufficient on all counts. ...........................31

II.    The government introduced insufficient evidence to support Counts 1
       and 6 because it failed to show the IV bag used in TY's August 4, 2022,
       surgery had been intentionally poisoned.............................................. 45

III.   The government introduced insufficient evidence to support Counts 2
       and 7 because it failed to show that the bags used in JE's August 9,
       2022,  surgery had been poisoned. ....................................................... 48

IV.    The government introduced insufficient evidence to support Counts 3 and   8 because it failed to show that the bags used in JA's August 24, 2022, surgery had been poisoned, and it failed to show that Dr. Ortiz tampered with the bag he placed in the warmer on August 16, 2022.  50

V.    The government introduced insufficient evidence to support Counts 4 and 9 because it failed to show that anyone poisoned the bags used in KP's August 19, 2022, surgery..................................................................51

VI.    The government introduced insufficient evidence to support Counts 5 and 10, involving a bag placed in the warmer August 23, 2022, unassociated with any surgery. ........................................................... 53

VII.    The district court erred in admitting evidence of the death of MK. .... 55

VIII.    The district court erred in permitting Dr. Hail to testify in spite of an extensive violation of Federal Rule of Evidence 615 and of a court order.................................................................................................... 66

IX.    The district court plainly erred in failing to intervene when the prosecutor commented on the defendant's failure to testify. ................77

CONCLUSION ............................................................................. 84

CERTIFICATE OF SERVICE......................................................... 85

CERTIFICATE OF COMPLIANCE................................................. 85

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Barrientes v. Johnson*,
   221 F.3d 741 (5th Cir. 2000) .................................................................80, 81, 82

*Bocanegra v. Vicmar Servs., Inc.*,
   320 F.3d 581 (5th Cir. 2003) ................................................................66

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................69

*Cotton v. Cockrell*,
   343 F.3d 746 (5th Cir. 2003) ................................................................78

*Cruz v. Maverick County*,
   957 F.3d 563 (5th Cir. 2020) ................................................................66

*Culombe v. Connecticut*,
   367 U.S. 568 (1961)........................................................................84

*Davis v. United States*,
   357 F.2d 438 (5th Cir. 1966)................................................................80

*Griffin v. California*,
   380 U.S. 609 (1965)........................................................................78

*Huddleston v. United States*,
   485 U.S. 681 (1988)........................................................................58

*Huff v. United States*,
   273 F.2d 56 (5th Cir. 1959) ................................................................*passim*

*In re Estrategias en Valores, S.A.*, No. 17-16559-LMI, 2020 WL
   13614259 (S.D. Fla. Apr. 13, 2020) ....................................................69

*Jackson v. Johnson*,
   194 F.3d 641 (5th Cir. 1999) ................................................................78

*Jackson v. Virginia*,
   443 U.S. 307 (1979)........................................................................32

*Kennedy v. Louisiana*,
    554 U.S. 407, *as modified* (Oct. 1, 2008) ...........................................................65

*Lincoln v. Sunn*,
    807 F.2d 805 (9th Cir. 1987) ...............................................................................80

*Lopez v. Smith*,
    574 U.S. 1 (2014) (per curiam)............................................................................81

*Lucas v. Johnson*,
    132 F.3d 1069 (5th Cir. 1998) .............................................................................80

*Madden v. Collins*,
    18 F.3d 304 (5th Cir. 1994) ....................................................................30, 79, 80

*Nivelo Cardenas v. Garland*,
    70 F.4th 232 (5th Cir. 2023) ...............................................................................80

*United States v. Age*,
    136 F.4th 193 (5th Cir. 2025)........................................................................60, 61

*United States v. Beechum*,
    582 F.2d 898 (5th Cir. 1978)(*en banc*).................................................59, 63, 64

*United States v. Bentley-Smith*,
    2 F.3d 1368 (5th Cir. 1993) .................................................................................56

*United States v. Bowen*,
    818 F.3d 179 (5th Cir. 2016) ...............................................................................32

*United States v. Brown*,
    186 F.3d 661 (5th Cir. 1999) ...............................................................................32

*United States v. Brown*,
    459 F.3d 509 (5th Cir. 2006) ...............................................................................33

*United States v. Danhach*,
    815 F.3d 228 (5th Cir. 2016) ...............................................................................31

*United States v. Dominguez-Benitez*,
    542 U.S. 74 (2004)...............................................................................................82

*United States v. Ell*,
   718 F.2d 291 (9th Cir. 1983) ...............................................68

*United States v. Fields*,
   777 F.3d 799 (5th Cir. 2015) ...............................................81

*United States v. Fitzharris*,
   633 F.2d 416 (5th Cir. 1980) ...............................................31

*United States v. Fortenberry*,
   860 F.2d 628 (5th Cir. Nov. 10, 1988) ...............................64

*United States v. Ganji*,
   880 F.3d 760 (5th Cir. 2018) ......................................*passim*

*United States v. Garrett*,
   238 F.3d 293 (5th Cir. 2000) ...............................................76

*United States v. Gurrola*,
   898 F.3d 524 (5th Cir. 2018) ...............................................60

*United States v. Gutierrez-Mendez*,
   752 F.3d 418 (5th Cir. 2018) ...............................................58

*United States v. Jackson*,
   339 F.3d 349 (5th Cir. 2003) ...............................................56

*United States v. Johnston*,
   127 F.3d 380 (5th Cir. 1997) ...............................................80

*United States v. Kinchen*,
   729 F.3d 466 (5th Cir. 2013) .........................................56, 63

*United States v. Lamp*,
   779 F.2d 1088 (5th Cir. 1986) ............................................68

*United States v. Lara*,
   23 F.4th 459 (5th Cir. 2022) ...............................................56

*United States v. Ledet*,
   385 F. App'x 392 (5th Cir. 2010)(unpublished) ..................42

*United States v. Lopez*,
   923 F.2d 47 (5th Cir. 1991) ................................................................83

*United States v. Maseratti*,
   1 F.3d 330 (5th Cir.1993) ..................................................................33

*United States v. McDowell*,
   498 F.3d 308 (5th Cir. 2007) ..............................................................33

*United States v. Miranda*,
   248 F.3d 434 (5th Cir. 2001) ..............................................................60

*United States v. Moreland*,
   665 F.3d 137 (5th Cir. 2011) ..............................................................32

*United States v. Olano*,
   507 U.S. 725 (1993) ....................................................................65, 78

*United States v. Ortega-Chavez*,
   682 F.2d 1086 (5th Cir. 1982) ...........................................................72

*United States v. Pettigrew*,
   77 F.3d 1500 (5th Cir. 1996) ..............................................................33

*United States v. Posada-Rios*,
   158 F.3d 832 (5th Cir. 1998) ..............................................................66

*United States v. Powers*,
   168 F.3d 741 (5th Cir. 1999) ........................................................60, 62

*United States v. Ricard*,
   922 F.3d 639 (5th Cir. 2019) ................................................63, 64, 65

*United States v. Ridlehuber*,
   11 F.3d 516 (5th Cir. 1993) ................................................................59

*United States v. Rojas Alvarez*,
   451 F.3d 320 (5th Cir.2006) ..............................................................33

*United States v. Sardelli*,
   813 F.2d 654 (5th Cir. 1987) ..............................................................80

*United States v. Segura*,
    747 F.3d 323 (5th Cir. 2014) ..................................................82

*United States v. Smith*,
    804 F.3d 724 (5th Cir. 2015) ..............................................56, 63

*United States v. Sudeen*
    434 F.3d 384 (5th Cir. 2005) ..................................................59

*United States v. Taylor*,
    210 F.3d 311 (5th Cir. 2000) ............................................60, 62

*United States v. Watkins*,
    591 F.3d 780 (5th Cir. 2009) ..................................................60

*United States v. Womack*,
    654 F.2d 1034 (5th Cir. 1981) ...............................................71

*United States v. Wylie*,
    919 F.2d 969 (5th Cir. 1990) .......................................67, 68, 71, 72

## Federal Statutes

18 U.S.C. § 1365(a) ..............................................................14

18 U.S.C. § 3231 ....................................................................1

21 U.S.C. § 331(k) ...............................................................15

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 2254 ..................................................................81

28 U.S.C. § 2254(d)(1) ........................................................81

## Rules

Fed. R. Evid. 104(a) ............................................................58

Fed. R. Evid. 402 .................................................................56

Fed. R. Evid. 403 ...........................................................15, 56

Fed. R. Evid. 404 .................................................................15

Fed. R. Evid. 404(a) ....................................................................... 15

Fed. R. Evid. 404(a)(1) ................................................................... 56

Fed. R. Evid. 404(b) .................................................................. 59, 62

Fed. R. Evid. 404(b)(1) ................................................................... 56

Fed. R. Evid. 404(b)(2) ................................................................... 57

Fed. R. Evid. 404(c)(1) ................................................................... 61

Fed. R. Evid. 615 .................................................................... *passim*

Fed. R. Evid. 615(a) ....................................................................... 68

Fed. R. Evid. 615(a)(3) ................................................... 1, 68, 69, 71

## Constitutional Provisions

U.S. Const. amend. V ..................................................................... 83

## Other Authorities

6 J. Wigmore, *Evidence* § 1840 (Chadbourn rev. 1976) ......................................... 68

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, and this Court has jurisdiction under 28 U.S.C. §1291. Appellant filed a timely notice of appeal, two days after written judgment. *See* (ROA.1149, 1150).

# ISSUES PRESENTED FOR REVIEW

Whether the government introduced sufficient evidence on any count? (Issues I-VI).

Whether the district court abused its discretion in admitting evidence of MK's death, where the government introduced scant evidence that Dr. Ortiz caused her death, and where its profound inflammatory potential greatly overwhelmed its marginal contribution to the government's proof? (Issue VII).

Whether Federal Rule of Evidence 615(a)(3) permits district courts to grant retroactive exemptions from the requirements of witness sequestration? If so, whether the government made an appropriate showing that the exempted witness was essential to the presentation of its case? Whether the district court abused its discretion in providing no sanction for the violation of its sequestration order? (Issue VIII).

Whether this Court's precedent plainly establishes that a prosecutor refers to the defendant's silence when he or she says "only one person in this room knows" the answer to an evidentiary question? Whether this plain error merits relief? (Issue IX).

## STATEMENT OF THE CASE

The government accused Appellant Dr. Raynaldo Rivera Ortiz, Jr. of poisoning five IV bags with toxic doses of local anesthesia. Its case at trial relied heavily on a coincidence it can prove with video evidence: that Dr. Ortiz was in 3 cases the last person to place an IV bag into an IV warmer before a surgery that resulted in an emergency transfer to another facility. The government and its witnesses theorized that tainted IV bags caused the patients to experience extreme hypertension and elevated heartbeat in each of these cases, and in at least one more, where Dr. Ortiz added an IV bag to the warmer 8 days before the ill-fated surgery. But the video evidence cannot establish that doctors used the ***same*** bag in the surgeries that Dr. Ortiz placed in the warmer – the warmer was effectively a black box, capable of holding 32 or 34 bags in three different stacks.

And there are other serious problems with the government's case. At least one of the patients began to experience a blood pressure spike ***before*** receiving the allegedly "poisoned" IV bag. Another began to experience spiking blood pressure ***an hour*** after receiving the putatively poisoned bag. In another case, the surgeon who performed her operation said that the patient's symptoms were most likely caused by ***her own*** medical accident. In yet another case, Dr. Ortiz was close quarters with another medical professional at the time the government theorized that he poisoned an IV bag. Finally, the government produced evidence that Dr. Ortiz placed five bags

in the warmer; yet it theorized that six bags contained toxic chemicals wound up in the warmer. Because it had no evidence of an accomplice, this required the government to resort to conjectural explanations for the last putatively tainted bag.

Riddled with coincidence, conjecture, and false assumptions, the government's case failed to establish guilt. The trial was also marred by several serious procedural errors. And yet, the jury convicted him, and the court sentenced him to 190 years imprisonment. An effective life sentence should not rest on evidence this weak, or a trial with serious procedural errors. This Court should vacate each count of conviction and remand for entry of judgment of acquittal, or, alternatively, for a new trial. If it vacates any count of conviction, it should vacate the sentence on every count.

## I. Facts

### The string of unexpected emergencies

Dr. Ortiz worked as an anesthesiologist in the DFW area, where he operated two medical businesses. *See* (ROA.2157). One of these businesses employed approximately 20 providers, including himself, and practiced at 4 or 5 different facilities. *See* (ROA.2183-2187). Between May and August 2022, one of these locations, Baylor, Scott and White Surgicare North Dallas ("BSWSND"), had 14 patients transferred to emergency facilities during or just after its procedures. *See* (ROA.1525-1256). BSWSND operates as an ambulatory surgery center, specializing in procedures that do not typically require an overnight stay. *See* (ROA.1436, 1497). During

this period, 14 patients experienced extremely elevated heartrates and blood pressure during their surgeries, requiring transfer to an emergency room. *See* (ROA.1525-1256).

The last 4 of these transfers (August 4, 9, 19, and 24, 2022) formed the basis of Counts 1-4 and 6-10 of the Indictment. Two more Counts (5 and 10) pertained to a bag Dr. Ortiz placed in the warmer, but which, the government contends, nobody ever used. The government contended that the last 4 transfers fit a pattern stretching back to May of 2022; it linked the emergencies in all 14 cases to the IV bags used in the operations. In the 4 surgeries in the Indictment, the government sought to link the patients' symptoms to their ***second*** IV bag. This was critical to the government's theory of the case because patients received their second IV bags from an IV warmer in the hall of the operating room, while their first bags came from another different source. *See* (ROA.1505-1506, 1825). Video evidence showed Dr. Ortiz placing bags in a warmer in the hall of the operating room; no evidence linked him to the source of the patients' first bags.

In fact, many of the transfers that did not make it into the Indictment (the first 10) do not fit the theory that the patient's second IV bag caused a cardiac or hypertensive emergency. For example, 5 patients (LS, MA, AH, FL, and MD[1]) needed an emergency transfer without ever receiving a second IV bag. *See* (ROA.1632, 1654,

---

[1] This Brief uses initials to protect the privacy interests of patients and MK.

1668, 1671, 2595). Another patient (MN) appears both to have experienced elevated blood pressure before receiving the second IV bag and to have stabilized before the doctors detached it. *See* (ROA.1457, 1626, 1674). Other anomalous facets of the 10 unindicted cases appear at pages 1671-1677 of the record. Some patients who were transferred in this run of interoperative emergencies had no cardiac issues at all; others had elevated blood pressure hours after the removal of the second bag; others had elevated blood pressure or heart rate that persisted for days after the removal of the second IV bag. *See* (ROA.1671-1677). The hospital did not store video from this time, so there is no evidence that Dr. Ortiz ever handled the IV bags in the ten transfer cases that preceded the indictment. *See* (ROA.1499).

**The death of MK**

During the period of these emergency transfers, the hospital experienced a tragedy. On June 21, 2022, a doctor who worked at BSWSND and several other facilities, died at home after affixing an IV bag to herself. *See* (ROA.1714-1720). Dr. MK came home from work at BSWSND suffering from a cold or flu, and she decided to use an IV bag from work to hydrate herself. *See* (ROA.1714-1715). MK had accumulated a small number of IV bags at home, some of which probably came from other facilities. *See* (ROA.1723-1726). Her husband did not see her bring an IV bag home from work that day, but did see one attached to her when she died. *See* (ROA.1720). Her death was painful and traumatic. She called her husband on the

phone from another part of their property, then appeared before him screaming in agony until she lost consciousness and died. *See* (ROA.1717-1719).

The IV bags taken from MK's home apparently underwent no chemical testing or physical examination. Two chemists, one at the Southwest Institute for Forensic Sciences (SWIFS) and another doing confirmatory work at a partner lab called NMS found bupivacaine (a local anesthetic, toxic when taken intravenously) in MK's blood. *See* (ROA.2226-2227). Specifically, NMS found 5.1 micrograms of bupivacaine per milliliter of MK's blood. *See* (ROA.2226-2227).

There is also no evidence, neither video nor testimonial, that Dr. Ortiz handled the bag that MK used when she died, if indeed it came from BSWSND. The government nonetheless introduced evidence of MK's death at trial.

**The IV warmer**

The government's case centered around a device at the hospital called an IV warmer. An IV warmer looks like a refrigerator, but it warms IV bags so that patients receiving IV fluids do not get chills. *See* (ROA.1511). The IV warmer that Dr. Ortiz accessed could hold 32 or 34 bags of saline fluid at a time, which stood in three stacks. *See* (ROA.1792, 1807). Each bag had an exterior wrapper. *See* (ROA.1505). An employee named Mr. Rumaldo Gonzalez, titled "an anesthesia tech," stocked and rotated the bags to maintain a rough "First In First Out" system. *See* (ROA.1509, 1546). He wrote a date on the wrapper of the bags, a practice designed to ensure that

no bag stayed in the warmer more than two weeks. *See* (ROA.1570). Video from a surveillance camera in the hallway showed people putting bags into the warmer and taking them out, but it could not track whether any bag going into was the same one taken out later at any given time. *See* (ROA.1498-1500, 1504, 1582-1583). The hospital kept no written log of which IV bags went into surgery. *See* (ROA.1582-1583). And it did not have cameras in its operating rooms. *See* (ROA.1501).

In addition to the IV bags of pure saline solution, the warmer also contained bags of "tumescent fluid." (ROA.1447, 1577). Doctors prepare "tumescent bags" by inserting one or more local anesthetics into a bag of pure saline solution through the bag's "port." *See* (ROA.1572). Surgeons would then inject the tumescent fluid into the tissue ("subcutaneously") of the patient (as opposed to intravenously). *See* (ROA.1575). A patient who received the contents of these bags intravenously would face great danger. *See* (ROA.1445).

If the bags were properly prepared, they had bright orange warning stickers and sat in the bottom part of the warmer, so that they would not be mixed up with the other saline bags intended for intravenous use. *See* (ROA.1576-1578, 1594-1598, 1810). And tumescent bags entered the warmer without a wrapper, which would have been removed when the doctor added the medicine. *See* (ROA.1814). Still, they went into the ***same warmer*** as the non-tumescent bags. *See* (ROA.1577). A

surgeon that used a tumescent bag instead of a bag of pure saline might thus accidentally inject local anesthesia into the bloodstream of the patient.

### The 4 surgeries named in the Indictment and the unused bag charged in the Indictment

As noted, the last 4 emergency transfers in the Spring and Summer of 2022 formed the basis for 8 counts in the Indictment. In three of these cases (TY, JE, and KP), Dr. Ortiz took at least one bag out of the warmer before the operation, then put a bag into the warmer before the operation. *See* (ROA.1530-1552). Also, in each of these cases, someone else took a bag from the warmer and brought it into the operating room of the ill-fated surgery. *See* (ROA.1530-1552). Again, it is not possible to tell from the videos whether the bag taken into the operating room was the same bag that Dr. Ortiz put into the warmer. *See* (ROA.1498-1500, 1504, 1582-1583, 1811-1812).

In a fourth case (JA) in August, Dr. Ortiz placed a bag in the warmer some 8 days before the ill-fated surgery. *See* (ROA.1678). The government would later explain that the bags had been rotated in the meantime. *See* (ROA.2826). That is true, *see* (ROA.1797), but it nonetheless attenuates any link between Dr. Ortiz's placement of the IV bag and JA's subsequent medical emergency.

The first of these 4 surgeries occurred on August 4, 2022, and involved a 56-year-old female patient with initials TY. *See* (ROA.1481). TY developed extremely

high blood pressure and heartrate during an abdominoplasty and a rhytidectomy, resulting in a transfer to the ER. *See* (ROA.1483, 2345, 2391-2395). An X-ray showed pulmonary edema. *See* (ROA.2395). Nobody recovered the bags used in this surgery and nobody tested TY's blood. The government's case that TY received a poisoned IV bag thus depends only on the timing and pattern of her symptoms. The surgeon who performed her operation opined on the witness stand that the most likely cause of her hypertensive emergency was the accidental breach of her vein when giving a subcutaneous injection of local anesthesia. *See* (ROA.2345, 2359).

The second of these 4 surgeries occurred August 9, 2022, and involved a 78-year-old male patient with initials JE. *See* (ROA.2098). JE underwent surgery for his wrist, *see* (ROA.2109), and began developing extreme hypertension, elevated heartrate, and ultimately pulmonary edema near the time of the second IV, *see* (ROA.2113-2114). But the written medical records show that his blood pressure began to spike ***before he received*** his second IV bag. *See* (ROA.2443, 2451, 2623). It also showed that his heartrate and blood pressure stabilized ***before doctors removed*** the second IV bag. *See* (ROA.2127, 2148, 2621). Although cleared for surgery, JE suffered from a range of potentially relevant illnesses: he had a "watchman" to stabilize his heartrate, *see* (ROA.2099, 2148); he suffered from atrial fibrillation, *see* (ROA.2103); he had coronary arterial disease, *see* (ROA.2150, 2447); and he tested positive for COVID while in recovery, *see* (ROA.2149).

The third of these 4 surgeries occurred August 19, 2022, and involved a 54-year-old female patient, initials KP. *See* (ROA.1771). KP's August 19, 2022, surgery was a second abdominoplasty, following up on complications from the same procedure performed the day before. *See* (ROA.1771). KP began to display an elevated blood pressure and heartrate ***about an hour after*** she received the second bag in the second procedure. *See* (ROA.2461). The surgeon used bupivacaine in the first procedure, and her anesthesiologist tentatively agreed that this dose could be detected in her bloodstream the next day, even if she received no more of it. *See* (ROA.2081). The government's expert disputed this. *See* (ROA.2413). Chemists found ephedrine (a stimulant used in anesthesia) in her blood, she received four doses of it during second surgery, s*ee* (ROA.2083), and a SWIFS chemist thought that the ephedrine in her blood test might be consistent with this charted clinical dose, *see* (ROA.2224-2225). Here, too, nobody recovered the bag used in her procedure, so the government's case that she received a poisoned IV bag depends on blood testing and the timing and pattern of symptoms.

On August 23, 2022, a date between the third and fourth surgeries discussed in the Indictment, Dr. Ortiz placed another IV bag in the warmer. *See* (Govt's Exh. 68). Before doing so, he entered the pre-operative area of the hospital and loaded syringes with medicine. *See* (Govt's Exh. 61). He then took the syringes to Operating Room 5 (OR5), where he remained until he exited with the IV bag and placed it in

the warmer. *See* (Govt's Exh. 64, 68). But from the time he entered OR5 with the loaded syringes to the time he exited the room and placed the bag in the warmer, at least one medical professional, and sometimes more, accompanied him. *See* (Govt's Exh. 71).

The fourth of these surgeries – the one in which Dr. Ortiz was ***not*** the last person to place a bag in the warmer – occurred on August 24, 2022, involving an 18-year male patient named JA. *See* (ROA.1830). JA's procedure addressed an injury to his nose; like the other patients, he displayed extremely elevated heartrate and blood pressure, and pulmonary edema. *See* (ROA.1884-1889, 2415).

During JA's surgery, the anesthesiologist from the third surgery (Dr. Marsden) entered the operating room and told staff to change his IV bag, *see* (ROA.1556-1557, 1892-1894), having developed a theory that the patients' IV bags were causing their emergencies, *see* (ROA.1832). He ordered preservation of the bags and wrappers used in the surgery. *See* (ROA.1556-1157, 1905). Later, staff pulled the bags from the warmer and assembled them together with the bags and wrappers from the surgery. *See* (ROA.1558, 1951). They examined these items and believed they found a hole in one of the wrappers from JA's surgery. *See* (ROA.1558). A doctor putting drugs in an IV bag for clinical use would introduce them via a port, not by puncturing them with a hypodermic needle.

**The chemists**

SWIFS and NMS, discussed above in connection with the tests of MK's blood, also received samples of KP's blood and JA's blood. *See* (ROA.2206-2207). NMS found 32 nanograms of ephedrine per milliliter of blood in KP's sample. *See* (ROA.2206-2207). By contrast, it found 370 nanograms of ephedrine per milliliter in JA's sample. *See* (ROA.2206-2207).  As noted, chemist from SWIFS opined that KP's concentration of ephedrine could be explained by the doses of ephedrine administered by her anesthesiologist. *See* (ROA.2224). SWIFS' qualitative testing for bupivacaine and lidocaine (local numbing agents) found them in KP and JA's blood, but NMS did not find reportable levels of those substances in either sample. *See* (ROA.2219-2223). NMS uses a "cut-off" for reporting – it will not report small levels of a chemical as a positive result. *See* (ROA.2216-2217). This ensure that it is not reporting contaminants or other artifacts of its testing procedure. *See* (ROA.2216-2217). Accordingly, the blood testing taken as a whole establishes a level of ephedrine in KP's blood potentially consistent with the doses she received in her first surgery, and a larger concentration in JA's blood.

For reasons the record does not make clear, the hospital chose to give the physical evidence in the case – the bags from the surgery, together with other bags from the warmer – to a chemistry professor at the University of North Texas (Professor Verbek) rather than to law enforcement. *See* (ROA.2246). Professor Verbek

wrote that he found stereoscopic evidence of "possible holes" in the wrappers of two unused IV bags (presumably from the warmer). (ROA.9897, 9899). On the stand, he said that the term "possible hole" did not reflect any doubt as to the hole's existence. *See* (ROA.2290). He did not confirm the presence of a hole in the wrapper taken from JA's surgery, though he may not have received that wrapper.

Professor Verbek and his team also claimed to find epinephrine (adrenaline), bupivacaine, and lidocaine in a partially used bag, presumably from JA's surgery. *See* (ROA.2281). And they claimed to find bupivacaine and lidocaine in two unused bags, presumably taken from the IV warmer. *See* (ROA.2281). In contrast to NMS, which regularly works with law enforcement, Professor Verbek does not use a "cut-off" to exclude contamination or testing artifacts. *See* (ROA.2291). He instead uses a "3 sigma" method that compares "signal" to "noise" to exclude false positives. *See* (ROA.2271-2273). The reader can try to understand the method at pages 2271-2273 of the record. *See, especially* (ROA.2271, lines 15-16)("So it doesn't look to be a real peak there where the bupivacaine is, but is there one?").

## II.    Procedural History

## A. Pretrial

## 1.    Indictment

A grand jury indicted Dr. Ortiz for 10 felonies. *See* (ROA.54-63). The first 5 counts alleged violations of 18 U.S.C. §1365(a), which criminalizes tampering with

a consumer product with intent to cause serious bodily injury, or with reckless indifference. *See* (ROA.54-63). Count 1 alleged that he tampered with the bag used in TY's surgery (August 4, 2022). *See* (ROA.55-59). Count 2 alleged tampering with the bag used in JE's surgery (August 9, 2022). *See* (ROA.55-59). Count 3 alleged tampering with the bag used in KP's surgery (August 16, 2022). *See* (ROA.55-59). Count 4 alleged that Dr. Ortiz tampered with a bag on August 16, 2022, which bag doctors allegedly used in JA's August 24, 2022, surgery. *See* (ROA.55-59). Finally, Count 5 alleged that on August 23, 2022, Dr. Ortiz tampered with a bag that nobody ever used. *See* (ROA.55-59).

Counts 6-10 alleged the same conduct, but a different statute. *See* (ROA.55-58, 60-61). They alleged violations of 21 U.S.C. §331(k), which criminalizes the alteration of a drug while held for sale. (ROA.60). Count 6 corresponded to the conduct alleged in Count 1, Count 7 to the conduct alleged in Count 2, and so forth. *See* (ROA.59-60).

The indictment described the death of MK, but did not charge it as a count. Dr. Ortiz pleaded not guilty and exercised his right to trial by jury. *See* (ROA.59-60).

## 2.    Litigation about Federal Rules of Evidence 404 and 615

In a pretrial filing, the defense moved to exclude testimony about the death of MK. *See* (ROA.715-718). It argued that Federal Rules of Evidence 403 and 404(a)

barred this evidence, and that a reasonable jury could not find that Dr. Ortiz in fact caused MK's death. *See* (ROA.715-718). The government argued that MK's death was intrinsic to the charged offense. *See* (ROA.498-500). In a pretrial conference the district court denied the defense motion. *See* (ROA.1352). The court's charge would ultimately caution the jury that uncharged conduct could be used only to decide "[w]hether the Defendant had the state of mind or intent necessary to commit the crime charged in the indictment; [o]r [w]hether the Defendant had a motive or the opportunity to commit the acts charged in the indictment." (ROA.113).

At a pretrial hearing, the defense successfully moved to exempt its investigator, Edwin Lisboa, from "the Rule" requiring witness sequestration. *See* (ROA.1351). Just before the testimony began, the government asked the court to exempt two agents from the Rule. *See* (ROA.1433). The court said that both could observe the testimony without losing the right to testify, but only one at a time. *See* (ROA.1433). No party sought exemption for any other witness at that time. *See* (ROA.1433).

In fact, however, the prosecution's expert witness on anesthesia, Dr. Hail, watched the trial proceedings, apparently from the audience. *See* (ROA.2370). Her defense counterpart, Dr. Sweitzer did not observe the trial (or listen to it, or hear about it), because the defense was complying with the Rule. *See* (ROA.2370-2371). The defense objected to Dr. Hail's testimony on the ground that she had not been

exempted from the Rule; it said this put its own expert at a comparative disadvantage. *See* (ROA.2370-2371). The court granted an exemption for Dr. Hail "after the fact," (ROA.2370), and found that the defense suffered no prejudice from this exemption because it could have asked for an exemption of its own, *see* (ROA.2370-2371, 2382). When Dr. Sweitzer testified, the government exploited its comparative advantage, repeatedly challenging her conclusions on the ground that she hadn't seen the testimony and was accordingly uninformed. *See* (ROA.2640, 2657, 2670, 2676, 2691).

### 3.     The trial evidence

#### a.     Trial evidence regarding Dr. Ortiz and the IV warmer

Together, the government's video evidence showed that Dr. Ortiz put 5 bags in the warmer. On August 4, 9, and 19, 2022, Dr. Ortiz was the last person to place an IV bag into the warmer before an ill-fated surgery. *See* (ROA.1530-1555). It showed that he also placed bags in the warmer on August 16, 2022, and August 23, 2022. *See* (ROA.1530-1555). So together, the government showed 5 occasions on which Dr. Ortiz put IV bags into the warmer. Notably, however, the government's chemists would identify three bags as poisoned, one from JA's surgery (presumably) and two from the warmer. *See* (ROA.2281). This brought the total number of allegedly poisoned bags to 6, if indeed the surgeries of TY, JE, and KP all involved one poison bag. The government would later argue that the sixth poisoned bag entered

the warmer because Dr. Ortiz left it out and the anesthesia tech picked it up and put it into the warmer. *See* (ROA.2873-2875).

Government witnesses concurred that they could not know exactly which bags went into the warmer or came out. *See* (ROA.1498-1500, 1504, 1582-1583). Dr. Marsden testified that the bag he received at the end of KP's surgery was cold to the touch. *See* (ROA.2027). The government later argued that this meant it was the last one to go into the warmer and therefore the one that Dr. Ortiz had placed there. *See* (ROA.2824). But Dr. Marsden did not tell anyone the bag was cold at the time, didn't ask for another IV bag, and used the purportedly cold one. *See* (ROA.2027-2028). Dr. Marsden admitted that he didn't tell the Dallas Detective anything about a cold bag when she interviewed him, but he said that he called her back to impart this information a few days later. *See* (ROA.2069). The Detective, in turn, said that she thought that she remembered this call and that she relayed it to a federal agent. *See* (ROA.2500-2501). She did not otherwise memorialize the call from Dr. Marsden. *See* (ROA.2501). The government could produce no written report of either the call from Dr. Marsden to Detective Watson or from Detective Watson to the federal agent. And did not call as a witness the federal agent who supposedly received the call from the Detective.

The government made much of Dr. Ortiz's movements on August 23, 2022. It introduced evidence that Dr. Ortiz took multiple bags out of the warmer that morning, and that he then entered OR5. *See* (Govt's Exh. 60); (ROA.1553-1554). He then exited OR5 without the IV bags, but with syringes, which he filled with medicines in the pre-op area, sometimes moving into patient bays as he did so. *See* (Govt's Exh. 61). A colleague came by while he was in this process and gave him a fist bump. *See* (Govt's Exh. 61). The government's video showed that he then returned to OR5, *see* (Govt's Exh. 64), exited OR5 again, this time with a colleague, and returned to pre-op, *see* (Govt's Exh. 65), where gave some of the syringes to a nurse, *see* (Govt's Exh. 66). Then the video showed that he returned again to OR5 a final time. *See* (Govt's Exh. 67). Finally, he exited OR5 with one IV bag, which he placed in the warmer. *See* (Govt's Exh. 68). It thus invited the jury to conclude that he had poisoned the bag in the operating room with the syringes he loaded in the pre-op area. The prosecution did not show the jury, however, that Dr. Ortiz was never alone in OR5 after he entered with the loaded syringes; this had to wait for cross-examination. *See* (ROA.1613-1615); (Govt's Exh. 71).

Government witnesses said that doctors did not usually fill the IV warmer, remove bags from it, or check it. *See* (ROA.1437, 1510, 1793-1795, 2024-2025, 2827). But defense witnesses said that Dr. Ortiz frequently acted well outside his job description, making an effort to stay busy with his hands at all times at work because

he had difficulty remaining still. *See* (ROA.2531, 2532, 2534, 2759-2763). One co-worker who worked with Dr. Ortiz years earlier said that he had long placed unused IV bags back in the warmer. *See* (ROA.2531, 2532, 2534, 2759-2763). And the defense showed video of many occasions in which other hospital staff (and not the anesthesia tech) added bags to the IV warmer. *See* (ROA.1584-1589).

### b.    Government evidence regarding Dr. Ortiz's putatively suspicious conduct

To supplement its case, the government sought to show that Dr. Ortiz engaged in several forms of suspicious behavior. As noted, it showed that he loaded syringes in the pre-op area on August 23, 2022. *See* (ROA.1542, 2051). But the government's own witness (RN Burks, who was a highly placed hospital administrator) testified that this conduct did not necessarily arouse suspicion by itself. *See* (ROA.1543). The defense elicited similar testimony from its own witnesses, *see* (ROA.2540, 2761), and showed that a colleague who saw Dr. Ortiz filling the syringes reacted with no alarm, *see* (ROA.2065-2067, 2761-2762).

Video introduced by the government showed Dr. Ortiz looking around the hall when obtaining or depositing IV bags into the warmer. *See* (ROA.1532, 1540, 1553). It also showed him checking the warmer after putting IV bags into it. *See* (ROA.1533). But the defense showed videos in which other staff checked the warmer as well. *See* (ROA.1591-1593).

The government also introduced evidence that Dr. Ortiz obtained his own IV bags for his own surgeries during the period of the emergency transfers. *See* (ROA.1825-1827). Producing testimony that he did not usually obtain his own bags before 2022, *see* (ROA.1522, 1825-1827), it invited the jury to conclude that he wanted to make sure he used uncontaminated bags in his own cases. But RN Burks said that Dr. Ortiz had sometimes (though not usually) gotten his own bags before this period*, see* (ROA.1522, 1572), while a defense witness said Dr. Ortiz had often done so before coming to BSWSND, *see* (ROA.2531). And video showed other doctors getting their own bags too. *See* (ROA.1572, 1589-1591).

### c.    Putative motive evidence

Trying to show a motive, the government introduced evidence that Dr. Ortiz was the subject of ongoing disciplinary proceedings at the time of the emergency transfers, some conducted internally by the hospital itself. *See* (ROA.1438-1440, 1471-1475, 1522-1523, 1909-1911, 2112). It also produced a financial analyst to show that Dr. Ortiz depended on the facility for income, and that he was experiencing financial difficulties. *See* (ROA.2151-2566). No witness explained to the jury why poisoning bags in Dr. Ortiz's hospital would help his financial situation.

### d.    Evidence about the course of the four surgeries in the Indictment and about MK's death

The surgeons and anesthesiologists who performed the 4 surgeries referenced in the Indictment all testified in the government's case-in-chief. In general, they

agreed that nothing they did in the surgeries, nor any kind of pre-existing condition of their patients, could have accounted for the emergencies that occurred on their watch. *See* (ROA.1733-1734, 1908, 1937, 2782-2787).

That said, Dr. Kerner, who performed the surgeries of both TY and KP, *see* (ROA.1483, 2346), twice disagreed with this analysis, providing a different opinion about the most likely explanation for the events of TY's surgery. *See* (ROA.2345, 2359). In her opinion, medicine used in a tumescent bag most likely caused the emergency after a subcutaneous injection accidentally breached the vein. *See* (ROA.2345, 2359). After this testimony, the government approached the court and said that its agents believed this witness had experienced a medical condition affecting her mental state, causing her transfer to the ER by ambulance. *See* (ROA.2380, 2434-2435). The jury didn't hear about that, though.

The government's anesthesia expert reviewed the charged cases and opined that the symptoms displayed did not likely result from pre-existing conditions, surgical error, or the accidental infiltration of subcutaneous injections to the vein. *See* (ROA.2388, 2406, 2413, 2419, 2470). She did agree, however, that some medicines administered subcutaneously could potentially cause cardiac events if they reached the veins. *See* (ROA.2376). In her opinion the surgical emergencies most likely resulted from the intravenous injection of bupivacaine, lidocaine, epinephrine, and/or

ephedrine. *See* (ROA.2396, 2406, 2413-2414, 2419). Critically, this conclusion depended on a pattern of outcomes in all charged surgeries. *See* (ROA.2398-2399, 2420).

The defense expert on anesthesia identified plausible explanations for the emergencies other than the intravenous injection of anesthetics or stimulants: the infiltration of the veins by subcutaneously injected anesthesia, COVID, pre-existing conditions, and side effects of intentionally administered drugs. *See* (ROA.2611-2639). As noted above, however, the government battered this expert in cross-examination, pointing out that she had not listened to the trial testimony and suggesting that she therefore could not accurately apply her knowledge to the case. *See* (ROA.2640, 2657, 2676, 2691).

Each of the patients who underwent the surgeries referenced in the charged counts testified for the government, plus JA's mother. *See* (ROA.1481-1487, 1769-1780, 1851-1856, 1865-1867). The government also called MK's husband, who described her traumatic death in front of him and his failed efforts to call 911 and save her life. *See* (ROA.1709-1722).

### e.     Chemical testing evidence

Government witnesses testified about the chemical testing of the blood and IV bags. *See* (ROA.2206). A defense expert (Dr. Harris) challenged Professor

Verbek's interpretation of his results, insofar as he regarded them as a positive finding for bupivacaine and lidocaine in three IV bags. *See* (ROA.2709-2720). Dr. Harris testified that the testing results did not reliably demonstrate the presence of these chemicals, but instead reflected "consumables" burned off from the testing machinery. *See* (ROA.2709-2720). She explained how those items could produce false positives in Professor Verbek's method. *See* (ROA.2709-2720). Professor Verbek had made such misinterpretation possible, she contended, because he did not apply a cut-off threshold. *See* (ROA.2709-2720).

### 4.    The end of the trial

#### a.    Motion for judgment of acquittal

The defense moved for judgment of acquittal after the government's case and again after the close of evidence. *See* (ROA.2493-2494). It argued specifically that the government had failed to prove that the defendant poisoned the bags, which supplemented its general argument that the government failed to prove its case on all elements and counts. *See* (ROA.2493-2494). The district court denied the motion. *See* (ROA.2494).

#### b.    Closing

In closing, the government relied heavily on the timing and sequence of Dr. Ortiz's interactions with the warmer, and on the purportedly suspicious conduct outlined above. *See* (ROA.2822-2827).

The defense argued that the government had failed to establish a pattern that pointed to Dr. Ortiz or the IV bags as the cause of the emergencies. *See* (ROA.2845-2861). It also noted that video footage showed Dr. Ortiz placing 5 bags into the warmer, while its evidence suggested 6 tainted bags. *See* (ROA.2828-2839). From this, it contended that Dr. Ortiz's conduct could not account for all the tainted bags in the warmer, raising the inference that some other cause was at work. *See* (ROA.2828-2839).

Further, the defense pointed out that Dr. Ortiz would not likely inject a bag with poison in close quarters with another health professional, as the government suggested in regard to Counts 5 and 10. *See* (ROA.2835). And it pointed to anomalies in the chemical evidence: the concentration of ephedrine in KP's blood was radically different from the concentration of ephedrine in JA's blood, and NMS's test of JA's blood did not show the same chemicals as Professor Verbek's test of his IV bag. *See* (ROA.2862).

The government responded this way to the defense argument about the mismatched blood and bag testing:

> The next Defense argument, [JA]'s blood did not test positive for bupivacaine. Well, [JA]'s blood did test positive for ephedrine, which is a common anesthesia drug, but was not given to him during these procedures. [KP]'s blood did test positive for bupivacaine despite not having received any bupivacaine for about 36 hours. **And, you know, only one person in this room knows what was actually used to adulterate those bags**. The dose JA received was likely very small.

(ROA.2875)(emphasis added).

In rebuttal closing, the government also answered the defense argument about the number of poisoned bags (6) in comparison to the number of bags placed in the warmer (5). It played video of Dr. Ortiz taking an IV bag into OR 5 on a Friday, followed by the anesthesia tech taking a bag from OR5 into the warmer the following Monday. *See* (ROA.2873-2874). It theorized that this must be the same bag, having remained in OR5 all day Friday and through the weekend. *See* (ROA.2873-2874).

### c.    Verdict and sentence

The jury convicted on all counts the second day of deliberation. *See* (ROA.1124-1125). The district court imposed the statutory maximum term of imprisonment for each count, all run consecutively, for a total of 2,280 months (190 years) imprisonment. *See* (ROA.1152).

## Summary of Argument

## A. Sufficiency claims

**1.**    The evidence is insufficient on all counts. The government's highly circumstantial case does not provide reasonable assurance that Dr. Ortiz poisoned any of the IV bags. Three times, he took IV bags out of the warmer and returned them just before a surgery mentioned in the Indictment. But there is no way to show that the bags he put into the warmer – which could hold 32 or 34 bags at any time, stacked in three rows -- were the same bags that came out.

Two facts make it unlikely that he actually poisoned any of the bags. First, at the time that the government suggested that Dr. Ortiz poisoned the bag named in Counts 5 and 10 of the indictment, he was in fact in the company of another medical professional, sometimes more than one. This makes it very unlikely that he poisoned that bag. And if he did not poison that bag, then at least one bag contained poison without him poisoning it, a fact that unravels the government's case that he poisoned any of the bags at all. There is, after all, no suggestion that he had an accomplice.

Second, the government introduced evidence that Dr. Ortiz put five IV bags in the warmer. But it introduced evidence that six bags contained poison. Again, if a bag contained poison that he did not place in the bag, the government's case unravels on every count.

None of the remaining evidence provides reasonable assurance that Dr. Ortiz poisoned the bags, even assuming that they were all poisoned.

**2.**    The government introduced insufficient evidence to show that the bag involved in Counts 1 and 6 – TY's August 4, 2022, surgery -- contained poison. Neither the bags nor TY's blood were ever tested chemically, so the case that her IV bag contained poison depends entirely on her symptoms. Those symptoms could have resulted from an accidental breach of the veins during a subcutaneous injection, or by the accidental use of a tumescent bag intravenously. Indeed, the surgeon who

performed the operation said that an accidental breach of the vein represented the most likely explanation for TY's symptoms.

**3.**     The government introduced insufficient evidence that the bag in Counts 2 and 7 – JE's August 9, 2022, surgery – contained poison. Neither JE's blood nor any bag used in his surgery was ever tested. His many pre-existing conditions could have contributed to a risk of his hypertensive/cardiac emergency. Most significantly, the written records show that his blood pressure rose before he received the second IV bag and that it fell before doctors removed the second bag. The government's theory puts the effect before the putative cause; if the medical records are accurate, JE's second IV bag did not cause his emergency.

**4.**     Counts 3 and 8 alleged that Dr. Ortiz tampered with an IV bag on August 16, 2022, and that doctors must have used that very bag in JA's August 24, 2022, surgery. Eight days intervened between the time Dr. Ortiz put an IV bag in the warmer and the emergency that occurred on August 24, 2022, and there is no evidence about how many bags came and went in the meantime. This magnifies several-fold the basic problem with the government's circumstantial case: it cannot prove that doctors actually used the bag Dr. Ortiz placed in the warmer in a surgery that went wrong.

**5.**     The government introduced insufficient evidence that the IV bag referenced in Counts 4 and 9 – used in KP's August 19, 2022, surgery – contained poison. The government never tested the IV bags used in KP's surgery. And KP's blood test found

a concentration of ephedrine consistent with her prior charted dose of that drugs. Further, her blood pressure rose an hour after she received her second IV bag, not immediately as in JA and JE's cases. The government never explained that massive problem in the clinical timeline.

6.      The government introduced insufficient evidence that Dr. Ortiz poisoned the bag referenced in Counts 5 and 10. Counts 5 and 10 alleged that Dr. Ortiz poisoned a bag on August 23, 2022, and that the bag was never used in surgery. As noted above, he was in close proximity to another medical professional at the time the government believes he poisoned the bag. This isn't likely.

## B. Procedural claims

1.      The district court abused its discretion when it admitted evidence of MK's death. That dramatic and emotionally powerful evidence created an unacceptable risk that the jury would convict Dr. Ortiz as punishment for an uncharged allegation. Even assuming that the bag came from BSWSND, the prosecution did not introduce sufficient evidence that Dr. Ortiz caused this death; no evidence, after all, linked him to MK's bag. The prosecution did not need the evidence to show a pattern of emergencies following the use of IV bags – it had *14 other such cases* at its disposal, including 4 in the indictment. Its unique value to the government was not evidentiary but emotional: in that case alone, someone died, horribly, and in the presence of a grieving loved one.

**2.**    Federal Rule of Evidence 615 requires that the court sequester witnesses, save certain exceptions. Yet the district court permitted Dr. Hail to testify after seeing the trial proceedings. The Rule does not authorize the district court to exempt witnesses "after the fact" and its decision to do so placed the defense's witness at a critical disadvantage. Worst of all, the government repeatedly exploited its decision to flout the Rule to discredit the most important defense expert. During cross-examination, it suggested over and again that the defense expert did not have informed conclusions because she had not witnessed the testimony in the case.

**3.**    The government argued in closing that "only one person in this room knows what was actually used to adulterate those bags." Nearly identical language has been condemned by this Court as a comment on the right to silence. *See Madden v. Collins*, 18 F.3d 304, 309 (5th Cir. 1994), *abrogated on other grounds recognized by Smith v. Quarterman*, 515 F.3d 392, 408 (5th Cir. 2008). Given the precision of this precedent, the error was clear and obvious. Further, in a close case like the one at bar, there is a reasonable probability that a comment on silence would affect the outcome. The error trenched on a fundamental constitutional right and should be remedied.

## ARGUMENT AND AUTHORITIES

### I.  The evidence is insufficient on all counts.

To prove guilt, the government's case on every count depends on a pattern seemingly too strong to be coincidence. As such doubt that any individual count fits that pattern undermines the sufficiency of the evidence on every count. The link between Dr. Ortiz's conduct and the charged events, and even whether criminal conduct occurred on each of these occasions, is speculative in some cases, contrary to the actual evidence in others.

### A.    Standard of Review

"When a defendant moves for acquittal in the district court, challenging the sufficiency of the evidence, this Court reviews the district court's denial de novo." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018)(quoting *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016)). Although this standard is "highly deferential," *Ganji*, 800 F.3d at 767, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980).

The defense preserved the insufficiency of the evidence in both general and specific terms. It first argued simply that the evidence failed to establish guilt. *See* (ROA.2493). This preserves all claims of insufficiency, absent waiver. *See Huff v.*

*United States*, 273 F.2d 56, 60 (5th Cir. 1959). The defense then argued more specifically that the government failed to prove that the defendant poisoned the bags. *See* (ROA.2493). To eliminate confusion, it made clear that the specific claims were not intended to waive the general. *See* (ROA.2493). The defense also renewed this motion at the close of the evidence. *See* (ROA.2789). It preserved error.

## B.    Discussion

Due Process requires this Court to reverse convictions premised on evidence insufficient to convince a reasonable jury of the defendant's guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315-216 (1979). Conducting this review, "[a] verdict is affirmed unless, viewing the evidence and reasonable inferences in light most favorable to the verdict, no rational jury 'could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.'" *Ganji*, 880 F.3d at 767 (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016)). "[I]n viewing the evidence in the light most favorable to the prosecution, [this Court will] 'consider the countervailing evidence as well as the evidence that supports the verdict in assessing sufficiency of the evidence.'" *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011)(quoting *United States v. Brown*, 186 F.3d 661, 664 (5th Cir.1999))(further internal quotation marks omitted by *Moreland*).

Evidence is insufficient if it supports an inference of guilt only when the reviewing court begins with an assumption of guilt. Thus, the evidence must establish

guilt; it is not enough that it be consistent with guilt. *See United States v. Brown*, 459 F.3d 509, 525 (5th Cir. 2006)("…if we begin with the assumption that [defendant] is guilty, the [evidence] can be read to support that assumption. But if we begin with the proper presumption that [defendant] is not guilty until proven guilty beyond a reasonable doubt, we must conclude that the evidence is insufficient to prove (guilt) beyond a reasonable doubt …"). Relatedly, "'a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.'" *Ganji*, 800 F.3d at 767 (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996)); *accord United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir.2006); *United States v. McDowell*, 498 F.3d 308, 314 (5th Cir. 2007); *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir.1993).

Under these standards, this Court should reverse all counts of conviction for two reasons. First, and primarily, if the evidence shows that all 5 IV bags in the indictment had been tainted, no rational jury could think it proven beyond a reasonable doubt that Dr. Ortiz did the poisoning. The government relied primarily on a coincidence to identify the defendant as the guilty party. Namely, it noted that he added IV bags to the warmer before 4 surgeries that resulted in an ER transfer. *See* (ROA.2822-2827). On 2 occasions, he was the last person to add a bag before the surgery; on another occasion, he added a bag 8 days earlier. *See* (ROA.1530-1552, 1678). But this coincidence carries limited probative value. There is no reliable way

to know which of the many bags in the warmer anyone took out on any given occasion. *See* (ROA.1498-1500, 1504, 1582-1583, 1811-1812). There is, moreover, no reason to think that the provider took out the last one added. And the remaining evidence makes it less likely, not more, that the defendant poisoned the bags, if indeed they all contained poison.

Second, as shown below, there are good reasons to doubt that any of the bags referenced in Counts 1, 2, 4, 5, 7, and 8 (corresponding to the surgeries of TY, JE, and KP) contained any poison at all. Those 2 cases, notably, were the only ones in which Dr. Ortiz was the last person to place a bag in the warmer before the surgery. And every bag subtracted from the total number of poisoned bags makes the central coincidence of the case – that Dr. Ortiz placed the bag in the warmer shortly before the surgery -- significantly less probative. *Cf.* (ROA.2398-2399)(diagnosis of intravenous poisoning flows from commonalities in all cases). The government's case ***on every count***, in other words, depends on a pattern, and doubt that any individual case belongs to the pattern tends to destroy the case ***on every count***.

1.   **If the government introduced sufficient evidence that all 5 bags referenced in the indictment had been poisoned, it introduced insufficient evidence that Dr. Ortiz poisoned them.**

     a.   **The coincidence at the center of the case is not proof beyond a reasonable doubt.**

The soul of the government's case is the improbability of a certain coincidence, set forth by government's counsel at closing argument. On the mornings of

August 4th, 9th, and 19th, 2022, Dr. Ortiz took at least one IV bag out of the hospital's bag warmer, and then put a bag back into the warmer later that morning. *See* (ROA.1531-1532, 1537, 1548). Later on each of these mornings, hospital staff took a bag out of the warmer and into surgery rooms. *See* (ROA.1534, 1539-1540, 1550). In each of these cases, the surgeries ended in a transfer to an ER due to the patient's elevated blood pressure and heart rate. *See* (ROA.1535, 1540, 1551). Also in each of these cases, Dr. Ortiz was the last person to put a bag in the warmer. *See* (ROA.1538, 1550).

In one additional case (JA) Dr. Ortiz placed a bag in the warmer 8 days before an ill-fated surgery. *See* (ROA.1542, 1543-1544, 1555-1556). The government introduced evidence that two employees rearranged the bags in the warmer between the time Dr. Otiz put a bag into the warmer and the time of the surgery. *See* (ROA.1544-1546). Finally, the government introduced evidence that two unused bags, presumably from the warmer, tested positive for potentially toxic medications. *See* (ROA.2281-2282).

This proves very little. The warmer is essentially a black box, and bags going in cannot be linked to bags going out. RN Burkes testified as much in terms:

> Q. Okay. Now, because you guys don't track these in any way, there's no way to know which specific bag goes in and which specific bag comes out, correct?
> A. Correct.
> Q. Okay. So just because one bag goes in doesn't mean it's the same bag that comes out next.

A. True.

(ROA.1582-1583). As the anesthesia tech testified, the bags look alike, and if they bear distinguishing features, those features do not appear on the video, and are not logged. *See* (ROA.1811-1812).

The warmer holds 32 or 34 bags at a time. *See* (ROA.1792). There is no good reason to think that a provider grabbing a bag for surgery always chooses the last one in. We might imagine that the provider most likely takes one from the top row, but there are multiple (3) stacks of bags in the warmer. *See* (ROA.1807). The chance that providers would take the bag Dr. Ortiz put into the warmer 3 times in a row is *at best* 1/27 (1/3 x 1/3 x 1/3). Less though: we have no real reason to think that a person poisoning IV bags would rather the poisoning occur quickly rather than later, and thus no reason to think such a person would place the bag on the top of the stack rather than the middle or the bottom. We could hypothesize a motive for choosing a quick rather than a time-release attack, but the profoundly irrational nature of the conduct makes it difficult to have any confidence in our conclusions.

In short, the inference that Dr. Ortiz placed the poison bags into the warmer depends on assumptions about human behavior when confronted with essentially arbitrary choices (which of 34 identical bags to take from a warmer?) or when accomplishing an irrational goal (how best to poison complete strangers?). Without these assumptions, the statistical likelihood that any given bag in the warmer came

from Dr. Ortiz is tiny. Perhaps everyone taking bags from a warmer takes them from the top right, or the highest stack, or the top left; perhaps people leaving poison for complete strangers want the poisonings to occur right away to avoid accidentally using a poisoned bag; perhaps they want them to occur far in time to attenuate the link to themselves or savor the anticipation. It is possible to have opinions about these questions, but there is a name for them: "suspicion, speculation, [and] conjecture…'" *Ganji*, 800 F.3d at 767.

> **b.    Several factors related to the placement of the IV bags tend to dispel an inference of guilt.**

There are also three facts that considerably weaken any inference of guilt. First, Dr. Ortiz was in the close company of at least one medical professional on an occasion when the government theorized him to be poisoning an IV bag. On August 23, 2023, he took multiple IV bags into OR 5, which has no video camera inside it. *See* (Govt's Exh. 60). He walked out of OR5 with syringes, loaded the syringes in the pre-operative area, then came back to OR5 still holding some of the syringes in his pocket. *See* (Govt's Exh. 61, 64). Then he exited OR5 with an IV bag, and placed the bag in the warmer. *See* (ROA.1553); (Govt's Exh. 68). Clearly, the government invited the jury to infer that he had poisoned the bag in OR5 with the loaded syringes. Remarkably, however, it did not show the jury (though the jury later learned in cross-examination) that Dr. Ortiz never occupied the room alone after re-entering it with the loaded syringes. *See* (ROA.1613-1616, 2056-2065); (Govt's Exh. 71).

This course of events profoundly weakens the government's case. As discussed above, it is not easy to imagine the thought process of a person (real or hypothetical) who chooses to poison IV bags. But we may reliably assume that someone attempting this goal would not poison the bag in full view of another medical professional, let alone a crowd of them. Such conduct would be seen as profoundly bizarre and prevent the poisoner from accomplishing the goal. And if Dr. Ortiz did not place a poisoned bag into the warmer on August 23, 2022, the government cannot show that he placed enough bags into the warmer to account for all 6 ostensibly poisoned bags. This requires it to imagine an accomplice, or some other indirect mechanism to get the bags into the warmer. It proved nothing of the kind.

Second, the government's video showed Dr. Ortiz placing 5 IV bags into the warmer in August 2022. *See* (ROA.1530-1554, 1678). The government identified 4 surgeries that resulted in transfers (all of which are charged) during the period when these bags were available for use. But it also presented evidence that 2 additional bags contained poison. *See* (ROA.2281). If Dr. Ortiz placed only 5 bags into the warmer, the sixth bag must have contained poison from some other source. *See* (ROA.2281).  One person maliciously injecting IV bags with local anesthesia is bizarre; two beggars belief.

The government – which did not note the issue before the jury until rebuttal closing – argued that Dr. Ortiz could have poisoned a bag in OR5 on August 19,

2022, which bag could have then been placed in the warmer by the anesthesia tech on the following Monday. *See* (ROA.2873-2874). It showed a video of the anesthesia tech placing a bag in the warmer that Monday. *See* (ROA.2873-2874). This conjectural explanation, however, assumes that the purportedly tainted IV bag would have simply laid undisturbed throughout the remainder of the Friday workday, that nobody who encountered it would have placed it back in the warmer before then, and that no other IV bags entered OR5 throughout the course of an entire hospital workday. There is no evidence of any of this, and no reason to think it true. It is simply conjecture.

### c.    The government's remaining evidence does not fill the gap.

The government will no doubt object that its case does not depend solely on the coincidence identified above, and point to purportedly suspicious behavior. But this evidence cannot drag the case over the finish line.

#### i.    *The fact that the defendant placed bags in or removed bags from the warmer is not suspicious.*

The government noted that the job description of anesthesiologists at BSWSND does not require them to deal with the IV warmer at all. *See* (ROA.1510, 2024-2025, 2827). It also introduced evidence that Dr. Ortiz's con-workers never saw him clean up or help out getting ready for surgery. *See* (ROA.2024-2025, 2827, 2775-2778).

The defense countered with former co-workers who said Dr. Ortiz did precisely this sort of thing; they said he was the sort of fidgety person who couldn't remain still at work. *See* (ROA.2531, 2532, 2534, 2759-2763). Indeed, a former co-worker said that he often took unused bags from operations and put them away, a practice dating back years for him. *See* (ROA.2532, 2534, 2535).

More importantly, the defense introduced video evidence of other hospital workers adding bags to the warmer, even though it wasn't in their job descriptions either. *See* (ROA.1584-1588). Additional video evidence showed that nobody reacted with much surprise or alarm when Dr. Ortiz loaded the warmer. *See* (ROA.1810)(anesthesia tech pats defendant on back after seeing him load the warmer). And that lack of reaction diminishes the probative value of the government's testimony that Dr. Ortiz never loaded the warmer before the events of the case. The witnesses may well not have recalled him absently placing bags in a warmer, or taking them out. But this is entirely mundane conduct unlikely to make much of an impression even if witnessed.

### ii.    The fact that Dr. Ortiz got his own bags and had them on hand at the outset of surgeries does not arouse reasonable suspicion.

The government also showed that Dr. Ortiz got his own bags during the summer of 2022, and that he would sometimes have more than one on hand in the operating room. *See* (ROA.1825-1827). But this isn't terribly strange: if he anticipated a

long surgery he might have preferred to have a bag nearby ahead of time. *See* (ROA.1841). This doesn't really show anything but preparation. Indeed, the defense showed that other doctors, including another anesthesiologist, also obtained their own bags. *See* (ROA.1572, 1589-1591). RN Burkes also agreed that it wasn't uncommon for anesthesiologists to grab their own bags, *see* (ROA.1702), and that while Dr. Ortiz didn't "typically" do so, he might have done so sometimes. *See* (ROA.1572)("Q. Okay. But when you say typically, it leaves space for like maybe he did sometimes? A. Yes."). Finally, a defense witness said the defendant did sometimes get his own bags when she worked with him at a different facility. *See* (ROA.2531).

### iii.    *Video of Dr. Ortiz filling syringes does not reasonably show his guilt.*

The government and its witnesses made much of video showing Dr. Ortiz drawing medicine with syringes in the hospital's pre-op area. *See* (ROA.2051). But another anesthesiologist saw him doing this and chatted with him; he didn't react with alarm or surprise. *See* (ROA.2056-2065); (Govt's Exh.61, @2:19). Indeed, Dr. Ortiz returned later to the pre-op and handed one of the syringes to a nurse, suggesting a plausible medical purpose. *See* (ROA.2067). RN Burks, a government witness and an experienced nurse who practiced in the setting, said that the behavior was not especially strange:

Q. Would you find it unusual for Dr. Ortiz to draw up medication in the preop area?

A. No.

Q. Would you find it unusual for him to draw up medication there, but not use it on a patient in the preop area?

A. Yes. I mean, yes and no. I mean, typically you would use -- Versed is what they usually give in the preop area. He could have had some of his other medications, but --

Q. Not highly unusual by itself, though.

A. No.

(ROA.1543).

Finally, this conduct preceded Dr. Ortiz's entry into an operating room populated by other medical professionals. *See* (ROA.1613-1616, 2056-265); (Govt's Exh. 71). If this conduct arouses suspicion, it is only because he might have used the syringes to poison the IV bags. But it is very unlikely that he injected poison into an IV bag while accompanied by another medical professional.

### iv.    *Ostensibly furtive conduct proves very little.*

In some videos, Dr. Ortiz looks around the hall near the warmer or looks into the warmer. *See* (ROA.1532, 1540, 1553). The defense showed other people checking the warmer, *see* (ROA.1591-1593), and elicited testimony that this was the only way to determine whether it was running low on IV bags, *see* (ROA.1581). The most that can be said about this conduct is that it is furtive. "[W]hether an individual looked nervous or made furtive gestures," may be a "[f]actor[] germane to a reasonable suspicion analysis," *United States v. Ledet*, 385 F. App'x 392, 394 (5th Cir.

2010)(unpublished), but the reasonable doubt standard demands something considerably more conclusive.

### v.    Testimony that one of the bags felt cold to the touch is less probative than the fact that the doctor used the bag.

Dr. Marsden testified that during KP's surgery he received an IV bag from the warmer that felt cold to the touch. *See* (ROA.2027). The government argued that the temperature of the bag proved it had not spent very long in the warmer. *See* (ROA.2870-2871). Dr. Ortiz added a bag to the warmer a few minutes before the anesthesia tech retrieved a bag for use in this surgery. *See* (ROA.2029-2030).

Dr. Marsden did not mention this recollection in his recorded interview with Detective Watson; he testified that he called her back to mention it a few days later, but Detective Watson did not write anything down about that call. *See* (ROA.2069, 2500-2501). She said that she relayed the information to federal agents, but the government introduced no other evidence that this call actually took place. *See* (ROA.2500-2501). The government did not call the agent to testify about this call.

Even putting all of this aside, the testimony is not very probative. If the bag was cold, it was not so cold as to deter Dr. Marsden's from using, even though doing so could cause the patient chills and discomfort. *See* (ROA.2027). Nor was the bag so cold as to deter the anesthesia tech from offering it Dr. Marsden. *See* (ROA.2027). Nor was it so cold that anyone commented on it at the time. *See* (ROA.2027). If

anything, the testimony tends objectively ***to defeat*** the probability that the bag was added a few minutes earlier. When all is said and done, the doctor and the anesthesia tech chose to use the bag.

### vi.  The government's motive evidence is conjectural and incoherent.

Finally, the government introduced what it billed as evidence of motive. It showed that the State Medical Board and the Hospital had recently subjected Dr. Ortiz to disciplinary proceedings. *See* (ROA.1438-1440, 1471-1475, 1522-1523, 1909-1911, 2112). It guessed then that he must have committed the offense in revenge. None of this comes from the defendant's mouth; the jury had no evidence that the defendant ever expressed a desire for revenge. Rather, the motive was simply hypothesized by the government.

The government's other proffered motive – the potential loss of income if Dr. Ortiz lost his ability to work at the hospital – makes even less sense, and if anything points toward innocence. The government introduced evidence that Dr. Ortiz would suffer financial loss if he lost employment privileges at BSWSND. *See* (ROA.2151-2566). But poisoning IV bags had no tendency to protect his employment there. More significantly, the defendant also received money when his partners practiced at BSWSND. *See* (ROA.2189). He would have lost quite a lot of money if the hospital shut down, the most predictable consequence of a string of unexplained ER transfers. *See* (ROA.2189).

**2.    If the Court agrees that some bags may not have been poisoned at all, the central coincidence of the government's case has less probative value.**

As will be argued below, some bags referenced in the Indictment may not have been poisoned at all. If the Court agrees, this significantly affects the government's case as to all counts. There is very good reason to doubt, for example, that JE's August 9, 2022, surgery ended in a transfer due to a poisoned bag. If this is so, this means that there are at most two cases in which Dr. Ortiz was the last person to place an IV bag in the warmer before an ill-fated surgery, a coincidence of very limited probative value. If the Court agrees that JE's surgery may not have involved a tainted bag, this also means that Dr. Ortiz put an IV bag in the warmer without malicious intent on at least one occasion, dispelling the suspicion the government attaches to the act generally. And if the Court agrees that two or three of the bags might not be poisoned, there is grave reason to doubt the whole case. *Cf.* (ROA.2398-2399).

## II. The government introduced insufficient evidence to support Counts 1 and 6 because it failed to show the IV bag used in TY's August 4, 2022, surgery had been intentionally poisoned.

### A.    Standard of Review

The defense preserved de novo review by general motion for judgment of acquittal. *See* (ROA.2493); *Huff*, 273 F.2d at 60.

**B.    Discussion**

Again, a verdict may not rest on suspicion, conjecture, or an attenuated piling of inferences. *See Ganji*, 800 F.3d at 767. Here, the government's evidence does not show that anyone poisoned the IV bag used in TY's August 4, 2022, surgery.

The government introduced no scientific testing to establish that TY had any foreign chemicals in her blood. Nor did it introduce any testing of the IV bags from this surgery, which were not preserved. Because nobody recovered the wrappers, moreover, there is no evidence of a hole. Accordingly, the government can point only to symptomatic commonalities with other surgeries that resulted in ER transfers to show that bags were tainted. This leaves at least two innocent explanations: that the surgeon accidentally permitted local anesthesia to enter the bloodstream when applying it subcutaneously, *see* (ROA.1914, 2566)(explaining this phenomenon), or that a surgeon accidentally used a tumescent bag in place of one containing pure saline solution, *see* (ROA.1577, 1594-1595)(showing that staff placed tumescent bags in the warmer, though they were marked and would lack a wrapper).

The surgeon from TY's operation, called by the government, in fact testified that the anesthetics in the tumescent bag were the most likely cause of the emergency:

> Q. All right. All right. Let me back up here a little bit. Any of the surgical procedures that you did on Ms. Young that day, did they contribute to those blood pressure issues?

A. They could have, because we were putting in the tumescent and that has lidocaine and epinephrine in it.
Q. Okay. Okay. Do you believe that's what happened?
A. That would be the most likely cause, yes.
Q. Okay. But do you believe that the tumescent used actually caused the blood pressure?
MS. MORGAN: Objection, asked and answered.
THE COURT: Sustained.

(ROA.2345). Specifically, she thought that the tumescent fluid might have accidentally entered the vein, causing the crisis:

Q. Okay. All right. Now, when you were talking about Ms. Young's surgery, you said that the tumescent would have been the most likely cause of a high blood pressure incident in that sort of surgery, correct?
A. It would make the most sense if it were inadvertently – if too much was absorbed into the vein or it was inadvertently injected.

(ROA.2359)

The government later informed the court that the witness appeared confused and that she left the courtroom in an ambulance. *See* (ROA.2380, 2434-2435). The jury didn't hear any evidence about the witness's medical condition, and the sophisticated hypothesis related in the passages above certainly doesn't sound like the product of a confused mental state. In any case, it remains enormously probative that the surgeon, against her own reputational interests, testified that this kind of medical accident represented the most likely cause for TY's symptoms. It demonstrates at a minimum that such accidents are a real phenomenon, and cannot be excluded by the symptoms alone.

**III.    The government introduced insufficient evidence to support Counts 2 and 7 because it failed to show that the bags used in JE's August 9, 2022, surgery had been poisoned.**

**A.    Standard of Review**

The defense preserved de novo review by general motion for judgment of acquittal. *See* (ROA.2493); *Huff*, 273 F.2d at 60.

**B.    Discussion**

The standards for insufficiency claims appear above. They compel the reversal (and entry of a judgment of acquittal) on Counts 2 and 7 because the government's evidence does not show that anyone poisoned the IV bag used in JE's August 9, 2022, surgery.

As with the August 4, 2022, surgery, the government introduced no scientific testing of either the bags used in JE's surgery or of his blood. And because nobody recovered the wrapper of the IV bag, there is no evidence it contained needle marks. Again, the government can rely only on the symptoms displayed and the course of the surgery.

The government's case that someone intentionally poisoned the IV bag in this surgery thus suffers the same flaws that plague Count 1 and 6: it excludes neither accidental infiltration of the bloodstream by local anesthesia nor the accidental intravenous use of an unmarked tumescent bag. Counts 2 and 7, moreover, encounter

an additional problem: the medical records rather sharply contradict the government's theory about why JE experienced an elevated heartrate and blood pressure.

JE was a senior citizen receiving treatment for a broken wrist. *See* (ROA.2109). The written medical records show that his heartrate and blood pressure came ***down*** while he continued to receive fluid from that bag. The doctor who performed the surgery, a government witness, twice acknowledged as much:

> Q. Okay. So that second IV bag is still hooked up to Mr. Eller
> and his blood pressure had come back down into a safer range.
> A. Yes, ma'am.

(ROA.2127); *see also* (ROA.2148, 2451). That flatly contradicts the hypothesis that the bag produced an elevated heartrate and blood pressure – if that were the case, it would continue to do so until emptied or disconnected.

Further, the written records show that JE's blood pressure began to spike ***before*** he received his second IV bag. *See* (ROA.2443, 2621, 2623). He received the first IV bag in the pre-operative room, not from the IV warmer. *See* (ROA.2115). This all but excludes the hypothesis that an IV bag from the warmer caused the spike. *See* (ROA.2623).

Finally, JE's records reveal ample alternative causes for an elevated heartrate and blood pressure. He had coronary heart disease. *See* (ROA.2447). He also suffered from atrial fibrillation, managed by a heart implant. *See* (ROA.2103-2105, 2446-2449). And he tested positive for COVID after the surgery. *See* (ROA.2149).

Record testimony showed that these conditions could cause a spike in blood pressure and heartrate. *See* (ROA.2150)(elderliness, coronary artery disease, heart conditions); (ROA.2579)(COVID). COVID can even cause pulmonary edema. *See* (ROA.2579).

If the Court does not find Counts 2 and 7 proven, this leaves at most 2 cases in which Dr. Ortiz was the last person to add a bag to the warmer before a relevant surgery. That is not a probative coincidence. And if the Court agrees that neither Counts 1 and 6, nor Counts 2 and 7 have been proven, this leaves a single case in which Dr. Ortiz was the last person to add a bag to the warmer before a problematic surgery. This gravely undercuts the government's proof on every count.

## IV. The government introduced insufficient evidence to support Counts 3 and 8 because it failed to show that the bags used in JA's August 24, 2022, surgery had been poisoned, and it failed to show that Dr. Ortiz tampered with the bag he placed in the warmer on August 16, 2022.

### A.    Standard of Review

The defense preserved de novo review of Counts 3 and 8 by general motion for judgment of acquittal. *See* (ROA.2493); *Huff*, 273 F.2d at 60.

### B.    Discussion

The government offered the jury the following theory in support of Counts 3 and 8: that Dr. Ortiz poisoned a bag on August 16, 2022, that he placed the bag in the warmer the same day, and that hospital staff used the bag some 8 days later in

JA's surgery. *See* (ROA.2826). It drew this conclusion because the anesthesia tech appeared to rearrange the bags in the warmer between the day that Dr. Ortiz placed a bag in the warmer and the day of JA's surgery. *See* (ROA.1678).

The government's case that surgeons used the August 16, 2022, bag in JA's August 24, 2022, surgery is extremely speculative. Eight days intervened, attenuating any relationship between the defendant's conduct and the events of the surgery. Yes, an anesthesia tech rotated bags between August 16, 2022, and August 24, 2022. *See* (ROA.2826). But this only means that the bag lay somewhere in the stack of 32 or 34 bags, that it was potentially ***available*** on August 24, 2022. It does not necessarily mean that it came to the top of the stack by that time, or that it wasn't used before that date.

Notably, the government's most persuasive evidence of poisoning – JA's blood test, *see* (ROA.2207), and the blood test of the doctor who died some three months before the events of the indictment, *see* (ROA.2207) – corresponds to surgeries in which it cannot prove that Dr. Ortiz was the last person to place the bag in the warmer.

## V. The government introduced insufficient evidence to support Counts 4 and 9 because it failed to show that anyone poisoned the bags used in KP's August 19, 2022, surgery.

### A.    Standard of Review

The defense preserved de novo review of Counts 4 and 9 by general motion for judgment of acquittal. *See* (ROA.2493); *Huff*, 273 F.2d at 60.

## B.    Discussion

Counts 4 and 9 relate to KP's August 19, 2022, surgery. Dr. Ortiz was concededly the last person to place a bag in the warmer before this surgery. However, the government did not recover the bag or wrapper. It thus can prove with physical evidence neither that the bag contained poison nor that the wrapper bore a needle mark. Qualitative testing at SWIFS found bupivacaine and lidocaine in KP's blood, but confirmatory quantitative testing performed by NMS came up negative for these compounds. *See* (ROA.2201, 2206-2207). NMS's testing showed 32 nanograms of ephedrine per milliliter of blood, *see* (ROA.2206-2207), but the government's chemist thought this potentially consistent with the clinical doses of ephedrine administered by Doctor Kerner, *see* (ROA.2224). By contrast, JA's blood showed  more than *ten times* that much ephedrine. *See* (ROA.2207). The chemical evidence, in other words, does not reliably show a tainted bag.

Further, KP displayed an elevated heartrate and blood pressure about *an hour* after she received her second IV. *See* (ROA.2461). The government's expert witness admitted that epinephrine – which she thought was in the IV bag – works much faster than that. *See* (ROA.2461). But she contended that the delay could be explained by the slow absorption of the medicine through the IV bag. *See* (ROA.2461). The expert

did not, however, satisfactorily explain why KP would take an hour to develop symptoms after the placement of the bag while other patients (like JA) receiving drugs in the same way reacted to it nearly immediately. As with JE, the timeline defeats the government's theory.

The government did not prove that KP received a toxic dose of anything from an IV bag. The deficiencies associated with this count weaken the government's claim of a pattern and therefore weaken its case on every count.

## VI.     The government introduced insufficient evidence to support Counts 5 and 10, involving a bag placed in the warmer August 23, 2022, unassociated with any surgery.

### A.     Standard of Review

The defense preserved de novo review of Counts 5 and 10 by general motion for judgment of acquittal. *See* (ROA.2493); *Huff*, 273 F.2d at 60.

### B.     Discussion

The government's case on Counts 5 and 10 relies on the claim that Dr. Ortiz injected poison into an IV bag in the close company of another medical professional. This is not a reasonable inference to draw from the evidence, so these Counts should be reversed.

The government introduced video evidence that Dr. Ortiz took multiple IV bags from the warmer on the morning of August 23, 2022, and then entered OR5. *See* (Govt's Exh. 60). It showed that he then exited OR5, went into a pre-op area,

and loaded medicines into syringes . *See* (Govt's Exh. 61). He then re-entered OR5 with some of the syringes. *See* (Govt's Exh. 64). Finally, he exited OR5 again and put one IV bag in the warmer. *See* (Govt's Exh. 68). Two full bags, presumably from the warmer, later tested positive for bupivacaine and lidocaine according to the standards of Professor Verbek. *See* (ROA.2281).

The government obviously wanted the jury to infer from this that Dr. Ortiz loaded the syringes with bupivacaine and lidocaine in the pre-op area and then injected those medicines (poison if taken intravenously) into an IV bag in OR5. The problem, as discussed above, is that at least one other person, and sometimes more than one person, occupied OR5 from the time Dr. Ortiz entered that room with syringes until he exited it with the bag. *See* (ROA.1613-1616, 2056-265); (Govt's Exh. 71).

It is no answer that Dr. Ortiz loaded the syringes in view of other people in the pre-op room, nor that he put bags in the warmer when others were looking. Whether these acts are in or out of his job description, usual or unusual, there are conceivable reasons for them. If anyone, or at least any medical professional, saw Dr. Ortiz ***puncture the bottom of an IV bag with a hypodermic needle*** and inject a toxic dose of local anesthesia, they would have demanded an answer or reported it. The chances that he did so in their company are thus profoundly slim. This is true even if he could do it 10 seconds, as the government's demonstration showed, *see*

(ROA.1565). To a medical professional, puncturing an IV bag with a hypodermic needle for 10 seconds, outside the port, would have been a bizarre and remarkable act.

It's physically possible that Dr. Ortiz could have poisoned the bag in OR 5 before loading the syringes, though this does not seem to be the government's theory. But if this is so, then the government cannot explain why he didn't just drop the bag in the warmer on his way to pre-op, rather than leaving it in OR5 and coming back for it. Further, if we assume that Dr. Ortiz poisoned the final bag in OR5 before entering the pre-op, then his conduct in the pre-op is not linked to a bag poisoning and loses its probative value. The government chose to suggest that Dr. Ortiz poisoned the bag during his last period in OR5 for a reason. And once the defense showed that someone was in the room with him during that time its case on Counts 5 and 10 fell apart.

Further, as discussed above, if Dr. Ortiz did not poison the Count 5 bag, this leaves at least one (and maybe 2) poison bag in the warmer (according to Professor Verbek) that he did not place there. This suggests an alternate cause for the emergencies and conclusively establishes reasonable doubt as to every count.

## VII. The district court erred in admitting evidence of the death of MK.

## A.    Standard of Review

This Court will "review a district court's evidentiary rulings for abuse of discretion." *United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015). But it is well settled that "the standard is heightened when evidence is admitted under [Rule] 404(b), because [e]vidence in criminal trials must be strictly relevant to the particular offense charged." *Smith*, 804 F.3d at 735 (quoting *United States v. Kinchen,* 729 F.3d 466, 470 (5th Cir.2013) (quoting *United States v. Jackson,* 339 F.3d 349, 354 (5th Cir.2003)))(internal citations omitted); *accord United States v. Bentley-Smith*, 2 F.3d 1368, 1377 (5th Cir. 1993).

The defense preserved error here with a pretrial motion to exclude the death of MK. *See* (ROA.715-718). The district court denied the motion. *See* (ROA.1352). After the 2000 Amendment to Federal Rule of Evidence 103, this pretrial ruling preserves error, even if the defense does not renew the objection during the trial. *See United States v. Lara*, 23 F.4th 459, 473–74 (5th Cir. 2022).

## B.    Discussion

Although relevant evidence is generally admissible, *see* Fed. R. Evid. 402, in criminal cases evidence must be "strictly relevant" to the charged offense. *Smith*, 804 F.3d at 735. Further, evidence should be excluded when it is substantially more prejudicial than probative. *See* Fed. R. Evid. 403. "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1); *accord* Fed.

R. Evid. 404(b)(1). Evidence of a prior bad act, however, may be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The government introduced dramatic evidence that a hospital doctor, MK, died after administering an IV bag to herself. *See* (ROA.1711). Her husband described her calls for help and her screams of pain as she died at home. *See* (ROA.1718-1719).  It related his desperate and unsuccessful efforts to perform CPR, and his feeling of lasting guilt[2] that he didn't pull the IV from her arm. *See* (ROA.1718-1719). This evidence should have been excluded for two reasons: 1) the government failed to show that Dr. Ortiz caused this death, and 2) the tendency of the evidence to prove the indicted offenses was swamped by its tendency to inflame the jury's passions. The jury was composed of humans, not robots. Any of them hearing this testimony would be profoundly moved, and enormously tempted to resolve the case on emotional rather than logical grounds.

**1.    The government did not introduce evidence sufficient for a reasonable trier of fact to find that Dr. Ortiz caused MK's death.**

---

[2] Of course, he is in no way responsible.

Under Federal Rule of Evidence 104(a), "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(a). And as this Court explained:

> because prior bad act evidence is only conditionally relevant, we have to ascertain whether the jury was presented with sufficient evidence that the putative bad act actually occurred. If not, then testimony as to it would be irrelevant under Rule 104(b), and it would have been error to admit it.

*United States v. Gutierrez-Mendez*, 752 F.3d 418, 423–424 (5th Cir. 2018)(citing *Huddleston v. United States*, 485 U.S. 681, 692 (1988)).

Evidence that MK died after using an IV bag tends to prove guilt, if it does, only on the assumption that Dr. Ortiz tampered with her IV bag. Because the government introduced no evidence on this point, the court erred in admitting evidence of MK's death. *See Gutierrez-Mendez*, 752 F.3d at 423–424; *Huddleston*, 485 U.S. at 689-692.

The government did not recover the bag MK used before her death. *See* (ROA.1727). As such, it could produce only a blood test showing bupivacaine in her body, together with the timing of her death, to show that the IV bag caused her death. *See* (ROA.2207). Further, the government could not prove that she used an IV bag from BSWSND on the day she died. Her husband did not actually see her bring an IV bag from her car to her home on the day she died. *See* (ROA.1726). MK worked at more than one facility, brought bags home on more than one occasion, and sometimes allowed the bags to accumulate at home. *See* (ROA.1723-1726).

More importantly, the government introduced no evidence linking Dr. Ortiz to MK's IV bag. It produced neither video nor testimony showing that Dr. Ortiz added a bag to the warmer at any time before MK's death. No reasonable finder of fact could think that the government proved Dr. Ortiz responsible for this death while honoring the presumption of innocence.

If the government wanted to elicit the testimony of MK's husband, it could have indicted Dr. Ortiz for causing MK's death. Tellingly, however, it left this death out of the Indictment.

**2.    The prejudicial effect of MK's death greatly overwhelmed any logical tendency it had to prove a fact of consequence.**

Applying Rule 404(b), this Court has provided the following two-part test:

> **First**, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. **Second**, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403.

*United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)(*en banc*)(emphasis added).

The strictures of Rule 404(b) do not apply to conduct that is "intrinsic" to the charged offense. *See United States v. Sudeen* 434 F.3d 384, 288 (5th Cir. 2005). Nonetheless, this Court has recognized that an expansive application of this concept could "swallow the rule." *United States v. Ridlehuber*, 11 F.3d 516, 524 (5th Cir. 1993).

"Evidence is considered intrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of the trial." *United States v. Age*, 136 F.4th 193, 220 (5th Cir. 2025)(quoting *United States v. Gurrola*, 898 F.3d 524, 536 (5th Cir. 2018)(internal citations omitted). However, evidence "intrinsic" to the crime may, and sometimes must, be excluded as more prejudicial than probative. *See United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999); *United States v. Taylor*, 210 F.3d 311, 317-318 (5th Cir. 2000). Even intrinsic evidence should not be "submitted to show the defendant's proclivity towards crime, but to complete" the story of the offense. *United States v. Miranda*, 248 F.3d 434, 440-441 (5th Cir. 2001) *overruled on other* grounds *United States v. Walker*, 302 F.3d 322 (5th Cir. 2001).

### a.    The evidence could not be properly admitted as "intrinsic."

The death of MK was not "intrinsic" to the charged offenses. The charged offenses, notably, do not require proof of ongoing conduct, an ongoing agreement, or a scheme. *Compare United States v. Watkins*, 591 F.3d 780, 785 (5th Cir. 2009)("…where a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof."). Rather, they each involve

the discrete act of tampering with a single object on a single occasion. The government accordingly cannot argue that the alleged act it sought to prove – that Dr. Ortiz also tampered with an IV bag that killed MK – constituted a part of the offense.

Nor can it be said that the death of MK "arose out of the same transaction or series of transactions as the charged offense, … was inextricably intertwined with the evidence regarding the charged offense, or … is necessary to complete the story of the crime of the trial." *Age*, 136 F.4th at 220. The alleged poisoning of MK's IV bag did not in any sense motivate the charged offenses. It did not enable the charged offense, as by giving Dr. Ortiz the instrumentalities of the crime or an opportunity to commit it. It is entirely possible to understand the conduct alleged in the Indictment without hearing a word about MK's death two months earlier.

Accordingly, if the government was correct about all of Dr. Ortiz's conduct – which he does not concede -- the poisoning of MK simply showed that he repeated a similar crime. If this is admissible, it is only as extrinsic evidence under 404(b). Any other interpretation of "intrinsic" evidence would give the government free reign to define "the story of the crime" it wishes to tell. *Age*, 136 F.4th at 220. This would free it of the notice requirements of Fed. R. Evid. 404(c)(1), eliminate the screening protections of the grand jury, eliminate any right to limiting instructions for extrinsic evidence (for precious little evidence would actually be extrinsic), and turn every trial into an unpredictable evidentiary free-for-all in which the defendant

is effectively accused of every bad act committed in reasonable proximity to the charged offense.

Alternatively, if the evidence was "intrinsic," it should nonetheless have been excluded as substantially more prejudicial than probative. *See Powers*, 168 F.3d at 749; *Taylor*, 210 F.3d at 317-318. As will be discussed below, the evidence added little to a rational appraisal of Dr. Ortiz's guilt. It was one of 15 purportedly suspicious cases in the late Spring and Summer of 2022, and accordingly made little or no marginal contribution to the government's case for a "pattern." The government could produce no evidence tying the defendant to the IV bag, nor any scientific testing of the bag. The unique contribution of MK's case to the government's case was emotional: for this case, and this case alone, the government could offer the jury a deceased victim and a grieving spouse describing a tragic death.

### b.    Rule 404(b) did not authorize admission of the evidence.

Nor could the testimony regarding MK's death be admitted as extrinsic evidence under Fed. R. Crim. P. 404(b). If the evidence had any tendency to prove something other than character, it was slight in comparison to its inflammatory potential. In deciding whether evidence of extrinsic misconduct is:

> substantially outweighed by its undue prejudice, [this Court will] look to four factors: "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." [It will] also consider whether the uncharged bad act is

"of a heinous nature" that would "incite[ ] the jury to irrational decision by its force on human emotion."

*United States v. Ricard*, 922 F.3d 639, 654 (5th Cir. 2019)(quoting *Smith*, 804 F.3d at 736 (quoting 729 F.3d at 473, and *Beechum*, 582 F.2d at 917))(internal citations omitted). This test clearly compels exclusion of the evidence.

**The government's need for the evidence.** The government had slight need for the evidence. If it needed to show a string of cases where people used IV bags and suffered unexplained medical emergencies, the counts in the Indictment offered it 4. If it needed more, it could resort to the 10 other unindicted cases that Spring and Summer. *See* (ROA.1525-1528). The marginal value of one more such case was profoundly slight. As discussed above, the case was not the only one involving unexplained medication in the bloodstream – JA's blood test, and maybe KP's, offered this as well. *See* (ROA.2206-2207). The case did not even offer an opportunity to show that Dr. Ortiz handled an IV bag in an unusual way prior to the death. What it offered was a tragic result and the dramatic testimony of a grieving spouse forced to watch the death of a loved one.

**Similarity to the charged offense.** MK's death resembled the charged counts only in that it involved an allegedly poisoned IV bag.

**Timing.** MK died about a month and a half before the date of Count 1. This factor alone points in the government's favor, but it doesn't carry much weight.

**Limiting instructions.** The limiting instructions in this case do not help the government. Rather, they structure the case in such a way as to dramatically reduce the evidence's legitimate value. The court charged the jury it could consider evidence of similar crimes ***only*** to decide "[w]hether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment[,] or [w]hether the defendant had the motive or opportunity to commit the acts charged in the indictment." (ROA.1113). Whatever MK's death showed, it wasn't intent, motive, or opportunity; at most, it helped show that some bags contained poison. It did not dispel a conclusion that they might have been poisoned accidentally, and certainly didn't give Dr. Ortiz motive or opportunity to commit the charged offenses. Given this instruction limiting the evidence's legitimate uses, the prejudicial potential overwhelmed its remaining legitimate value many times over.

**Inflammatory potential.** Finally, there is the last factor named in *Ricard*:

> "whether the uncharged bad act is "of a heinous nature" that would "incite[ ] the jury to irrational decision by its force on human emotion."

*Ricard*, 922 F.3d at 654 (5th Cir. 2019)(quoting *Beechum*, 582 F.2d at 917).

Here, that factor is overwhelming and dispositive. If Dr. Ortiz did indeed poison MK, which he disputes, it would be murder, the worst act alleged in the case. This adds enormous force to the case for exclusion. *See Fortenberry*, 860 F.2d at 632-633 (evidence should have been excluded where it was "of a magnitude far

greater than the charged offenses"). Indeed, murder is a uniquely serious human of-fense. *See Kennedy v. Louisiana*, 554 U.S. 407, 438, *as modified* (Oct. 1, 2008)(agreeing that "in terms of moral depravity and of the injury to the person and to the public, [other serious crimes] cannot be compared to murder...")(internal quotations and citations omitted).

And the form of the evidence only exacerbated the risk that it would "incite[] the jury to irrational decision by its force on human emotion." *Ricard*, 922 F.3d at 654. Again, the government offered the testimony of a grieving spouse, recounting the agonized screams of his loved one as she died before his eyes. It emphasized that testimony at closing. *See* (ROA.2816, lines 17-22). The emotional force of the testimony was incomparable, and the risk that it would sway the jury for improper reasons was enormous.

**2.      The government cannot shoulder its burden to show harmless error**

Because the defense preserved error, the government has the burden to show it harmless. *See United States v. Olano*, 507 U.S. 725, 734 (1993). It cannot do so here.

If the government presented a sufficient case for conviction – and it did not – it certainly did not present an overwhelming one. It had no direct evidence that Dr. Ortiz put poison in the bags, but rather relied heavily on the coincidence of when he took bags in and out of a warmer. It presented an attenuated and logically incoherent

theory of motive. Its theories of guilt involve grave factual problems: the extra poisoned bag, *see* (ROA.2839), the presence of other medical professionals in the relatively small space where Dr. Ortiz allegedly poisoned an IV bag, s*ee* (ROA.1613-1616, 2056-265), the 2 cases in which the timing of the blood pressure spikes, as charted by contemporaneous records, all but exclude the IV bags as the culprit, *see* (ROA.2127, 2148, 2443, 2451,2461,  2621, 2623).

Against this backdrop, the testimony of a grieving husband describing the death of his wife before his eyes could provide a powerful emotional reason to convict. The government cannot show harmless error.

## VIII. The district court erred in permitting Dr. Hail to testify in spite of an extensive violation of Federal Rule of Evidence 615 and of a court order.

### A.     Standard of Review

A district court has "broad discretion" to decide whether a party violated Federal Rule of Evidence 615.  *Cruz v. Maverick County*, 957 F.3d 563, 570–71 (5th Cir. 2020). This Court reviews for abuse of discretion a district court's decision to permit a witness to testify in spite of a violation. *See United States v. Posada-Rios*, 158 F.3d 832, 871–72 (5th Cir. 1998). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003). Further, this Court will "use a de novo standard for our review of the record to determine

whether the defendant suffered 'sufficient prejudice' to warrant reversal on account of such witness's testimony." *United States v. Wylie*, 919 F.2d 969, 976 (5th Cir. 1990).

The defense preserved error by objecting to the witness's testimony on the very precise ground that the government did not move for an exemption at the outset of the case. *See* (ROA.2370)("And it's my understanding that it is a proponent of an expert witness who would have to move and make -- put forth a showing before the expert witness is allowed to remain in the courtroom exempt from the rule of sequestration."). The defense also urged the precise theory of prejudice alleged here: that the government obtained a tactical advantage because the defense expert could not hear the testimony of other witnesses. *See* (ROA.2370). It renewed the objection later and again argued its detrimental reliance on the court's earlier ruling. *See* (ROA.2381). Error is fully preserved.

## B. Discussion

## 1. The court erred

### a. The government's conduct violated the Rule

In mandatory language, Federal Rule 615 requires the exclusion of witnesses from the courtroom, absent certain exceptions. It says:

> At a party's request, the court **must** order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony.

Fed. R. Evid. 615(a)(emphasis added). The Rule contains 4 exceptions: 1) it excepts parties 615(a)(1); 2) it excepts "an officer or employee" of an organizational party, if designated as a representative, 615(a)(2); 3) relevant here, it excepts "any person whose presence **a party shows** to be essential to presenting the party's claim or defense," 615(a)(3)(emphasis added), and 4) it excepts others whose presence is authorized by statute, 615(a)(4). The Rule is no technicality, but a critical safeguard against unreliable evidence. Its "main purpose is to aid in detecting testimony that is tailored to that of other witnesses and is less than candid." *Wylie*, 919 F.2d at 976 (citing *United States v. Ell*, 718 F.2d 291, 293 (9th Cir.1983), *United States v. Lamp*, 779 F.2d 1088, 1095 (5th Cir. 1986), and 6 J. Wigmore, *Evidence* § 1840 (Chadbourn rev. 1976)).

The text of the Rule facially required the exclusion of Dr. Hail from the courtroom. She was a witness, and the court invoked Rule 615. None of the exceptions applied: 1) she was not a party, 2) she was neither an employee nor an officer of the US government, 3) the government did not even try to show her presence essential to the presentation of its case, and 4) no other statute authorized her presence.

Upon learning that Dr. Hail had watched the trial testimony, the court nonetheless granted her permission to remain in the courtroom "after the fact." (ROA.2370). Presumably, this invoked Rule 615(a)(3)(essential witness), for no

other possible exception suggests itself. However, both the text of the Rule and basic fairness preclude retroactive exemptions under Rule 615(a)(3).

The text Rule 615(a)(3) permits essential witnesses to remain in the courtroom only when "a party shows" their necessity. A party that has not even ***requested*** the presence of the witness has certainly not made the necessary "showing." *See In re Estrategias en Valores, S.A.*, No. 17-16559-LMI, 2020 WL 13614259, at *10 (S.D. Fla. Apr. 13, 2020)(statutory phrase "it is shown" requires party to "point out to the bankruptcy court" the relevant circumstance)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)(inferring a duty "to point out to the court" grounds for summary judgment where the governing rule requires a "showing."). Notably, the Rule does not merely require that "a court find" the witness to be essential – rather, it places the burden on "a party" to "show" the witness's necessity. By making the party the subject of the phrase "a party shows," the Rule clearly contemplates that the exemption will follow from a party's effort to acquire it. The exemption, in other words, is not self-executing or passively acquired.

Common sense shows the benefit of this reading. The expectation that parties will seek exemption at the outset of the case provides an opportunity for the opponent to contest the party's showing. It also allows the opponent to prepare a cross-examination aware of the exemption. And as this case shows, it allows the opponent

to seek (or not seek) exemption for their own witnesses aware of the other side's choices.

The government also did not make the substantive showing required by the Rule. Answering the defense objection to Dr. Hail's testimony, the government said the following:

> We did not move for that (exemption). My understanding is the baseline rule is that an expert witness who is not a fact witness involved in the events is permitted to witness the trial testimony.

(ROA.2370). There is no "baseline rule" of this sort. *See* Fed. R. Evid. 615. To be sure, the court's comments show that requests for the exemption of an expert are usually granted. *See* (ROA.2382)("And how long have you been practicing here, Mr. Nicholson? When have you ever seen an expert not exempted from the rule?"). But every case is different, and parties can't simply assume that a court will give them exemptions from a rule without asking.

Further, the evidence did not show that Dr. Hail was essential to the presentation of the government's case. The parties' colloquy strongly suggested that Dr. Hail did not sit at counsel table, but that she observed the trial from the audience. *See* (ROA.2370). A witness whose presence is "essential to presenting the party's claim" would likely be in close communication with the party's lawyer, not sitting back in the audience. In any case, the government simply said that Dr. Hail was an expert

witness -- this is not the required showing under Rule 615(a)(3). *See* (ROA.2370-2371).

The government argued that the defendant's own expert notice for Dr. Sweitzer contemplated her commentary on the testimony of other witnesses. *See* (ROA.2371). But the defense drafted that notice before the court invoked the Rule. When the court invoked the Rule, it recognized two agents as exempt, provided they attend the trial one at a time. *See* (ROA.1433). It had previously exempted a defense investigator. *See* (ROA.1351). That course of events, together with the plain text of the Rule, reasonably led the defense to conclude that no further witnesses were permitted. At most, the defense's pretrial notice showed that the defense thought an exemption might be granted if requested. That doesn't mean the defense thought it was implicitly granted an exemption it didn't even ask for.

### b.    The Rule 615 violation merits relief

This Court should reverse the convictions due to the government's violation of Rule 615.

> While Rule 615 sequestration is mandatory, this Court has held that a trial court has discretion to allow the testimony of a witness who has violated the Rule and that a party must demonstrate an abuse of discretion and "sufficient prejudice" to warrant reversal on account of such testimony.

*Wylie,* 919 F.2d 969, 976 (5th Cir. 1990)(quoting *Womack,* 654 F.2d 1034, 1040 (5th Cir.1981). "Abuse of discretion" here refers to a district court's decision to permit

testimony in spite of a violation of the Rule. But here, the district court did not exercise this discretion, because it thought that no violation of the Rule had occurred. Rather, it thought it could "grant permission, after the fact." As such, this Court should proceed to an evaluation of harm and prejudice.

But if the district court had exercised discretion to permit the testimony in spite of the Rule, that decision would be an abuse of discretion. In cases like this one where a district court permits a witness to testify in spite of prior direct observation of the trial, this Court asks whether the testimony was merely cumulative, and whether the offending party had "reason to perceive that such testimony would be necessary until it heard the testimony of another witness." *Wylie*, 919 F.2d at 976 (recounting *United States v. Ortega-Chavez*, 682 F.2d 1086, 1089 (5th Cir. 1982)). Under these standards, the court abused its discretion in permitting Dr. Hail to testify.

Dr. Hail did not deliver cumulative testimony. Rather, she provided a comprehensive evaluation of essentially every symptom exhibited by the relevant patients, explaining why none of them, in the government's view, could have been caused by anything but intravenous injection of local anesthetics.

Further, the government of course "had reason to perceive that [Dr. Hail's testimony] would be necessary" before it allowed her to sit in the audience. It gave pretrial notice of her testimony, (ROA.168), as its chief expert on anesthesia. The government also had every reason to understand that her presence was not permitted.

The district court issued a sequestration order. *See* (ROA.1433). The government sought a Rule 615 exemption for 2 agents, which it received it on the condition that they attend the trial one at a time. *See* (ROA.1433). Nobody who witnessed these rulings would think that other, unnamed, witnesses had also been exempted *sub silentio*.

The prejudice was singular. The defense argued other causes for the patients' emergencies. *See* (ROA.2611-2639). In support, it presented expert testimony from an anesthesiologist. *See* (ROA.2611-2639). The government, however, repeatedly discredited this witness by noting that she hadn't seen the other witnesses' testimony, and hadn't factored in the information they disclosed. Thus:

> Q. But you didn't hear the testimony in court that this facility had never had a patient die at the facility. You didn't -- did you -- did you know that?

(ROA.2640). And:

> Q. Okay. So you didn't -- you didn't hear any of the testimony about what happened during these incidents?
> A. No.

(ROA.2657). And:

> Q. (BY MR. RUNKLE) So you didn't hear the testimony here in court that as soon as the IV bag was changed she started experiencing extreme hypertension and pulmonary edema? Did you hear that testimony?
> A. I did not.

(ROA.2673). And:

Q. Okay. But -- **so you didn't hear any testimony about** – or you didn't look at any documents about when those things were done?
A. I looked at the op note and I looked at the nurse's note and neither one of them document when they gave the amounts. This anesthesia record doesn't even document the different bags of tumescent fluids when they were hung or not hung. **Once, again, I have not heard any testimony in court, so –**

(ROA.2676)(emphasis added). And:

Q. But you didn't review his testimony that he gave in court here a few days ago, did you?
A. No, I did not.

(ROA.2670). And:

Q. And the testimony that was heard in this court was that his heart -- there was a concern that his heart was stopping because it was -- you know, his blood -- his pulse tripled and at certain points between the five minute intervals his heart stopped. That was the testimony that was given in this court. Are you aware of that?
A. I didn't hear any of the testimony that was given in court….

(ROA.2691).

Of course, if the government had sought to qualify its witness when the court invoked the Rule, the defense would have done the same for its own expert. The experts were essentially equivalent, so if the government could have obtained an exemption, the defense likely could have done the same. This would have placed the experts on an equal footing. Instead, the government achieved a critical tactical advantage in a battle of the experts on the case's central issue: what caused the medical emergencies in the case.

The court found that the defense suffered no prejudice because it "could have asked" for permission to let its expert sit through the trial. (ROA.2382). But of course, the defense's choice was informed by its belief, reasonable in light of the court's prior rulings and the text of the Rule, that the government witness was not sitting through the trial. The government robbed the defense of critical information when it made its choice by violating the Rule.

### c.    The district court erred in refusing any sanction for a violation of its order.

Alternatively, if the government witness's presence did not violate Rule 615, it certainly violated a court order. The court said "the rule is invoked." (ROA.1433). All parties know that this excludes potential witnesses from the courtroom. The court made exceptions for the defense investigator, *see* (ROA.1351), and 2 agents, provided they sit "one at a time," (ROA.1433). It excepted no one else. Allowing yet another witness to sit through the trial represented a violation of the court's sequestration order. Yet the court imposed no sanction at all.

In the context of discovery violations, this Court has considered the following factors when evaluating the adequacy of sanctions:

> (1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances.

*United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000). Adapting these factors to the present context, the district court abused its discretion in refusing to order a sanction. The government can offer no good reason that it permitted its witness to sit through the trial without seeking an exception. The parties discussed exceptions twice before the witness sat in on the trial, once at the pretrial conference and again immediately before the presentation of evidence. *See* (ROA.1351, 2370-2371). When the court limited the government to one agent at a time, the government had adequate notice that exceptions were not automatic.

The prejudice to the defense was immense, as discussed above. It placed the defense expert and the prosecution expert on unequal footing as they offered testimony on the case's central issue.

No continuance could cure the prejudice; Dr. Sweitzer could not watch testimony that had already occurred, and a complete transcript would have produced extensive delays.

Finally, there is another "relevant circumstance" that substantially aids the case for a sanction: the government repeatedly chose to leverage its violation of the Rule in cross-examination of the defense witness.

Confronted with a clear violation of its order, the court did nothing to rectify it. Instead, it blessed the government's conduct and reprimanded the defense for its compliance. *See* (ROA.2370-2371, 2382). It abused its discretion.

**2.     The government cannot shoulder its burden to show harmless error.**

The error may well have made a decisive difference in the case. Again, each party offered an expert witness to interpret the medical evidence and provide an opinion on the cause of the patients' medical emergencies. *See* (ROA.2611-2639); (ROA.2388, 2406, 2413, 2419, 2470). And a reasonable jury could harbor a reasonable doubt on that question. The surgeon who performed 2 of the surgeries testified that accidental infiltration of anesthesia to the blood stream was the most likely cause of one of the emergencies. *See* (ROA.2345). In 2 cases (Counts 1, 2, 6, and 7), the government introduced no evidence of chemical testing of either the patients' blood or the IV bags. Also, in 2 surgeries (counts 2, 3, 7, and 8), the medical records showed serious problems with the timing of the patient's symptoms in relation to their second IV bag. *See* (ROA.2127, 2148, 2443, 2451,2461,  2621, 2623). The government's violation of the Rule gave the jury a reason to think that its expert provided a more informed opinion on these questions.

The government took liberties with the Rules and an order of the court, then leveraged the defense's compliance with them into a powerful argument on one of the case's chief defensive issues. This was not a fair trial.

**IX.    The district court plainly erred in failing to intervene when the prosecutor commented on the defendant's failure to testify.**

**A.     Standard of Review**

This Court reverses unpreserved where the defense shows: 1) error, 2) that is clear or obvious error, 3) that affects a party's substantial rights, and 4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732 (1993).

## B.    Discussion

## 1.    The court erred

> The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify, if the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.

*Cotton v. Cockrell*, 343 F.3d 746, 751 (5th Cir. 2003) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965), and quoting *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir.1999)).

Here, the defense raised doubt about the government's case using the chemical tests of JA's blood and IV bags. It argued at closing:

> But if it was lidocaine in the bag attached to Mr. A[], shouldn't there be lidocaine in his blood? And if there's bupivacaine in the bag attached to Mr. A[], shouldn't there be bupivacaine in his blood? And if there's ephedrine in Mr. A[]'s blood, enough to cause heart damage, shouldn't there be proof that that's in the bag? There's not.

(ROA.2862).

The government responded this way:

The next Defense argument, [JA]'s blood did not test positive for bupi-vacaine. Well, [JA]'s blood did test positive for ephedrine, which is a common anesthesia drug, but was not given to him during these proce-dures. [KP]'s blood did test positive for bupivacaine despite not having received any bupivacaine for about 36 hours. **And, you know, only one person in this room knows what was actually used to adulterate those bags**. The dose [JA] received was likely very small.

(ROA.2875)(emphasis added).

This Court has already found that a materially identical argument meets the standards for constitutional error. *See Madden v. Collins*, 18 F.3d 304, 309 (5th Cir. 1994), *abrogation on other grounds recognized by Smith v. Quarterman*, 515 F.3d 392, 408 (5th Cir. 2008). Specifically, it found error, though harmless, in the following comment:

Then, also, the defense will argue that why in the world would someone who killed, murdered two people and stole this credit card sign their own name to the Texaco card? I don't know that; you don't know why. **There's only one person here that knows why, and there's only one person here that knows the answer to all of these questions.**

*Madden*, 18 F.3d at 309 (emphasis added).

The comments here are not meaningfully different. Both deal with an eviden-tiary problem in the prosecution's case by saying that only the defendant knows the answer. In this way, the prosecutor simultaneously inverts the burden of proof – blaming the defendant for its inability to answer a reasonable question – and calls the jury's attention to the defendant's failure to provide it any information. By its terms – "there's only one person" – this rhetoric refers to the absence of testimony

only the defendant can provide. And this Court has repeatedly held that a reference to testimony only the defendant can provide is a comment on his silence. *See United States v. Sardelli*, 813 F.2d 654, 657 (5th Cir. 1987); *United States v. Johnston*, 127 F.3d 380, 397 (5th Cir. 1997); *Davis v. United States*, 357 F.2d 438, 441 (5th Cir. 1966); *see also Lincoln v. Sunn*, 807 F.2d 805 (9th Cir. 1987).

## 2.    The error is clear and obvious.

This Court has found error in materially indistinguishable remarks: "there's only one person in this room who knows…" **Compare** (ROA.2875) **with** *Madden*, 18 F.3d at 309. Because it has condemned the very precise formulation employed here, controlling precedent admits no doubt about the error.

In *Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998), this Court held that the following argument did not amount to a comment on silence:

> We don't know that those are his matches; they might have been the girl's matches. She might have written in the matchbook; we don't know that. Only one person does know that, and that's Henry Lee Lucas.

*Lucas*, 132 F.3d at 1079, n.6. But it is well-settled that "[t]o the extent two panel decisions conflict, the earlier decision controls." *Nivelo Cardenas v. Garland*, 70 F.4th 232, 242, n.7 (5th Cir. 2023). *Lucas* accordingly cannot introduce any doubt into the propriety of the "only one person knows" formulation.

Likewise *Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000). In *Barrientes*, a state prosecutor said, referring to the defendant, "He knows. He knows where the

witness is as he sits there right now. He knows. He knows." *Barrientes*, 221 F.3d at 780–81. The district court denied the defendant relief from his state conviction under 28 U.S.C. §2254, and this Court denied a certificate of appealability. *See id.* But the *Barrientes* argument was not the same one made here. Here, the prosecutor said "***only*** the defendant knows" the truth, and did so to answer an evidentiary problem with its case.

Further, *Barrientes* arose under the Antiterrorism and Effective Death Penalty Act, which requires the movant to show a state court disposition "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Because the *Barrientes* panel could look only to Supreme Court law, the earliest Fifth Circuit panel opinion was not necessarily dispositive. *See Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) ("We have emphasized, time and time again, that the [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.' "). A plain error defendant, by contrast, may take advantage of Fifth Circuit precedent alone to establish clear or obvious error. *See United States v. Fields*, 777 F.3d 799, 802 (5th Cir. 2015)("In considering whether an error is 'clear or obvious' … we must decide whether controlling circuit or Supreme Court precedent has reached the issue in

question, or whether the legal question would be subject to "'reasonable dispute.'")(quoting *United States v. Segura*, 747 F.3d 323, 330 (5th Cir.2014)). Here, and in contrast to *Barrientes*, the earliest Fifth Circuit case on the question gets the job done.

**3.    The error affected substantial rights.**

A party seeking relief on plain error must show a "reasonable probability" of a different result absent the error. *United States v. Dominguez-Benitez*, 542 U.S. 74, 81-82 (2004). But "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *Dominguez-Benitez*, 542 U.S. at 83, n.9.

As discussed above in Claim VI, the government did not present an overwhelming case. Calling the jury's attention to Dr. Ortiz's decision to remain silent invited a general inference of guilt, and may well have tipped the evidentiary scales in the government's favor.

In addition, the government used its improper argument to neutralize an issue that could have resulted in acquittal on multiple counts. As the defense noted in closing, the government could not prove that JA's blood had the same chemicals that appeared in his IV bag. *See* (ROA.2862). This calls into question the unorthodox

methods by which the government's chemist identified the chemicals in the bags. *See* (ROA.2709-2720). Further, JA's blood had very different contents than KP's – no confirmed lidocaine or bupivacaine, and a very different concentration of ephedrine. *See* (ROA.2207). The government nonetheless argued that their symptoms displayed a signature similarity.

These arguments provided objectively powerful reasons to doubt the government's theories, especially in a case so heavily reliant on circumstantial evidence. Yet the government shirked its burden of proof, arguing that it could not show the nature of the poison because only the defendant would really know. This argument presumed the defendant's guilt (he only knew the content of the bags if he poisoned them), inverted the burden of proof, and called the jury's attention to the defendant's silence.

## 4.  The error affects the fairness, integrity, and public reputation of judicial proceedings.

As noted, a prosecutor's reference to the defendant's silence represents a violation of the Fifth Amendment, constitutional error. "Errors of constitutional dimension will be noticed more freely under the plain error doctrine than less serious errors." *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991), *overruled on other grounds by Davis v. United States*, 589 U.S. 345 (2020). The particular right at issue here –  to have the government prove guilt without the defendant's cooperation –

represents a fundamental American value and a guarantee against abusive government. *See Culombe v. Connecticut*, 367 U.S. 568, 582 (1961). This Court should not look the other way when the prosecution compromises that right.

## CONCLUSION

This Court should reverse the convictions on each and every count and order a judgment of acquittal. Alternatively, it should grant a new trial on each and every count. In the event that it reverses or vacates fewer than all counts, it should vacate the sentence on every count so that the district court may consider the impact of the relief on 18 U.S.C. §3553(a).

Respectfully submitted,

JASON D. HAWKINS
FEDERAL PUBLIC DEFENDER

/s/ Kevin Joel Page
KEVIN JOEL PAGE
ASSISTANT FEDERAL
PUBLIC DEFENDER
525 South Griffin
Suite 629
Dallas, Texas 75202
(214) 767-2746

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

On June 16, 2024, I filed this Brief through the Court's ECF system. Opposing Counsel has therefore been served. Further I certify that I sent a paper copy via regular mail to Dr. Ortiz.

/s/ Kevin Joel Page

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations established by this Court's June 9, 2025 order on Appellant's Unopposed Motion for Overlength Brief because it contains 19,928 words excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii). The brief was prepared using MS Word, Times New Roman 14-point font, with footnotes in 12-point font.

/s/ Kevin Joel Page