# 24-11032

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### UNITED STATES OF AMERICA,
Plaintiff-Appellee

v.

### RAYNALDO RIVERA ORTIZ, JR.,
Defendant-Appellant

---

On Appeal from the United States District Court
For the Northern District of Texas
Dallas Division
District Court No. 3:22-CR-378-N

---

### APPELLEE'S BRIEF

---

Nancy E. Larson
Acting United States Attorney

Gail Hayworth
Assistant United States Attorney
Texas Bar No. 24074382
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
gail.hayworth@usdoj.gov

Attorneys for Appellee

## **STATEMENT REGARDING ORAL ARGUMENT**

Ortiz raises four issues on appeal, arguing that (1) insufficient evidence existed to support his convictions on all ten counts of the indictment, (2) the district court erred under Federal Rules of Evidence 104, 403, and 404(b) by admitting evidence regarding an uncharged victim's death, (3) the district court erred in allowing the government's expert to testify despite a purported violation of Federal Rule of Evidence 615 and the court's sequestration order, and (4) the district court erred by not sua sponte intervening regarding a one-sentence remark in the prosecution's rebuttal closing. Despite the size of the record, the issues can be resolved based solely on established precedent, the record, and the due deference this Court gives to the jury's verdict and the trial court's evidentiary rulings. However, because the record in this case is extensive, the government recognizes that oral argument may be helpful to the Court and accordingly stands ready to present argument should the Court deem it helpful.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES ......................................................... v

STATEMENT OF JURISDICTION............................................... 1

STATEMENT OF THE ISSUE .................................................... 1

STATEMENT OF THE CASE ..................................................... 2

    1.    In the summer of 2022, Surgicare, an ambulatory surgery center, experiences a string of unusual complications during surgeries..... 2

    2.    After doggedly reviewing KP's case, KP's anesthesiologist, Dr. Marsden, suspects a tainted IV bag................................................. 4

    3.    Dr. Marsden arrives in time to save JA and to collect the IV bag and wrapper from JA's surgery; after a hole is found in the JA's wrapper, Surgicare shuts down...................................................... 5

    4.    Surveillance video captures Ortiz placing an IV bag in the warmer before each of the charged victim's hypertensive event................. 8

    5.    Ortiz is indicted for five counts of tampering with a consumer product and five counts of adulteration of a drug, a jury convicts him on all counts, and the district court sentences him to 2,280 months in prison. ..................................................................... 10

SUMMARY OF THE ARGUMENT ......................................... 22

ARGUMENT AND AUTHORITIES......................................... 17

    1.    Ample evidence supported the jury's verdict. ............................ 17

        A.    Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in TY's August 4, 2022 surgery and thus its verdict on Counts One and Six............................. 19

**Page(s)**

B.  Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in JE's August 9, 2022 surgery and thus its verdict on Counts Two and Seven. ...................... 40

C.  Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in KP's August 19, 2022 surgery and thus its verdict on Counts Four and Nine.................. 48

D.  Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in JA's August 24, 2022 surgery and thus its verdict on Counts Three and Eight. ............... 54

E.  Ample evidence supported the jury's finding that Ortiz poisoned an IV bag found in the warmer on August 24, 2022 and thus its verdict on Counts Five and Ten..................... 61

2.  The district court did not abuse its discretion in admitting the evidence regarding MK's death. ................................................. 70

3.  The district court did not abuse its broad discretion in allowing toxicologist Dr. Hail to testify. ................................................... 80

A.  The district court did not abuse its broad discretion in exempting Dr. Hail from the Rule after she had already been present in the courtroom. ................................................. 82

B.  Even assuming a violation of the Rule, the district court did not abuse its discretion in allowing Dr. Hail to testify. ....... 84

C.  The district court did not plainly err in finding the government made a sufficient showing to exempt Dr. Hail from the Rule. ................................................................. 89

D.  The district court did not plainly err by not striking Dr. Hail's testimony as a sanction for violating a court order. . 90

4.  The district court did not plainly err by not intervening during closing argument. ................................................................... 92

iii

**Page(s)**

CONCLUSION ........................................................................ 101

CERTIFICATE OF COMPLIANCE ........................................................ 92

# TABLE OF AUTHORITIES

**Federal Cases**                                    **Page(s)**

*Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir. 1981)................. 83

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) ...................................94, 98

*Cotton v. Cockrell*, 343 F.3d 746 (5th Cir. 2003) ......................................98, 101

*Cruz v. Maverick County*, 957 F.3d 563 (5th Cir. 2020)........................ 80, 89, 91

*Enoch v. Gramley*, 70 F.3d 1490 (7th Cir. 1995) ............................................. 97

*Huddleston v. United States*, 485 U.S. 681 (1988)................................ 71, 72, 73

*Jackson v. Johnson*, 194 F.3d 641 (5th Cir. 1999) ............................................ 94

*Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998) .......................................16, 98

*Madden v. Collins*, 18 F.3d 304 (5th Cir. 1994).......................................97, 101

*Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007 (5th Cir. 1986)................ 85, 90, 91

*Nivelo Cardenas v. Garland*, 70 F.4th 232 (5th Cir. 2023).............................. 104

*Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201 (5th Cir. 1993)
............................................................................................................. 80, 85, 90

*Puckett v. United States*, 556 U.S. 129 (2009) .................................................. 82

*United States v. Acosta*, 972 F.2d 86 (5th Cir. 1992) ...................................36, 69

*United States v. Age*, 136 F.4th 193 (5th Cir. 2025) ........................................ 71

*United States v. Asibor*, 109 F.3d 1023 (5th Cir. 1997)................................... 18

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) .................................. 72

*United States v. Bohuchot*, 625 F.3d 892 (5th Cir. 2010)............................... 101

*United States v. Brown*, 186 F.3d 661 (5th Cir. 1999) ..................................... 19

*United States v. Cervantes*, 706 F.3d 603 (5th Cir. 2013) ...........................70, 82

**Federal Cases, continued**                                            **Page(s)**

*United States v. Flores*, No. 22-30540, 2023 WL 5703612 (5th Cir. Sept. 5, 2023)
................................................................................................ 78

*United States v. Garcia Mendoza*, 587 F.3d 682 (5th Cir. 2009)......................... 78

*United States v. Johnston*, 127 F.3d 380 (5th Cir. 1997) .................................... 99

*United States v. Kinchen*, 729 F.3d 466 (5th Cir. 2013) ................................72, 74

*United States v. Lage*, 183 F.3d 374 (5th Cir. 1999) .......................................... 32

*United States v. Lara*, 23 F.4th 459 (5th Cir. 2022).......................................... 92

*United States v. Mayweather*, 2023 WL 195414 (5th Cir. Jan. 17, 2023) ........... 78

*United States v. McMillan*, 600 F.3d 434 (5th Cir. 2010).................................. 101

*United States v. Miller*, 146 F.3d 274 (5th Cir. 1998) ....................................... 69

*United States v. Moreland*, 665 F.3d 137 (5th Cir. 2011) .................................. 19

*United States v. Moreno-Gonzalez*, 662 F.3d 369 (5th Cir. 2011) ............... passim

*United States v. Naidoo*, 995 F.3d 367 (5th Cir. 2021) ..................................... 79

*United States v. Ocampo-Vergara*, 857 F.3d 303 (5th Cir. 2017) ...................... 17

*United States v. Reynolds*, 534 F. App'x 347 (6th Cir. 2013) ............................ 90

*United States v. Shows Urquidi*, 71 F.4th 357 (5th Cir. 2023)............................ 75

*United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014)......................... 19

*United States v. Williams*, 620 F.3d 483 (5th Cir. 2010).................................... 79

*United States v. Wylie*, 919 F.2d 969 (5th Cir. 1990) ....................................... 85

*United States v. Yi*, 460 F.3d 623 (5th Cir. 2006) ............................................ 71

*United States v. Zuniga*, 18 F.3d 1254 (5th Cir. 1994)................................18, 49

*Zafiro v. United States*, 506 U.S. 534 (1993) .................................................. 78

## Federal Statutes and Rules    Page(s)

Fed. R. App. P. 4(b)(2) ............................................................. 1

Fed. R. Evid. 104(b) ............................................................... 73

Fed. R. Evid. 401 ................................................................... 73

Fed. R. Evid. 402 ................................................................... 73

Fed. R. Evid. 403 ................................................................... 74

Fed. R. Evid. 615(a)(3) .................................................. 82, 83, 91

## STATEMENT OF JURISDICTION

This is a direct appeal from a conviction in a criminal case.  The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291.  The district court entered judgment on November 24, 2024, and Ortiz timely filed the notice of appeal the same day.  *See* Fed. R. App. P. 4(b)(2); (ROA.18-19).

## STATEMENT OF THE ISSUES

1.     Viewing the evidence in the light most favorable to the jury's verdict, could a rational jury have found that Ortiz committed each of the tampering and adulteration-of-a-drug offenses charged in the indictment beyond a reasonable doubt?

2.     Did the district court abuse its discretion under Federal Rules of Evidence 104, 403, and 404(b) by admitting evidence of uncharged victim MK's death?

3.     Did the district court abuse its discretion under Federal Rule of Evidence 615 by permitting the government's expert Dr. Stacey Hail to testify?

4.     Did the district court plainly err by not sua-sponte intervening during the prosecutor's closing rebuttal argument?

## STATEMENT OF THE CASE

1.  **In the summer of 2022, Surgicare, an ambulatory surgery center, experiences a string of unusual complications during surgeries.**

Baylor Scott & White Surgicare North Dallas ("Surgicare") is an ambulatory surgical center located on Coit Road in Dallas, Texas. (ROA.1497, 1853.)  It is a low-risk facility that serves patients who are generally healthy and do not need a high level of care; its patients come in for surgery and then leave, often on the same day.  (ROA.1497.)  However, in the summer of 2022, Surgicare started experiencing a string of unusual complications during surgeries in which patients would have these extreme high blood pressures (hypertensive episodes), which would cause cardiac issues and require Surgicare to call 911 to have the patients transferred to a higher level of care at a hospital.[1]  (ROA.1525-27.)  Specifically, between May 19, 2022 and August 24, 2022, Surgicare had 14 transfers, whereas for the entire year of 2021, it had five.  (ROA.1525-26, 1681, 2544.)

Trying to understand what was causing these complications, Surgicare asked numerous physicians to review the transfer cases and perform a root-cause analysis.  (ROA.1526-28, 1681-83.)  Operating under the default

---

[1] The hypertensive episodes were particularly unusual because many of the sedatives and medications given during surgery (like opioids and anesthetic gas) generally result in lower blood pressures, so it would be more typical to see a patient with low blood pressure during a procedure rather than high blood pressure.  (ROA.2007-08, 2117.)

assumption that the medical supplies were not poisoned, (ROA.1682, 2398),

the reviewing physicians looked for similarities between the cases—for

example, whether they involved the same nurse, operating room ("OR"),

doctor, medical histories, or administered medications—but no common

explanation was found.  (ROA.1527-28, 1681-83.)  Surgicare even had its

anesthesia machines serviced, and it checked for any drug recalls, but it could

not identify what was causing these hypertensive events.  (ROA.1528.)

    The unexplained hypertensive events included the following individuals:

(1) TY, a 56-year-old female scheduled to have a four or five-hour outpatient

surgery (liposuction and a lower facelift) on August 4, 2022, but who woke up

in a hospital, where she then spent the next five nights, (ROA.1481-84, 2391);

(2) JE, a 78-year-old male who shattered his wrist on a cruise with his

girlfriend and was scheduled to have it repaired on August 9, 2022, but who

woke up in an ambulance on the way to the hospital, where he stayed for a

month, (ROA.2094-2100, 2400); (3) KP, a 54-year-old female who was

expecting to go home after a follow-up surgery to cauterize some blood vessels

on August 19, 2022, but whose first post-surgery memory was being wheeled

into an ambulance and taken to the hospital, where she spent the next five

days, (ROA.1770-76, 1780); and (4) JA, an 18-year-old male scheduled to have

a two-hour surgery to repair his broken nose on August 24, 2022, but who

woke up in a hospital the next night, where he stayed for a week and a half, (ROA.1852-57).

Each of these patients—though of different ages, genders, and medical histories, with different medical providers, and undergoing different medical procedures—experienced the same unique and distinctive constellation of symptoms: a blood-pressure spike, a blood-pressure tank, and some cardiac dysfunction without the culprit lesion (heart blockage) that one would see in a true heart attack. (ROA.2394-99.) And each of these patient's doctors could not explain these unusual complications. (ROA.1485, 1740-41, 2397-98 (TY); ROA.2117-19, 2406-08 (JE); ROA.1775-76, 2041-44 (KP); ROA.1894-95, 1946 (JA).)

## 2. After doggedly reviewing KP's case, KP's anesthesiologist, Dr. Marsden, suspects a tainted IV bag.

After KP's unexplained hypertensive episode, her anesthesiologist for the procedure in question, Dr. Marsden, kept reviewing KP's case in his mind, trying to figure out what happened: KP's blood pressure first started rising after he administered the new IV bag. (ROA.2031.)[2] Her blood pressure continued to rise to concerning levels even after he treated her post-surgery

---

[2] Patients first have an IV bag administered in the pre-operation area ("preop") where medical staff prepares them for the surgery that will take place in the OR. (ROA.1991-92.) For longer surgeries, a second (or more) IV bags may be needed after the first bag is exhausted, and those bags are retrieved from the warmer in the OR hallway.

pain, which was the most likely cause of a blood-pressure rise.  (ROA.2036.)
When he gave KP medication to lower her blood pressure through the IV bag
by opening it and letting some of the fluid flow to her, her blood pressure
strangely and paradoxically went higher.  (ROA.2036-38.)  After the seven-
minute ambulance ride to the hospital—when the IV bag had been sitting on
KP's lap with no fluid flowing to her during the transport—KP's blood
pressure tanked, even though it had not previously responded to any blood-
pressure-reducing medications.   (ROA.2040-41.)  Mulling all this over, Dr.
Marsden concluded that the only explanation that made sense, as crazy as it
sounded, was that KP's IV bag had been tainted with epinephrine.
(ROA.2044-45.)  Seeking to test his theory, Dr. Marsden called Surgicare's
administrator Ashley Burks to see if he could come to the center and review
the anesthesia charts in the other unexplained hypertensive cases, and Burks
welcomed his review.  (ROA.2044-45.)

**3.      Dr. Marsden arrives in time to save JA and to collect the IV bag and
wrapper from JA's surgery; after a hole is found in the JA's wrapper,
Surgicare shuts down.**

A couple days later, on August 24, 2022, Dr. Marsden headed to
Surgicare to review the charts, but when he arrived, he saw an ambulance in
the parking lot.  (ROA.2045.)  He entered the facility and found the

paramedics and Surgicare personnel responding to an emergency code[3] in

OR 1, where a patient's—18-year-old JA's—heart had stopped beating.

(ROA.1889-90, 2046.)  Dr. Marsden saw Burks and asked her to retrieve a new

IV bag from an unopened box, explaining that he thought there could be "a

problem with the IV bags."  (ROA.2047.)  When Burks returned with the new

IV bag, Dr. Marsden disconnected the old bag and hung the one Burks

brought.  (ROA.2047-48.)  Shortly thereafter, JA started to do better, and the

paramedics transported him to the hospital.  (ROA.2048.)

Once JA was transported, Dr. Marsden told everyone, "nothing leaves

th[is] room," and he asked everyone to gather up any IV bags and wrappers[4] in

the room.  (ROA.2048.)  Determined not to lose track of it, Dr. Marsden kept

the IV bag he removed from JA in his hand, and he put the wrapper from the

new IV bag that Burks retrieved in his back pocket because he did not want to

confuse it with the other wrappers.  (ROA.2048.)  Dr. Marsden then walked to

the anesthesia cart and found a wrapper on the top of its trash can—a wrapper

that, upon close inspection, had a hole in it.  (ROA.2048-49; *see also*

ROA.1558-62; GX 191.)  The hole appeared to be made by a needle,

---

[3] A code is an emergency where urgent life-saving measures are needed and an
announcement is made overhead calling for all available staff members to assist.
(ROA.1889-90.)

[4] New, unused IV bags come in a plastic shell or wrapper that is removed when the IV bag is
hooked up to the patient and used.

(ROA.1564), and it was made in the perfect place to surreptitiously infiltrate an IV bag—the part of the wrapper that sits just above the IV bag's injection port. Infiltrating an unopened IV bag there, through its self-healing septum, left no hole in the actual IV bag itself that might cause leakage or attract attention, only a tiny hole in the wrapper that would quickly be thrown in the trash. (GX 191, ROA.1952-53, 2048-49, 2258-59.)

Once the hole in JA's wrapper was discovered, Burks immediately canceled all the remaining surgeries that day and shut down the facility. (ROA.1563-64.) At Surgicare, the IV bags used during surgeries were retrieved from a warmer—an appliance that looked like a fridge and which sat in the middle of the OR hallway and warmed fluids (irrigation bottles and IV bags) to body temperature. (GXs 124-25; ROA.1508-09, 1747, 1825.) On August 24, 2022, after JA's transfer, an inspection of the IV bags in the warmer revealed two bags that were tainted—each with a hole in its wrapper and, according to later testing, foreign substances (bupivacaine and lidocaine) in its fluids. (ROA.2257-59, 2275-78.)

After learning of these events, the IV bags' manufacturer, Baxter Healthcare, conducted a full manufacturing-record review and investigation and concluded that manufacturing was not a potential root cause for the tainted bags. (ROA.1981-82.)

**4.  Surveillance video captures Ortiz placing an IV bag in the warmer before each of the charged victim's hypertensive event.**

Surgicare's security cameras—which were placed throughout the facility (except for the ORs) in May 2022 (after a homeless man entered a bathroom and caused some damage), (ROA.1498; GX 216)—revealed a suspect.  The system stored about 30 days of footage, after which it started recording over itself, so while Surgicare was not able to retrieve footage from May 2022, it did retrieve footage from August 2022.  (ROA.1499.)  That footage captured the defendant-appellant, Dr. Raynaldo Ortiz, placing an IV bag in the warmer before each of the charged victim's (TY, JE, KP, and JA's) hypertensive episode and before the charged tainted IV bag was found in the warmer on August 24, 2022.  (GXs 3, 16, 33, 47, 68.)  One video, in particular, captured Ortiz placing the same IV bag in the warmer that was later retrieved for TY's surgery and which triggered her hypertensive event.  (GX 6; *see also* GXs 3 & 7.)

As an anesthesiologist, it was not Ortiz's job to stock or place IV bags in the warmer, and, at Surgicare, Ortiz was not known for helping others with their job responsibilities.  (ROA.1510-11, 1796-97, 1835-36, 2774-77, 2780-81.)  Moreover, Ortiz's actions surrounding the warmer—looking around to see if the coast was clear before he placed or checked on a bag, (GXs 3-5); hiding a bag under a folder or behind his body before placing it in the warmer, (GXs 33,

47); loading up multiple unlabeled syringes in the preop room, putting them in his pocket, and walking around the facility before taking them to OR 5 (the OR where Ortiz worked) and emerging with an IV bag, which he placed in the warmer, (GXs 61-68); and his obvious interest in seeing the victims being taken out on a stretcher, (GXs 10, 22)—evidenced a guilty conscience.

In addition to the videos, other evidence also pointed to Ortiz. Before the summer of 2022, Ortiz did not typically get IV bags for his own procedures at Surgicare; rather, the nurse got them. But that summer—during the string of unexplained hypertensive events and long before anyone suspected tainted IV bags—Ortiz started getting his own bags, sometimes retrieving multiple bags at once and piling them on the ventilator in OR 5. (ROA.1826-27.) Moreover, the unexplained hypertensive events also correlated with Ortiz's presence at Surgicare. The events paused for one week in July when Ortiz was out of town on vacation, (ROA.1566-67), and then stopped completely after Surgicare reopened and Ortiz was no longer working at the facility, (ROA.1444).

Further, Ortiz had the ability, opportunity, and motive to poison the IV bags. As an anesthesiologist, he had ready access to all the supplies needed to make his medical bombs—the IV bags, the syringes, the needles, and the tainting drugs (epinephrine, bupivacaine, lidocaine, ephedrine), (ROA.1516-

17, 1746-47, 2050-51)—as well as the knowledge to make them so as to avoid detection. (*E.g.*, ROA.2049, 2383-84, 2678-79.) Ortiz further had the motive to plant those medical bombs, as, shortly before the unexplained hypertensive emergencies began, Ortiz learned that Surgicare's Medical Executive Committee (MEC)[5] was investigating him for his handling of a May 19, 2022 procedure, (ROA.1438-40, 1523-25, 1828, 2120-21), and—given his past public reprimand by the Texas Medical Board for a 2017 incident, (ROA.1470-72); an ongoing Texas Medical Board investigation for a 2020 incident, (ROA.1473-76); and his recent surrender of privileges at another facility, (ROA.2122)—Ortiz was especially motivated to make other doctors look bad and take the heat off himself.

**5.    Ortiz is indicted for five counts of tampering with a consumer product and five counts of adulteration of a drug, a jury convicts him on all counts, and the district court sentences him to 2,280 months in prison.**

A federal grand jury charged Ortiz with five counts of tampering with a consumer product, in violation of 18 U.S.C. § 1365(a), and five counts of adulteration of a drug, in violation of 21 U.S.C. §§ 331(k) and 333(b)(7), based on the IV bags he tampered with and adulterated on August 4, 2022, which was used in TY's surgery (Counts One and Six); on August 9, 2022, which was

---

[5] Surgicare's MEC is a committee comprised of doctors and administrators that oversees the clinical practice of the facility and is responsible for credentialing and recredentialing the physicians that practice there, as well as overseeing their conduct. (ROA.1909-11.)

used in JE's surgery (Counts Two and Seven); on August 16, 2022, which was used in JA's surgery (Counts Three and Eight); on August 19, 2022, which was used in KP's surgery (Counts Four and Nine); and on August 23, 2022, which was found in the warmer following JA's surgery (Counts Five and Ten). (ROA.59-60.)

At trial, the government presented 24 witnesses, three rebuttal witnesses, and more than 200 exhibits, including the IV bag wrappers with holes in them and hours of surveillance footage the jury could view for itself. The defense's theory at trial was that Surgicare and the government suffered from confirmation bias—that they wanted someone to blame for these adverse medical events and so they viewed Ortiz's conduct as suspicious when, the defense claimed, it was not, and they failed to explore other explanations for the events (like the patient's underlying medical condition or the medications given during surgery). (ROA.2831-43.) The jury, however, rejected the defense's argument and convicted Ortiz on all counts. (ROA.1124-25.)

At sentencing, the district court emphasized the seriousness of Ortiz's offense and the grave cost it effected on each of the victim's and their families, as well as on the public's trust of doctors and the healthcare system. (ROA.2929-33.) The court then sentenced Ortiz to the statutory maximum sentence—240 months' imprisonment as to Counts One through Four and

Counts Six through Ten, to run consecutively to each other, and 120 months on Count Five, to run consecutively to all counts, for a total of 2,280 months in custody.  (ROA.1152, 2933.)

## SUMMARY OF THE ARGUMENT

1.     Overwhelming evidence supported the jury's verdict on all counts, including (1) surveillance video showing Ortiz's suspicious and not-medically-explainable actions placing an IV bag in the warmer before each of TY's, JE's, KP's, and JA's hypertensive incidents and even capturing (through the slit of the warmer's door) that the bag Ortiz placed in the warmer before TY's surgery was the same bag retrieved for TY's surgery; (2) testimony and medical records showing that the administration of the IV bag taken from the warmer is what triggered each of the patient's hypertensive episodes; (3) testimony that the hypertensive episodes could not be explained by the patient's underlying medical conditions, the surgical procedures, or the medications given during surgery; (4) testimony that the patient's symptoms were consistent with a poisoned IV bag; (5) evidence showing that the patients who had their blood tested (KP and JA) had chemicals in them that should not have been there; (6) evidence showing that—after Dr. Marsden suspected that Surgicare's IV bags might be tainted and JA's IV bags were inspected—it was discovered that JA's IV bag wrapper had a hole in it and his IV bag had chemicals in it that should not have been there; (7) evidence showing that Ortiz had the ability,

12

opportunity, and motive to poison IV bags at Surgicare; (8) testimony showing that Ortiz started getting his own IV bags around the time the unexplained hypertensive episodes began and long before anyone suspected tainted bags; and (9) testimony showing that the string of unexplained hypertensive events that occurred in the summer of 2022 paused when Ortiz was on vacation and stopped after he was no longer working at the facility.  Based on this evidence, a rational jury could have found that Ortiz poisoned each of the IV bags charged in the indictment beyond a reasonable doubt.

Arguing otherwise, Ortiz essentially repeats the same trial arguments that the jury rejected, emphasizing the evidence he finds most favorable to his defense while nitpicking or ignoring contrary evidence.  But, in doing so, he ignores that all credibility choices and reasonable inferences supporting the jury's verdict must be accepted.  Under that proper standard of review, Ortiz cannot show that the jury's verdict was irrational, and this Court should affirm the jury's verdict.

2.    The district court did not abuse its discretion in admitting evidence regarding uncharged victim MK's death.  First, sufficient proof established the evidence's relevance under Federal Rule of Evidence 104(b), as, based on the evidence produced at trial, the jury could have reasonably found by a preponderance of the evidence that Ortiz poisoned MK's IV bag.  Indeed, the

jury could have easily made that finding considering the trial evidence showing that: (1) Ortiz poisoned numerous IV bags at Surgicare in the summer of 2022; (2) MK worked at Surgicare on June 21, 2022, and then, after work, went home and administered an IV bag to herself; (3) MK died shortly after administering that bag; (4) a postmortem analysis revealed the unexplained presence of bupivacaine in MK's blood; (5) Baxter, the bag's manufacturer, received no complaints of tainted IV bags for the impacted lot numbers other than from Surgicare; and (6) there was no evidence of tainted IV bags at any of the other facilities where MK worked.

Second, the district court did not abuse its broad discretion in determining that the probative value of the MK evidence was not substantially outweighed by its risk of unfair prejudice. The MK evidence had significant probative value. Unlike the other victims, MK was not undergoing surgery at the time her IV bag was administered, so MK's case rendered inapplicable many of the alternative explanations offered by defense counsel for the hypertensive episodes (*e.g.*, physician error, medications administered during surgery, surgical pain, waking up from anesthesia) and persuasively demonstrated that it was the IV bag that caused the cardiac event. Further, given the district court's limiting instruction, the MK evidence's brevity, and the fact that MK's poisoning was of the same nature as the charged offenses,

Ortiz cannot show that the district court abused its wide discretion in finding that the MK evidence's strong probative value was not substantially outweighed by the risk of unfair prejudice.

In any event, any error in admitting the MK evidence was harmless because, even without it, overwhelming evidence supported the jury's verdict.

3.     The district court did not abuse its broad discretion in exempting Dr. Hail from Rule 615's courtroom exclusion even though the government made its exemption motion after Dr. Hail had already been present in the courtroom during other witnesses' testimony.  Considering the Rule's text (which says nothing about *when* a party must show a witness's presence to be essential), the caselaw (which indicates that a party can move for an exemption even after the witness has purportedly violated the Rule by remaining in the courtroom), and the equities (which weigh against a timing requirement for showing a witness's presence to be essential), the district court here did not abuse its discretion in finding Dr. Hail's presence to be essential and thus exempting her from the Rule even though the government did not move for her exemption until later in the trial.

Moreover, even if Dr. Hail's presence constituted a technical violation of the Rule, it did not violate the Rule's main purpose, was not a willful violation,

and caused Ortiz no prejudice.  As such, the district court acted well within its broad discretion in allowing Dr. Hail to testify.

For the first time on appeal, Ortiz contends that, even setting aside the timing of the government's motion, the government failed to make the requisite showing that Dr. Hail's presence was essential to the government's claims.  But Ortiz can show no error, let alone clear or obvious error, in the district court's exemption finding where, as here, the government showed that the witness was an expert witness who would not testify as to the facts of the case but rather would give her expert opinion based on the evidence.

4.   The district court did not err, let alone plainly err, by not sua sponte intervening when the prosecutor stated in his rebuttal closing argument that "only one person in this room knows what was actually used to adulterate those bags," while also emphasizing that such information was immaterial to the issue of Ortiz's guilt.  Under this Court's precedent in *Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998), the comment was proper, and Ortiz's efforts to cast *Lucas* aside under this Court's rule of orderliness fail because, contrary to Ortiz's assertions, *Lucas* does not conflict with prior circuit authority.  Indeed, at the very least, *Lucas* does not clearly or obviously conflict with such authority, so Ortiz can show no clear or obvious error under the second prong of plain-error review.  Moreover, Ortiz's argument also fails on the third

16

prong, as he can show no effect on his substantial rights.  Considering (1) the minimal prejudicial effect (if any) of the prosecutor's isolated, one-sentence remark (indirectly referring to Ortiz while also emphasizing that those facts that "only one person" knows are immaterial to the jury's deliberations); (2) the district court's charge instructing the jury that no inference may be drawn from the election of a defendant not to testify; and (3) the overwhelming evidence of Ortiz's guilt, Ortiz cannot show a reasonable probability that the trial's outcome would have been different had the prosecutor not made the remark.

## ARGUMENT AND AUTHORITIES

### 1.    Ample evidence supported the jury's verdict.

### Standard of Review

Ortiz preserved error by moving under Federal Rule of Criminal Procedure 29 for a judgment of acquittal at the close of the government's case-in-chief and by renewing that motion at the close of all evidence.  *See United States v. Ocampo-Vergara*, 857 F.3d 303, 306 n.3 (5th Cir. 2017).  For such preserved sufficiency challenges, this Court's review is "highly deferential to the verdict."  *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Id*. Thus, the inquiry is limited to whether the jury's verdict was reasonable, not whether this Court believes it to be correct. *Id*. at 375.

In making this inquiry, the Court "accept[s] all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997); *see also United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) ("We will not second guess the jury in its choice of which witnesses to believe."). "[A]ny conflict in the evidence must be resolved in favor of the jury's verdict," and "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Moreno-Gonzalez*, 662 F.3d at 372 (internal quotation marks and citations omitted).

**Discussion**

To support both a conviction for tampering with consumer products, in violation of 18 U.S.C. § 1365, and a conviction for adulterating a drug, in violation of 21 U.S.C. § 331(k), the government must prove, among other things, that Ortiz poisoned (and thus tampered with and adulterated) a lactated ringer's IV bag. For each count, Ortiz contends that the government failed to make that showing, arguing that (1) insufficient evidence demonstrated that an IV bag used in a particular surgery was poisoned because there were other

18

possible causes for the patient's symptoms, and/or (2) even if sufficient evidence showed that the IV bag was poisoned, insufficient evidence demonstrated that he did the poisoning because it is impossible to know whether the IV bag he placed in the warmer was the same bag later retrieved from the warmer and used in the surgery. But Ortiz fails to view the evidence in the light most favorable to the government and to the jury's verdict.[6] Viewed in that proper light—that is, accepting all credibility choices and reasonable inferences that tend to support the verdict, and resolving any conflict in the evidence in favor of the verdict—there was overwhelming evidence from which a reasonable jury could have found beyond a reasonable doubt that Ortiz poisoned each of the IV bags alleged in the indictment.

### A. Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in TY's August 4, 2022 surgery and thus its verdict on Counts One and Six.

Ortiz contends that insufficient evidence showed that the IV bag taken from the warmer and used in TY's surgery on August 4, 2022 was the same

---

[6] Indeed, Ortiz appears to rely on a standard of review that is no longer good law. He cites cases that rely on the "equipoise rule," which provides that the appellate court must reverse a conviction if the evidence gives "equal or nearly equal" circumstantial support to a theory of guilt and a theory of innocence. (*See* Brief at 32 (citing *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011), and *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999), both of which cite and rely on the equipoise rule).) This Court abandoned the equipoise rule in 2014. *See United States v. Vargas-Ocampo*, 747 F.3d 299, 301-02 (5th Cir. 2014) (en banc).

bag he placed in the warmer earlier that day.  (Brief at 35-36.)  However, the surveillance video demonstrates that it was the same bag.

On August 4, 2022, at 11:33 a.m., Ortiz opened the warmer's door, and notably, before he placed the IV bag inside, there were no IV bags visible through the door's slit.



(GX 6 at 00:03.)  Ortiz then placed the IV bag in the warmer such that it (and it alone) was visible through the door's slit.



(GX 6 at 00:04-05.)  About thirty minutes later, at 12:09 p.m., a nurse retrieved

an IV bag for TY's surgery:  She opened the warmer's door, and the bag Ortiz

placed there was still visible through the door's slit.



(GX 6 at 35:26.) The nurse then picked up that visible bag, and after doing so, there was, once again—just as before Ortiz placed the bag—no IV bags visible through the door's slit.



(GX 6 at 35:29.) Thus, based on the surveillance video alone, a reasonable jury could have found that the IV bag Ortiz placed in the warmer on August 4 was the same bag used in TY's surgery.[7]

Ortiz further contends that insufficient evidence showed that the IV bag he placed in the warmer shortly before it was retrieved for TY's surgery was

---

[77] Beyond this, as discussed below, there was overwhelming evidence that the IV bag taken from the warmer and used in TY's surgery was poisoned and that Ortiz poisoned it, and from that evidence, a rational jury could have found beyond a reasonable doubt that the bag Ortiz placed in the warmer was the same one taken out and used in TY's surgery.

poisoned.  (Brief at 45.)  But he is wrong.  Overwhelming evidence supported the jury's finding that Ortiz poisoned that bag.

First, the evidence showed that the triggering event for TY's hypertensive episode was the hanging of the IV bag retrieved from the warmer. TY's anesthesiologist, Dr. Erdman, testified that TY's blood-pressure spike started within minutes after that IV bag was hung.  (ROA.1738-39.)  Similarly, TY testified that her surgeon, Dr. Kerner, later informed her that her blood pressure and heart rate went up pretty quickly after that new IV bag was administered.  (ROA.1492.)  And toxicologist Dr. Hail testified that, based on the anesthesia record, TY's blood-pressure spike coincided with when that IV bag was hung.  (ROA.2392; GX 156 at 11.)

Second, TY's sudden and unexpected hypertensive episode, which required her to be transferred to a hospital, was something that her anesthesiologist and other experienced medical professionals had never seen before the summer of 2022 or since, that is, after Ortiz was no longer working at Surgicare.  Dr. Erdman testified that, aside from MN (another suspected poisoning during the summer of 2022), in his 40 years of practice, he had never seen anything like what happened to TY before or since.  (ROA.1745-46.) Surgicare's administrator and experienced nurse Ashley Burks likewise testified that what happened to TY was one of a string of "unusual"

complications that happened during the summer of 2022 that Surgicare had never experienced before.  (ROA.1525-26.)  And Dr. Carpenter, a plastic surgeon and member of Surgicare's MEC, testified that, prior to the summer of 2022, he was aware of no very serious adverse events that happened at this facility, (ROA.1436), and he had not seen a hypertensive episode like what happened with TY and other suspected poisoning victims since the facility reopened after its closing in August 2022, that is, after Ortiz no longer worked at the facility, (ROA.1444-45).

    <u>Third</u>, TY experienced a unique and distinctive constellation of symptoms—a blood-pressure spike[8], a blood-pressure tank,[9] and some cardiac dysfunction without the culprit lesion[10]—that could not be explained by her treating and examining physicians, who, of course, started with a default assumption that TY's medical supplies had not been poisoned.[11]  TY's anesthesiologist Dr. Erdman testified that none of the drugs he gave her that

---

[8] (ROA.1734, 1761 (Dr. Erdman testifying that there was a very rapid and extreme blood-pressure rise).)

[9] (ROA.1762 (Dr. Erdman testifying that TY's blood pressure was low in the recovery room); ROA.2390-91 (Dr. Hail testifying that, during the procedure, Tammy Young had an enormous blood-pressure spike but later her blood pressure suddenly tanked).)

[10] (ROA.2394-97 (Dr. Hail testifying that—although TY had cardiac dysfunction with a reduced ejection fraction (reduced heart pumping) and elevated troponins (an enzyme released when heart cells are injured)—she did not have a heart blockage (by a blood clot), which is the culprit lesion one would see in a heart attack).)

[11] (ROA.2398 (Dr. Hail testifying that the possibility of adulterated IV fluids "would not be in a normal physician's differential diagnosis").)

day and none of TY's underlying medical conditions caused the event. (ROA.1740-41.)  TY testified that the heart doctor at the hospital to which she was transferred could not tell her what went wrong.  (ROA.1485.)  And Dr. Hail testified that TY's medical records do not indicate a cause or explanation for what happened to her.  (ROA.2397.)  Further, administrator Burks testified that numerous physicians had reviewed these transfer cases, including TY's, and they could not figure out what was happening.  (ROA.1527-28.)

Fourth, TY's symptoms, however, could be explained by an adulterated IV bag—i.e., a bag poisoned with the very drugs Ortiz had ready access to at the facility.  Toxicologist Dr. Hail testified that TY's issues were consistent with an IV bag tainted with epinephrine and bupivacaine.  Specifically, TY's blood-pressure spike was consistent with epinephrine.  (ROA.2397; *see also* ROA.1741, 1745 (Dr. Erdman testifying that the rapid spike in blood pressure in TY's surgery was consistent with an infusion of epinephrine).)  TY's blood-pressure tank was consistent with the epinephrine wearing off, the antihypertensives that were administered to respond to the blood-pressure spike, and/or bupivacaine.  And TY's cardio dysfunction was consistent with bupivacaine.  (ROA.2397-98.)

Fifth, evidence showed that, around the time of TY's surgery, IV bags were intentionally tampered with and adulterated at Surgicare.  On August 24,

2020, two unopened and unused IV bags with small holes in each of their wrappers were found in the warmer.  (ROA.2257-58; GX 192.)  The holes were in the bottom of the wrapper, right over where the IV bag's self-healing septum was—i.e., the perfect place to tamper with the bag without potentially creating leakage or otherwise attracting notice that could alert someone to the tampering.   (ROA.1952-53, 2048-49, 2258-59.)  And inside those two wrapped, unused, and perfectly punctured bags, were chemicals that should not have been there—bupivacaine and lidocaine.  (ROA.2276-77.)

Sixth, TY's symptoms (which were consistent with a poisoned IV bag and otherwise unexplained by her treating physicians) were strangely experienced during the same short timeframe at Surgicare by other patients of different ages, genders, and medical histories, with different medical providers, and undergoing different medical procedures[12]—including by patients (KP and JA, the only ones who had their blood tested) who were found to have chemicals in their blood that should not have been there, and a patient (JA, the only one whose IV bag wrapper was collected) who had a hole in his IV bag

---

[12] (ROA.1525-28 (Burks testifying that Surgicare had 14 transfers from May to August 2022 when, in the entire prior year of 2021, it had only five); ROA.1681-82 (Burks testifying that the number of transfers in the summer of 2022 was "staggering" and she performed a root-cause analysis before tampered bags were ever suspected and they could not figure out what was happening); ROA.2544 (Defense witness Skabo testifying that he has worked at a lot of ambulatory surgical centers and he has never seen 13 transfers to emergency care within two or three months).)

wrapper.  (ROA.2399 (Dr. Hail testifying that the same pattern of symptoms was seen in TY, JE, KP, and JA); ROA.2201, 2411-13; GX 146 (bupivacaine found in KP's blood, which should not have been there); ROA.2202-03, 2417-18; GX 130 (ephedrine found in JA's blood, which should not have been there).)

Seventh, Ortiz's actions regarding TY's IV bag demonstrated a consciousness of guilt.  On August 4, 2022, at 7:56 a.m., as seen on the surveillance footage, Ortiz removed a vial of medicine from the OR hallway cabinet, took an IV bag out of the warmer, and went into OR 5.  (GX 1; ROA.1530.)  Later that day, at 11:33 a.m., Ortiz exited OR 5 with an IV bag and placed it in the warmer, looking around to see if anyone was coming both before and after he placed the bag.





(GX 3; ROA.1531-32.)

Three minutes later, at 11:36 a.m., Ortiz walked down an empty OR hallway, heading from the preop area to OR 5. Halfway down the hall, he stopped near OR 4's door, pretending to look at something on the floor as if to give himself the time and position to see or hear if anyone was exiting OR 4. Ortiz then continued on towards OR 5 before circling back to the warmer, opening its door, and looking inside.





(GX 4.)

Ten minutes later, at 11:46 a.m., Ortiz returned to the warmer. Coming

from the direction of the preop room, he walked down the OR hallway with

other medical personnel, paused at the medicine cabinet, and looked inside,

pretending to reach for something while he waited for the hallway to clear. After the last person exited the hallway, Ortiz opened the warmer and looked inside.






(GX 5; ROA.1532.)

Finally, when the paramedics came to transfer TY to the hospital, Ortiz could not hide his interest; he asked multiple people what was going on and positioned himself so he could watch from a distance as TY was taken out on a stretcher.  (GX 10; ROA.1536.)

As multiple witnesses testified, the mere act of putting a bag in the warmer was strange enough because that was not Ortiz's job, (ROA.1510, 1532, 1796); he typically did not help others in doing their jobs;[13] and, in general, it was not something that anesthesiologists ever did.  (ROA.1748 (Anesthesiologist Dr. Erdman testifying that, in his 40 years of practice, he has never put an IV bag in the warmer); ROA.1954 (Anesthesiologist Dr. Hussain testifying that he has never put an IV bag in the warmer); ROA.1795-96 (Anesthesia tech Rumaldo Gonzalez testifying that, aside from one instance in which he saw Ortiz put an IV bag in the warmer in the summer of 2022, he has never seen a doctor put an IV bag back in the warmer); ROA.1586-89 (defense

---

[13] (ROA.2780-81 (Burks testifying that Ortiz is not known for doing a lot of extra work at Surgicare, and, when she worked with him on a regular basis from 2009 to 2014, she never saw him put away supplies at the end of the procedure or help anyone with their job); ROA.1796-97 (Anesthesia tech Rumaldo Gonzalez testifying that Ortiz never helped him with his job, and he never saw Ortiz helping other people with their jobs); ROA.1835-36 (Circulating nurse Brook Buchanon, who worked regularly with Ortiz since March 2022, testifying that Ortiz did not help with anyone else's job, did not clean the room after a procedure, and was not generally helpful); ROA.2774-77 (Surgical tech Paul Monaco, who has worked with Ortiz every Tuesday and Thursday from December 2016 to August 2022, testifying that he has never seen Ortiz clean up an OR room, put away supplies at the end of procedure, offer to help clean up IV bags, or help anyone out with their job); ROA.2765 (defense witness testifying that he does not recall ever seeing Ortiz take an unused IV bag out of the OR when the procedure is over).)

counsel noting videos where Gonzalez or a circulating nurse puts an IV bag in the warmer but notably citing no examples of an anesthesiologist or any other doctor (other than Ortiz) putting a bag in the warmer).)

Similarly, Ortiz's checking of the warmer was also strange because he had no reason to check it. (ROA.2777.) It was not his job to stock the warmer, (ROA.1510); he never helped those workers who actually had the job to stock the warmer, (ROA.1796-97); and, even assuming there could be an innocent explanation for checking it once, there was certainly no reason to open it three times in less than 15 minutes.

But on top of these already strange actions was the strange manner in which Ortiz did them—i.e., making sure the coast was clear before he placed the bag and before he checked on it and displaying an insuppressible interest in TY's exit on a stretcher. "[F]actfinders may properly 'use their common sense' and 'evaluate the facts in light of the natural tendencies and inclinations of human beings.'" *United States v. Lage*, 183 F.3d 374, 383 (5th Cir. 1999). And here, a rational jury viewing Ortiz's actions could have found that his conduct evidenced a consciousness of guilt: Ortiz knew he was putting a poisoned bag into the warmer, so he looked around to make sure no one was watching; he

returned to the scene of the crime to check on his bag; and he was interested in the aftermath of his conduct.[14]

Eighth, Ortiz had the ability, opportunity, and motive to poison TY's IV bag. Ortiz had the ability because, as an anesthesiologist, he enjoyed unlimited access to all the tools needed to make his medical bombs—the IV bags, the drugs (epinephrine, ephedrine, bupivacaine, lidocaine), the syringes, and the needles—as well as access to the warmer in which he placed them. (ROA.1516-17, 1746-47, 2050-51.) Further, given his knowledge and training as an anesthesiologist, Ortiz also knew: (1) the perfect place to inject drugs into an unopened IV bag that would avoid detection (i.e., right above the bag's septum), (ROA.2048-49); (2) that epinephrine would cause the life-threatening situation he desired, and, given its extremely short half-life and natural occurrence in the body, it would also be difficult, if not impossible, to detect in the patient's blood afterwards, (ROA.2384, 2678-79); and (3) that, in diagnosing what happened afterwards, doctors would never start with the premise that an IV bag had been poisoned, (ROA.2398).

Ortiz had the opportunity to poison the bag because he had privileges at Surgicare, and, as a doctor whose job is to heal and care for others, he enjoyed

---

[14] Ortiz argues that his conduct regarding TY's bag (or any of the other charged IV bags) was not suspicious, but the jury saw the videos and concluded otherwise, and their conclusion was certainly not irrational.

the default assumption that when he handled IV bags, syringes, and vials of medicine, no one would ever think he was poisoning an IV bag.  Moreover, as demonstrated at trial, it took less than 10 seconds to inject an IV bag, (ROA.1565), and, in the OR, Ortiz could place an IV bag on the anesthesia cart's surface with his back to the room so that his body blocked what he was doing on the cart's surface, (GX 119; ROA.1698-99).  Further, given the general busyness of the OR, with workers buzzing around doing their own tasks, (ROA.1698-99), as well as the fact that no one would be scrutinizing his actions thinking that he might be poisoning a bag, (ROA.2398), Ortiz had ample opportunity to poison IV bags, including TY's bag, in OR 5.

Ortiz further had a motive to poison bags at Surgicare.  The unexplained medical emergencies there began in May 2022—after Ortiz knew he was being investigated by the MEC for a May 19, 2022 incident.  (ROA.1438-40, 1523-25, 1828, 2120-21.)  At that time, Ortiz was already under significant professional pressure, as he had a public reprimand from the Texas Medical Board for an incident that occurred in 2017, (ROA.1470-72; GX 170), and he was being investigated by Texas Medical Board for another incident that occurred in November 2020, (ROA.1473-76).  Ortiz was also financially struggling—his income had steadily declined since 2016, he owed large sums in taxes, and his company (Garland Anesthesia Consultants) was struggling to

make payroll. (ROA.2174, 2154-55, 2192-94.) Given these professional and financial pressures, a rational jury could have found that Ortiz lashed out. He made others suffer because he was struggling, and the particular suffering he chose to inflict was uniquely designed to make other doctors look bad (because medical emergencies were happening in their procedures), and to take the heat off him (because even good doctors can have incidents), thereby encouraging the MEC to close its investigation and recredential him.[15]

Ninth, although Ortiz did not typically retrieve the IV bags used in his procedures at Surgicare (the nurse got them), in the summer of 2022—while the string of unexplained hypertensive episodes was occurring and long before anyone suspected tainted IV bags—Ortiz started getting his own bags, sometimes retrieving multiple bags at once and piling them on the ventilator in OR 5. (ROA.1826-27.) Ortiz's well-timed actions to control and select the particular bags used in his own procedures demonstrated that he knew—well before anyone else—that IV bags in Surgicare's warmer were tainted.

Tenth, the string of unexplained hypertensive events that occurred at Surgicare in the summer of 2022 correlated with Ortiz's presence there.

---

[15] It may be impossible to ever make much sense out of such a senseless act as poisoning IV bags. But the point remains that, in the summer of 2022, Ortiz was facing significant professional and financial pressures, and the unexplained medical emergencies began after he knew Surgicare's MEC was investigating him for the May 19, 2022 incident, picked up again when he knew the MEC was meeting on June 22, and also occurred on a date when the Texas Medical Board disciplined him. (ROA.1473-74, 1566-67, 1694-95.)

Specifically, the events paused for one week in July when Ortiz was out of town on vacation, (ROA.1566-67), and then stopped completely after Ortiz no longer worked at the facility, (ROA.1444).

In short, the government presented overwhelming evidence that Ortiz poisoned an IV bag used in TY's surgery.

Ortiz argues otherwise, emphasizing that TY's blood at the time of the emergency was not collected and tested, the IV bags used during her surgery were not collected and tested, and the IV bag wrappers were not collected and examined for holes. (Brief at 46.)  However, the absence of such evidence merely illustrates how unthinkable the crime was at the time of TY's surgery. Ortiz notably cites no authority requiring such evidence.  To the contrary, this Court's caselaw makes clear that direct evidence (of the poisoning) is not required:  A conviction can be established by circumstantial evidence alone. *See United States v. Acosta*, 972 F.2d 86, 88 (5th Cir. 1992) (holding that "[d]irect evidence of the defendant's guilt is not required" and that guilt can be shown "by circumstantial evidence alone"); *Moreno-Gonzalez*, 662 F.3d at 372 (emphasizing that the standard of review for the sufficiency of circumstantial evidence is the same as for direct evidence).  And, as discussed above, the circumstantial evidence of Ortiz's guilt was overwhelming.

Ortiz further contends that there were two innocent explanations for TY's blood-pressure spike: TY's surgeon Dr. Kerner (1) accidentally permitted local anesthesia to enter the blood stream when applying it subcutaneously near an incision, or (2) accidentally used a tumescent bag[16] in place of one containing pure saline solution.  (Brief at 46.)  However, a rational jury could have rejected each of these explanations.  TY's anesthesiologist Dr. Erdman testified that the local anesthetic Dr. Kerner used to provide numbness along the incision in the facelift part of TY's surgery was not given in the range of doses that could cause systemic toxicity and could not have explained the blood-pressure spike.  (ROA.1751, 1765.)  And administrator Burks testified that Surgicare's root-cause analysis for each of the unexplained hypertensive episodes during the summer of 2022, including TY's, did not reveal any medical errors involving tumescent.  (ROA.1700.)  Further, tumescent bags were not mixed in with other IV bags, (ROA.1701), and were notably distinct from an IV bag containing pure saline solution—as they had no wrapper and were marked with a big orange sticker for high alert, (ROA.1576-77, 1700-01, 1810, 1813-14).  Considering this, a reasonable jury could have easily rejected the notion that Dr. Kerner—a highly regarded and experienced plastic

---

[16] Tumescent is comprised of IV solution, lidocaine (or another local anesthetic), and a little bit of epinephrine.  It is injected subcutaneously into the fat tissue and is used during liposuctions to decrease the bleeding, provide some numbness, loosen the tissue, and tighten the skin.  (ROA.2336-38.)

surgeon, who had performed thousands of surgeries, (ROA.2016-18, 2329), and correctly identified and used a tumescent bag hundreds of times, (ROA. 2016-18, 2785-86)—could have misidentified a tumescent bag as a regular IV bag containing pure saline solution, let alone hooked it up to the patient without anyone else (not the nurses or Dr. Erdman) catching the error.

Ortiz proposes a third possible explanation for the blood-pressure spike: the use of tumescent during the liposuction portion of the surgery.  (Brief at 46-47.)  But a rational jury could have rejected that explanation as well.  Dr. Erdman testified that the use of tumescent could not have explained TY's blood-pressure spike.  (ROA.1765-66, 2785-86.)  Dr. Marsden, Dr. Hail, and other witnesses testified similarly—explaining that the tumescent solution contains a dilute concentration of local anesthetic and epinephrine, (ROA.1461, 1464-65, 2022, 2336, 2389); it is put into fatty tissue, which does not have a great blood flow and which is eventually removed from the body during the liposuction, (ROA.2022, 2335-38, 2678); the epinephrine constricts the blood vessels and prevents absorption into the blood, (ROA.2334-35, 2571); even if absorbed in the blood stream, the local anesthetic from the tumescent solution would cause a blood-pressure decrease, not a rise, (ROA.2472-73); and, in any event, the tumescent administrations during TY's surgery could not have caused her blood-pressure spike because they occurred

long before the spike, (ROA.1768, 2472). Indeed, even Ortiz's expert admitted that the timing of TY's blood-pressure spike (hours after the tumescent was administered), when epinephrine has a half-life of only two minutes, makes it "less likely" that the epinephrine in the tumescent caused TY's blood-pressure spike. (ROA.2678-79.)[17]

In sum, there was ample evidence to support the jury's verdict that Ortiz poisoned the IV bag used in TY's surgery and thus ample evidence to support Ortiz's conviction on Counts One and Six.

---

[17] Ignoring this evidence, Ortiz contends that TY's surgeon, Dr. Kerner, testified that the "most likely cause of the emergency" was her use of tumescent during the liposuction. (Brief at 46.) But that is not quite what Dr. Kerner testified. Dr. Kerner testified that she did not remember if TY had a rise in blood pressure during her surgery and that she "just . . . totally blanked" regarding whether TY had any complications or rising blood pressure. (ROA.2343-44.) Only when pressed further about the details of "those blood pressure issues" that she did not remember and "went totally blank" on, did Dr. Kerner suggest that the tumescent (which had lidocaine and epinephrine in it) "could have" caused those unremembered "blood pressure issues." (ROA.2345.) Later, on cross-examination, Dr. Kerner testified that tumescent would make the most sense of *a* high blood pressure incident if it were inadvertently injected or if too much was absorbed in the vein, (ROA.2359), but she also testified that that is not what she did—she did not inadvertently inject tumescent intravenously into TY's system, (ROA.2367-68). In any event, beyond repeatedly emphasizing that she was struggling to remember TY's blood-pressure issues, (ROA.2358, 2368), Dr. Kerner testified that treating blood pressure during surgery is in the wheelhouse of the anesthesiologist, (ROA.2362), and Dr. Erdman, TY's anesthesiologist, testified that Dr. Kerner's use of tumescent could not have explained TY's blood-pressure spike, (ROA.1765-66).

**B.      Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in JE's August 9, 2022 surgery and thus its verdict on Counts Two and Seven**.

Ortiz disputes that the IV bag taken from the warmer and used in JE's surgery on August 9, 2022 was the same bag he placed in the warmer earlier that day.  However, surveillance video supports the jury's conclusion that it was the same bag, as the video captures movement (seen through the warmer door's slit) in the same area of the warmer when Ortiz puts the bag in and when Dr. Billman takes the bag out for use in JE's surgery.  (*Compare* GX 17 at 00:07 *with* GX 17 at 34:36.)[18]  Further, as discussed below, Ortiz's actions regarding the bag demonstrate that he knew that the bag was tainted.  Those actions—combined with the evidence showing that the bag used in JE's surgery was poisoned—further supports the jury's finding that the bag Ortiz placed in the warmer on August 9, 2022 was the same bag taken out and used in JE's surgery.

Ortiz further argues that insufficient evidence supported the jury's finding that the IV bag retrieved from the warmer and used in JE's surgery—

---

[18] Ortiz contends that it is improbable that the bag he put in the warmer would be the same bag retrieved for the next surgery.  But it is a rational inference (supported by the videos) to conclude that the poisoner would want to place the bag in the warmer as quickly and stealthily as possible, which would mean placing it on top of the most accessible stack or spot in the warmer.  And it is also a rational inference that the person retrieving a bag from the warmer for surgery would likewise grab the bag from the most accessible spot.

the one that Ortiz placed in the warmer earlier that day—was poisoned.  (Brief at 48.)  But overwhelming evidence supported the jury's finding.

First, the evidence showed that the triggering event for JE's hypertensive episode was the hanging of the IV bag retrieved from the warmer.  Dr. Vo, JE's surgeon, testified that it was at the very end of the surgery when the hypertensive event happened.  (ROA.2114-15, 2117.)  Dr. Vo's dressings were already on, and they were about to extubate JE and take him to the recovery room.  (ROA.2114-15.)  At this time, as seen on the surveillance video, Dr. Billman, the anesthesiologist, exited OR 4 and retrieved an IV bag from the warmer at 10:54 a.m., looking unbothered.  (ROA.2116-17; GX 18.)  Then, about ten minutes later, at 11:03-04 a.m., all available staff rushed to OR 4, some bringing the crash cart,[19] to help with the apparent emergency.  (GX 20.)

Second, JE's sudden and unexpected hypertensive episode, which required him to be transferred to a hospital, was something that his surgeon and other experienced medical professionals had never seen before the summer of 2022 or since, after Ortiz was no longer working at Surgicare.  (ROA.2117 (Dr. Vo testifying that he had never seen anything like what happened to JE before); *see also* ROA.1436-37, 1444, 1525-26.)

---

[19] A crash cart is a cart that has all the drugs needed to take care of a patient who is in the middle of a life-threatening emergency.  (ROA.1540.)

Third, JE experienced a distinctive constellation of symptoms—a blood-pressure spike, a blood-pressure tank, and some cardiac dysfunction without the culprit lesion—that could not be explained by his treating and examining physicians, who, of course, started with a default assumption that JE's medical supplies had not been poisoned.  (ROA.2406-08 (Dr. Hail testifying that JE had the same unusual series of symptoms that TY had and the underlying reason for this event was never discovered during JE's hospitalization); ROA.2118-19 (Dr. Vo testifying that no medications, surgical techniques, or underlying health conditions caused JE's complications).)

Fourth, JE's symptoms, however, could be explained by an adulterated IV bag—i.e., a bag poisoned with the very drugs Ortiz had ready access to at the facility, epinephrine and a local anesthetic (lidocaine and/or bupivacaine). As Dr. Hail testified, JE's initial blood-pressure spike was consistent with epinephrine; his blood-pressure tank was consistent with the epinephrine wearing off, the antihypertensives that were administered to address his blood-pressure spike, and/or with a local anesthetic in the bag (lidocaine or bupivacaine) lowering JE's blood pressure; and his cardiac dysfunction was consistent with lidocaine or bupivacaine.  (ROA.2407-08.)

Fifth, evidence showed that, around the time of JE's surgery, other IV bags at Surgicare were intentionally tampered with and adulterated. (*See* Part 1(A)(Fifth), *supra*.)

Sixth, JE's symptoms were strangely experienced during the same short timeframe at Surgicare by other patients of different ages, genders, and medical histories, with different medical providers, and undergoing different medical procedures—including by patients (KP and JA, the only ones who had their blood tested) who were found to have chemicals in their blood that should not have been there, and a patient (JA, the only one whose IV bag wrapper was collected) who had a hole in his IV bag wrapper. (*See* Part 1(A)(Sixth), *supra*.)

Seventh, Ortiz's actions regarding the IV bag used in JE's surgery demonstrated his consciousness of guilt. On the morning of JE's surgery, at 8:00 a.m., Ortiz took three IV bags out of the warmer and brought them to OR 5, (GX 15), and, as multiple witnesses testified, it made no sense for Ortiz to do this. (ROA.1747-48 (Dr. Erdman testifying that a nurse has never brought him more than one bag at a time); ROA.1826 (circulating nurse Brook Buchanon testifying that she just gets one bag from the warmer at a time because you want to keep the IV bags warm and just grab them when you are about to switch it out); ROA.2529 (defense witness Skabo testifying that he

does not get bags in advance if they are coming out of the warmer because you do not want them to be cold).)

About two and half hours later, at 10:19 a.m., Ortiz exited OR 5, hurried down the empty hallway, and put one IV bag back into the warmer.

 

(GX 16; ROA.1537.)

Then, 37 minutes later, he went to the preop area, looked around, and asked a worker for assistance in finding an IV bag, which the worker helped him retrieve from the blue cart where the preop bags were stored.  (GX 19; ROA.1539.)

Based on these actions, a reasonable jury could have concluded that Ortiz knew something was wrong with the IV bag he placed in the warmer. After strangely taking multiple bags from the warmer to OR 5 and then putting

one back, Ortiz went out of his way—walking to a different part of the facility and asking a staff member for help in locating the bags stocked for preop patients—to avoid using a bag from the warmer.

Ortiz's guilty conscience was then further displayed when JE was transferred to the hospital.  He watched as the paramedics wheeled JE past on a stretcher and then lingered in the hallway for quite some time, starring after JE, while those around him moved on with their various tasks.  (GX 22; ROA.1541.)  Ortiz could not hide his interest in the aftermath of his actions.

Finally, as discussed above, Ortiz had the ability, opportunity, and motive to poison IV bags at Surgicare; Ortiz started getting his own IV bags around the time the unexplained hypertensive episodes began and long before anyone suspected tainted bags, (ROA.1826-27); and the string of unexplained hypertensive events that occurred in the summer of 2022 (of which JE's was one) paused when Ortiz was on vacation and stopped after he was no longer working at the facility, (ROA.1444, 1566-67).

Based on this evidence, a rational jury could have easily found that Ortiz poisoned the IV bag taken from the warmer and used in JE's surgery.

Ortiz contends otherwise, arguing that that bag could not have caused JE's hypertensive episode because the medical record indicates that his blood pressure spiked before that bag was applied and because JE's blood pressure

came down while that bag was still attached.[20]  However, a reasonable jury could have found that JE's anesthesia record was not accurate regarding the timing of when the second IV bag (the bag retrieved from the warmer) was administered given that: (1) the video evidence showed that the hypertensive episode occurred shortly after Dr. Billman brought the second bag into the room; (2) the timing of the administration of fluids is generally not something anesthesiologists need to be precise about on an anesthesia record, (ROA.2403-04); (3) doctors are less focused on their documentation during an emergency code, (ROA.1891), and, in fact, when JE was sent to the hospital, his anesthesia record was unfinished, and his anesthesiologist only completed it later, after the fact, (ROA.2474-75; *compare* GX 144 at 977 *with* GX 143 at 8); and (4) the anesthesia record indicates that the second bag was administered at or around 11:30 a.m., which cannot be accurate because, at that point, JE was already being transported to the hospital, (ROA.2476).

Further, the fact that JE's blood pressure came down while the second bag was still attached would not prevent a rational jury from finding that the bag was poisoned.  Dr. Hail testified that JE's blood pressure came down due

---

[20] As with TY, Ortiz also complains about the lack of physical evidence (no collection and testing of JE's blood, the surgery IV bags, or the IV bag wrappers).  But such evidence is not required, and its absence illustrates more the unthinkable nature of the crime than anything else.  JE's poisoning can be shown with circumstantial evidence, and here, that evidence was overwhelming.

to three possible reasons—i.e., the epinephrine was wearing off, the blood-pressure-reducing medications Dr. Billman administered to respond to the blood-pressure spike were working, and/or a local anesthetic in the bag (lidocaine or bupivacaine) was reducing the pressure, (ROA.2407-08)—none of which required the removal of the adulterated bag.

Finally, Ortiz argues that JE's underlying health conditions (his moderate coronary heart disease; atrial fibrillation, which was managed by a heart implant; and positive Covid test after the surgery) could have caused his blood-pressure spike.  But JE's surgeon, Dr. Vo, testified that JE's underlying health conditions did not cause the complications that occurred during his surgery, (ROA.2118-19); the doctors who treated JE after his transfer to the hospital likewise did not find that JE's underlying health conditions caused the event, (ROA.2407); and toxicologist Dr. Hail testified that JE's prior heart problems, managed atrial fibrillation, and positive Covid test post-surgery did not cause his blood-pressure spike, (ROA.2407-08, 2431, 2453, 2476-77).[21]

In sum, ample evidence supported the jury's verdict that Ortiz poisoned the IV bag used in JE's surgery.

---

[21] Indeed, even the defense expert's report about Covid complications with anesthesia said nothing about Covid causing a blood-pressure spike.  (ROA.2656.)

### C.    Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in KP's August 19, 2022 surgery and thus its verdict on Counts Four and Nine.

As an initial matter, ample evidence supported the jury's finding that the IV bag Ortiz placed in the warmer on August 19, 2022 was the same bag used in KP's surgery. Surveillance video showed that, on August 19, 2022 at 8:22 a.m., Ortiz took a bag out of the warmer and carried it into OR 5. (GX 46.) Then, more than two hours later, at 10:34 a.m., Ortiz emerged from OR 5 with an IV bag carried under his arm and hidden by a folder. He placed that IV bag in the warmer and pulled out another bag, which he carried back to OR 5. (GX 47.) About seven minutes later, anesthesia tech Gonzalez exited OR 2, where the doctors were finishing up KP's surgery. (GX 49.) He retrieved a bag from the warmer and brought it to Dr. Marsden, KP's anesthesiologist, who testified that the bag was cold, (ROA.2027-28)—meaning that Gonzalez retrieved a bag that had not been in the warmer long enough to warm up, i.e., the bag placed there by Ortiz less than 10 minutes before. (ROA.2028-30.) Ortiz challenges the credibility of Dr. Marden's testimony that the bag was cold, [22] (Brief at 43), but the jury who witnessed Dr. Marsden's testimony

---

[22] Ortiz contends that Dr. Marsden's testimony that the bag was cold is not credible because he still used the bag. However, Dr. Marsden explained why he used the bag—because they were "just near the last few minutes of that case," so using a room-temperature bag, where he did not intend to give a lot of volume to the patient, was "not a medical problem." (ROA.2028.) Further, the surveillance video, which shows Ortiz placing the bag in the same general area of the warmer from which Gonzalez retrieved it, corroborates Dr.

believed him, and this Court should not second guess that choice.  *See Zuniga*, 18 F.3d at 1260.

Ample evidence also supported the jury's finding that the IV bag taken from the warmer and used in KP's August 19, 2022 surgery—i.e., the bag Ortiz placed in the warmer only moments before—was poisoned.

First, the triggering event for KP's hypertensive event was the hanging of the IV bag retrieved from the warmer.  Dr. Marsden testified that, after he replaced the original IV bag with the one Gonzalez retrieved from the warmer, KP's blood pressure jumped up significantly from the stable pressure she had maintained throughout the surgery.  (ROA.2031.)  Toxicologist Dr. Hail also testified that, based on her review of the medical records, the event that initiated KP's hypertensive episode was the bag of IV fluid given to her at the end of her surgery.  (ROA.2409, 2414; *see also* GX 145.)[23]

---

Marden's testimony that the bag was cold.  (*Compare* GX 48 at 0:07-0:13 (Ortiz placing the bag in an area just above the bags visible in the door's slit) *with* GX 48 at 6:55-6:57 (Gonzalez taking a bag from the area just above the bags visible in the door's slit).)

[23] Ortiz takes issue with how fast KP's blood pressure rose after IV bag was administered, arguing that it took "about an hour" for her blood pressure to get "very high" (above 200). (Brief at 52; ROA.2461.)  But Ortiz ignores that, within ten minutes of the IV bag being administered, KP's blood pressure jumped up significantly from where it had steadily been during the procedure (from 90 to 140), and it continued to climb from there. (ROA.2031; GX 145 at 8, 18.)  Dr. Hail explained that this more gradual rise in blood pressure was explained by the slow drip of the IV bag, (ROA.2461), which Dr. Marsden corroborated when he testified that he later opened up the IV bag to increase its flow and flush the antihypertensive medications to KP, but strangely, increasing the flow of the IV bag, even with the antihypertensive medications, only increased KP's blood pressure, (ROA.2036).

Second, KP's unexpected hypertensive episode, which required her to be transferred to a hospital, was something that her anesthesiologist and other experienced medical professionals had never seen before the summer of 2022 or since. (ROA.2037-38 (Dr. Marsden testifying that he had never experienced a situation like that in his career, which included performing anesthesia not only at low-risk ambulatory surgery centers but also at several trauma hospitals); *see also* ROA.1436-37, 1444-45.)

Third, KP experienced a distinctive constellation of symptoms—a blood-pressure spike, a blood-pressure tank, and some cardiac dysfunction without the culprit lesion—that could not be explained by her treating physicians, who naturally started with a default assumption that KP's medical supplies had not been poisoned. (ROA.2409-11.) As Dr. Marsden testified, he was extremely confused by what happened to KP, (ROA.2041)—it was "like everything was upside down," and he kept trying to make sense of everything he observed, (ROA.2043-44). Similarly, KP's treating physicians at the hospital could not explain what happened to her. As KP testified, they "kept running tests" but ultimately told her, "we don't know what happened." (ROA.1775-76.) Although the hospital "worked [KP] up pretty extensively"—running a number of scans, "looking for anything to explain what had happened"—they could not find a cause for KP's adverse event. (ROA.2411.)

Fourth, KP's symptoms, however, could be explained by an adulterated IV bag—specifically, a bag poisoned with the very drugs Ortiz had ready access to at the facility.  Dr. Marsden testified that, for several days, he kept going over KP's case in his mind, and the only explanation that made sense of everything he had witnessed was that KP's IV bag had been tainted with epinephrine.  (ROA.2044-45.)  Similarly, toxicologist Dr. Hail testified that what happened to KP could be explained by poisoning—that KP's blood-pressure spike was consistent with epinephrine in a tainted IV bag and that KP's blood-pressure tank was consistent with the epinephrine wearing off, the administration of the antihypertensives to counter the blood-pressure spike, and/or the effects of a local anesthetic (like bupivacaine) in a tainted IV bag.  (ROA.2413-14.)

Fifth, KP's blood was tested and found to have at least one chemical in it that should not have been there.  Specifically, in KP's blood, the crime lab, Southwestern Institute of Forensic Sciences (SWIFS), detected ephedrine, lidocaine, and bupivacaine.[24]  (GX 146; ROA.2201.)  At the very least, the

---

[24] Ortiz disputes SWIFS's conclusion that lidocaine and bupivacaine were present in KP's blood, emphasizing that another lab's, National Medical Services' (NMS's), quantitative testing did not detect those compounds.  (Brief at 52.)  But credibility issues are resolved in favor of the jury's verdict, and, here, a rational jury could have found that SWIFS's testing was reliable, as SWIFS's chemist testified that she was confident in her test results, (ROA.2221); those results were not necessarily inconsistent with NMS's quantitative testing because the amount of lidocaine and bupivacaine SWIFS found in KP's blood might be just below NMS's level of detection, (ROA.2228); and given that KP's blood sample was taken at 11:17 p.m. (GX 146 at 12)—about 12 hours after the IV bag from the warmer was first

51

bupivacaine should not have been there because, as toxicologist Dr. Hail testified, bupivacaine has a half-life of about 2.7 hours, so the bupivacaine administered during KP's initial surgery on August 18—even assuming a significant amount of it was absorbed (which was very unlikely)—would not have been detectable in KP's blood by the end of August 19, when K.P.'s blood sample was drawn.  (ROA.2413; GX 146 at 12.)[25]   The presence of bupivacaine in KP's blood therefore evidenced that KP had been poisoned.

Sixth, overwhelming evidence showed that, around the time of KP's surgery, other IV bags at Surgicare were intentionally tampered with and adulterated by injecting medications into the bags that should not have been there.  (*See* Part 1(A)(Fifth), *supra*.)

Seventh, KP's distinctive symptoms were experienced during the same short timeframe by other Surgicare patients of diverse backgrounds and situations—including by a patient (JA) whose IV bag wrapper had a hole in it and whose blood (like KP's) was found to contain chemicals that should not have been there.  (*See* Part 1(A)(Sixth), *supra*; ROA.2409, 2414.)

---

attached to her, (GX 50)—and considering bupivacaine's and lidocaine's half-lives, (ROA.1939, 2413), it is not surprising that the amount of those compounds in KP's blood would be quite small.

[25] Ortiz contends that the ephedrine found in KP's blood is consistent with the clinical doses of that medicine administered at the beginning of her August 19, 2022 surgery, but even assuming the presence of ephedrine in KP's blood was not evidence of tampering, the presence of bupivacaine was.

**Eighth**, Ortiz's actions regarding the IV bag used in KP's surgery demonstrated his consciousness of guilt. Specifically, Ortiz took the IV bag to the warmer while hiding it under his arm and behind a folder.

 

(GX 47.) A reasonable jury viewing that conduct could have easily found that Ortiz knew that the bag he was carrying was adulterated, and he did not want anyone to see him putting it into the warmer.

**Ninth**, Ortiz had the ability, opportunity, and motive to poison the IV bag used in KP's surgery. (*See* Part 1(A), *supra*.) Indeed, the date he placed the IV bag into the warmer (August 19, 2022) had particular significance for Ortiz. It was the effective date of his agreed settlement with the Texas Medical Board, which had been investigating him since 2021 and which, among other disciplinary actions, required Ortiz's medical charts to be reviewed by a

monitoring physician. (ROA.1473-76; GX 171.) Thus, August 19, 2022 was a particularly bad day for Ortiz, and a rational jury could have found that, on that day, he lashed out—using his physician skills, knowledge, and access to orchestrate adverse medical events for other doctors and to desecrate his physician's oath to do no harm.

Finally, as discussed above, Ortiz started getting his own IV bags around the time the unexplained hypertensive episodes began and long before anyone suspected tainted bags, (ROA.1826-27); and the string of unexplained hypertensive events that occurred in the summer of 2022 (of which KP's was one) paused when Ortiz was on vacation and stopped after he was no longer working at the facility, (ROA.1444, 1566-67).

In short, overwhelming evidence supported the jury's finding that Ortiz poisoned an IV bag used in KP's surgery.

**D.    Ample evidence supported the jury's finding that Ortiz poisoned an IV bag used in JA's August 24, 2022 surgery and thus its verdict on Counts Three and Eight.**

Ortiz does not dispute that sufficient evidence showed that JA was poisoned with a tainted IV bag. (Brief at 28, 51.) Indeed, the evidence establishing that fact was overwhelming. As with prior patients TY, JE, and KP, (1) JA's hypertensive episode was triggered by the administration of the IV bag taken from the warmer, (ROA.1830-31, 1888, 1935-36, 1943-44); (2) the

episode, which required JA's transfer to a hospital, was something his anesthesiologist and other experienced medical professionals had never seen before the summer of 2022 or since, (ROA.1895, 1906, 1936); (3) JA experienced the same distinctive constellation of symptoms as TY, JE, and KP, (ROA.1886-87, 1889, 1935, 2399, 2414-16, 2420), which could not be explained by the medications given during his procedure or his underlying health condition, (ROA.1937-46, 2420); (4) JA's symptoms, however, could be explained by an adulterated IV bag, (ROA.2419, 2659-60); and (5) around the time of JA's surgery, other IV bags at Surgicare were found to have punctured holes in their wrappers and chemicals in their fluid that should not have been there, (*see* Part 1(A)(Fifth), *supra*).

Beyond all that evidence, because Dr. Marsden arrived at Surgicare in time to voice his concern that some IV bags might be tainted, the IV bags and wrappers from JA's surgery were collected and examined. A tiny hole was found in an IV bag wrapper, (ROA.1558, 1561-62, 1952, 2048-49; GX 191); chemicals (bupivacaine, lidocaine, and epinephrine) were found in JA's IV bag that should not have been there, (ROA.2048, 2273); and chemicals (lidocaine

and ephedrine[26]) were found in JA's blood that should not have been there, (ROA.2202-03, 2221, 2417-18; GX 130).

Because the evidence of JA's poisoning was undisputably overwhelming, Ortiz focuses his argument instead on disputing the sufficiency of evidence demonstrating that he (Ortiz) was the poisoner. Specifically, Ortiz contends that no rational jury could have found that the IV bag he placed in the warmer on August 16, 2022 was the one taken from the warmer and used in JA's surgery on August 24, 2022. (Brief at 51.) But he is wrong. Ample evidence demonstrated that he was JA's poisoner.

First, the expiration date written on the poisoned IV bag's wrapper was consistent with being the bag Ortiz placed in the warmer on August 16, 2022. Specifically, the poisoned IV bag used in JA's surgery had a wrapper marked with the date "8/28." (GXs 136, 191.) This means that that bag first went into the warmer around August 14, 2022. (ROA.1790-91, 1799-1800 (Gonzalez testifying that, when he stocks the warmer, he writes the expiration date on the bag, which is about 14 days after the bag first goes into the warmer).) And such an approximate stock date is consistent with being the IV bag that Ortiz

---

[26] JA's blood was not tested for epinephrine, (ROA.2383-84), and the IV bag was not tested for ephedrine, (ROA.2469-70).

took out of the warmer on August 16, 2022 and then returned to the warmer later that day.  (GXs 29, 33.)[27]

 Second, the poisoned IV bag used in JA's surgery exhibited Ortiz's modus operandi.  The bag was infiltrated in the perfect place to avoid detection: a liquid injection (via a needled syringe) through the IV bag's self-healing septum.  (GX 191, ROA.1952, 2049, 2258-59.)  The bag was infiltrated with epinephrine and a local anesthetic, (ROA.2273), which is consistent with TY's, JE's, and KP's poisonings.  And after its infiltration, the poisoned bag, like the others, was placed in the warmer, a medical bomb waiting to go off.

 Third, Ortiz's actions regarding his placement of the IV bag on August 16, 2022 are consistent with his knowing placement of a poisoned bag.  On that day, at 8:00 a.m., Ortiz took three IV bags out of the warmer, even though there was no medical reason for him to do so.  (GX 29; ROA.1747-48, 1826.)  Later, at 9:17 a.m., he exited OR 5 and walked down the hallway toward the preop room with a syringe in his hand, which he notably put in his pocket when he ran into someone who then walked with him back to OR 5.  (GX 30.)

 A minute later, he exited OR 5 again and headed back toward the preop room.  He walked past OR 4, looking in the OR door's window to see if

---

[27] Such a stock date is also consistent with Gonzalez's later rearranging of the bags on August 18, 2022, (GX 34), such that the bag Ortiz placed in the warmer on August 16 (with an expiration date of 8/28) was moved behind older bags in the warmer.

anyone was coming, and then doubled back to the warmer, opened it, and looked inside. (GX 31.) Ortiz then continued on to the preop room, where he loaded a syringe multiple times with multiple vials, standing in the corner with his back to the rest of the room. He left the preop room with a syringe in his front pocket. (GX 32.)

About an hour and a half later, Ortiz exited OR 5 and placed an IV bag in the warmer. Though he was on the phone, he shifted the IV bag so that it was held by both of his hands in front of his body, as if to block its view from those standing in the hall behind him, leaving his phone to be held by his shoulder and neck.



(GX 33 at 00:03-05.)

A rational jury could have found that these actions evidenced Ortiz's guilty knowledge—that Ortiz took multiple bags out of the warmer without any legitimate medical reason because he wanted to taint some and isolate others from the warmer for his patients; that Ortiz hid that syringe in his pocket and acted like he was not headed to the preop room to load it up because he was hiding his shameful actions; that Ortiz made sure the coast was clear before he checked the warmer because he did not want anyone to see his interest in the place where he was about to plant a medical bomb; and, while on the phone, he used both hands to hold that tainted bag in front of his body because he knew what it was and did not want others to see him placing it in the warmer.

Finally, as discussed above, Ortiz had the ability, opportunity, and motive to poison IV bags at Surgicare; Ortiz started getting his own IV bags around the time the unexplained hypertensive episodes began and long before anyone suspected tainted bags, (ROA.1826-27); and the string of unexplained hypertensive events that occurred in the summer of 2022 (of which JA's was one) paused when Ortiz was on vacation and stopped completely after he was no longer working at the facility, (ROA.1444, 1566-67).

59

In short, ample evidence supported the jury's finding that Ortiz poisoned the IV bag used in JA's surgery.

Ortiz argues otherwise, contending that it is improbable that a bag placed in the warmer on August 16, 2022 could have gone unused until JA's surgery on August 24, 2022 because, at Surgicare, older bags (i.e., bags with earlier expiration dates) were generally stacked in the warmer so they would be used before younger bags (bags with later expiration dates). (Brief at 28.) But, whether probable or not, the expiration date on the poisoned bag's wrapper ("8/28") proves that the poisoned bag could and did stay in the warmer at least that long before being used. And in any event, a rational jury could have found that it was not improbable that the bag Ortiz placed in the warmer on August 16 could still be there on August 24 because that bag appeared to have a lot of contemporaries. Specifically, a rational jury could have found that there were many bags already in the warmer when Gonzalez restocked it on August 18, 2020 at 5:30 a.m., as it took Gonzalez some time to rearrange the bags already there to make room for the new bags, and, though the warmer could hold about 32 or 34 bags, Gonzalez added only about 14 new bags to the warmer. (GX 40; ROA.1792.)

In sum, overwhelming evidence supported the jury's verdict that Ortiz poisoned the bag used in JA's surgery.

**E.    Ample evidence supported the jury's finding that Ortiz poisoned an IV bag found in the warmer on August 24, 2022 and thus its verdict on Counts Five and Ten**.

Ortiz does not dispute that two poisoned IV bags were found in the warmer on August 24, 2022.  Indeed, ample evidence showed as much, as each bag was found to have a hole in its wrapper, (ROA.2257-59), and chemicals in its fluid that should not have been there, (ROA.2275-77).  Rather, Ortiz contends only that there was insufficient evidence that the bag he placed in the warmer the day before, on August 23, 2022, was one of those two poisoned bags.  But, contrary to his assertions, ample evidence supported the jury's finding that the IV bag Ortiz placed in the warmer on August 23, 2022, was one of the poisoned bags found in the warmer the next day.

First, the expiration date written on the poisoned IV bag's wrapper ("9/4") was consistent with being the bag Ortiz placed in the warmer on August 23, 2022.  (GX 244 at 10-11.)  A written expiration date of "9/4" means that the bag was first put into the warmer on August 18, 2022, because that is the last time anyone stocked the warmer in August of 2022, (ROA.2492-93), and thus, it is the stocking date that gets closest to 14 days before an expiration date of September 4.  And a stock date of August 18, 2022 is consistent with Ortiz taking two IV bags out of the warmer on August 23,

2022, injecting one, and returning the tampered bag to the warmer later that day.

Second, Ortiz's actions regarding the bag he placed in the warmer on August 23, 2022 were consistent with his knowing placement of a poisoned bag. On that date, at 7:54 a.m., Ortiz took two IV bags out of the warmer and carried them to OR 5. (GX 60.) At 8:19 a.m., Ortiz entered the preop room with his hands in his pant pockets and multiple syringes (two large and three small) in his front shirt pocket; he walked around until no one was near him and then pulled his hands and vials out of his pockets and started drawing up medications in one large syringe and then another, looking around and sometimes moving in and out of the empty patient bays.







(GX 61.)  As anesthesiologist Dr. Marsden testified, this behavior was bizarre:

filling up two large (ten milliliter) syringes in the preop area—where nothing is

given in that much volume—mixing multiple medications in the same syringe,

putting multiple unlabeled syringes together in one's pocket, and then walking around simply could not be explained as normal medical practice. (ROA.2050-51, 2067.)

At 8:23 a.m., Ortiz exited the preop room with the two large and three small syringes in his front pocket and headed to the waiting area, where no patients are treated. (GX 62.) He returned to the preop room a couple minutes later, still carrying the syringes, (GX 63); headed to OR 5, (GX 64); and then returned to the preop room, where he gave the three small syringes to a nurse anesthetist, (GX 65-66; ROA.2053).

At 8:28 a.m., Ortiz entered OR 5 with the two large syringes still in his pocket. (GXs 66-67; ROA.2054.) Two or three minutes later, Ortiz exited OR 5. He no longer had the two large syringes in his pocket, and he was carrying an IV bag. (GX 68; ROA.2054.) Ortiz headed to place the bag in the warmer but was unexpectedly interrupted by Gonzalez, who entered the hallway and stopped to talk to Ortiz at the warmer.



(GX 68.)  After placing the bag in the warmer and responding to Gonzalez,
Ortiz pretended to leave the OR hallway but turned back when the hallway
cleared.





(GX 68.)  He returned to the warmer and lifted his hand as if to open the door,
but when someone came out of OR 4, he dropped his hand.  Ortiz said
something to the man that exited OR 4 and waited for him to leave the
hallway before approaching the warmer again, opening it, and touching a bag
inside.





(GX 68.)

These actions—which lacked a legitimate medical explanation and demonstrated a strong interest in the IV bag he had just placed in the warmer, as well as a strong desire to hide that interest from others—supported the jury's finding that Ortiz knew the bag was poisoned.

Third, the tampered bag found in warmer on August 24 was consistent with Ortiz's modus operandi. It had a hole in the perfect place to avoid

detection.  (ROA.2257-58; GX 192.)  It was placed in the warmer as a medical bomb waiting to go off.  And it was poisoned with local anesthetics readily accessible to Ortiz at Surgicare.  (ROA.2276-77.)[28]

Finally, as discussed above, Ortiz had the ability, opportunity, and motive to poison bags at Surgicare; Ortiz started getting his own IV bags around the time the unexplained hypertensive episodes began and long before anyone suspected tainted bags, (ROA.1826-27); and the string of unexplained hypertensive events that occurred in the summer of 2022 paused when Ortiz was on vacation and stopped after he was no longer working there, (ROA.1444, 1566-67).

In sum, ample evidence supported the jury's finding that Ortiz poisoned the bag he placed in the warmer on August 23.

Ortiz argues otherwise, contending that no rational jury could have found that he would have injected an IV bag in OR 5 when there was at least one other person in the room from the time he entered it with the two large syringes until the time he exited it with the IV bag.  But, as demonstrated by Burks in court, Ortiz could have injected an IV bag quickly, in less than 10 seconds.  (ROA.1565.)  And given the setup of the ORs, Ortiz could have done

_____

[28] Although the bag did not have epinephrine in it, (ROA.2277-78), it was not tested for ephedrine, (ROA.2313-14), which was another medication Ortiz used to cause blood-pressure spikes, (ROA.2208).

so secretly—on the surface of the anesthesia cart, with his back to the rest of the room, and his body blocking his actions from view.  (GX 119; ROA.1698-99.)  Moreover, as seen throughout the surveillance videos, the other people entering and leaving OR 5 were busy with their own tasks, and Ortiz knew that.  Indeed, scrub tech Paul Monaco—the one person that kept Ortiz from ever being totally alone in OR 5 that day, (ROA.2062)—was typically opening and scrubbing materials between surgeries, (ROA.2057), or reading, (ROA.2486-87).  And because the crime was so unthinkable, no one was scrutinizing Ortiz's actions with the IV bags (even if they considered his actions strange).  Given this, a reasonable jury could have easily found that Ortiz injected the IV bag in OR 5 undeterred by Paul Monaco's (or any other busy worker's) presence in the room.

Ortiz also argues that no rational jury could have found that the bag he placed in the warmer on August 23 was poisoned (or that any of the bags he previously placed in the warmer were poisoned) because, though surveillance video showed him placing five bags in the warmer (i.e., the five charged in the indictment), there was another bag (a sixth bag) found in the warmer that was poisoned.  Because he did not place that sixth bag, Ortiz reasons that someone else must have poisoned it and that this, in turn, created reasonable doubt that he (Ortiz) poisoned the five charged bags because, he reasons, there cannot be

multiple poisoners at Surgicare. However, the trial evidence provided a sufficient explanation for the sixth bag that did not require a second poisoner.

On Monday, August 22, 2022 at 6:45 a.m., Gonzalez, as part of his job duties in cleaning the ORs and getting them ready for a new work week, took an unused IV bag from OR 5 and put it in the warmer. (DX 89; ROA.1702, 2027.) Notably, Ortiz had worked in OR 5 on the previous Thursday and Friday, and on both days, he had taken bags from the warmer into OR 5 that he did not later return to the warmer. (GXs 42, 47.) A rational jury could have found that Ortiz poisoned one of those bags, which Gonzalez unknowingly returned to the warmer on August 22, and that this explanation, especially in view of all the other evidence, left no reasonable doubt that Ortiz, and not some other unknown poisoner, adulterated IV bags at Surgicare.

\* \* \*

Overwhelming evidence supported the jury's verdict on each count.[29] Arguing otherwise, Ortiz essentially repeats the same trial arguments that the jury rejected, emphasizing the evidence he finds most favorable to his defense

---

[29] This is especially true when the evidence is viewed in its totality—when Ortiz's actions are viewed as a whole, across all counts. *See Acosta*, 972 F.2d at 89 (holding that the defendant's actions underlying each count come together and "produce circumstances sufficient to support [his] conviction on all counts"); *United States v. Miller*, 146 F.3d 274, 281 (5th Cir. 1998) (emphasizing that "[n]o single piece of circumstantial evidence need be conclusive when considered in isolation"; rather, the question is whether, based on the evidence "considered as a whole," a rational jury could have found the defendant guilty).

while nitpicking or ignoring contrary evidence. But, in doing so, he flouts the proper standard of review, under which all credibility choices and reasonable inferences supporting the jury's verdict must be accepted, any conflict in the evidence must be resolved in favor of the jury's verdict, and the evidence need not exclude "every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Moreno-Gonzalez*, 662 F.3d at 372. Under that proper standard, Ortiz cannot show that the jury's verdict was irrational, and this Court should affirm the well-supported verdict.

## 2.    The district court did not abuse its discretion in admitting the evidence regarding MK's death.

### Standard of Review

With respect to Ortiz's contention that the district court erred under Federal Rules of Evidence 404(b) and 403 because the evidence regarding MK's death was substantially more prejudicial than probative, Ortiz preserved error by filing a pretrial motion, which raised essentially the same arguments he now raises on appeal and which the district court denied. (ROA.716-17, 1352.) For preserved evidentiary issues, this Court reviews the district court's decision to admit the evidence for abuse of discretion, subject to the harmless-error analysis. *See United States v. Cervantes*, 706 F.3d 603, 615-16 (5th Cir. 2013).

As for Ortiz's contention that the district court erred in admitting the evidence under Rule 104, Ortiz arguably did not preserve error because, "in assessing the sufficiency of the evidence under Rule 104(b), the trial court must consider all evidence presented to the jury," and Ortiz did not object to the MK evidence on Rule-104 grounds at the close of all evidence. *See Huddleston v. United States*, 485 U.S. 681, 690-91 & n.7 (1988) (noting that the objector must move to strike the evidence if, at the close of the trial, the offeror has failed to satisfy the preliminary fact supporting its relevance). However, this Court need not decide whether Ortiz preserved his Rule 104 argument because, even assuming he did, he fails to show that the district court abused its discretion under Rule 104.

## Discussion

The district court did not abuse its discretion in admitting the evidence regarding MK's death.

As an initial matter, Ortiz wrongly contends that Rule 404(b) applies. It does not. Rule 404(b) "only applies to extrinsic evidence," and the evidence regarding MK's death was intrinsic, not extrinsic. *See United States v. Yi*, 460 F.3d 623, 632 (5th Cir. 2006). As this Court has held, "[e]vidence is considered intrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense," *United States v.*

*Age*, 136 F.4th 193, 220 (5th Cir. 2025), and here, the evidence regarding MK's death is precisely that: evidence of an uncharged offense that arose out of the same series of transactions as the charged offenses—as it occurred during the same spree of poisonings and was motivated by the same triggering event (i.e., MEC's investigation of the May 19, 2022 incident involving Ortiz). (ROA.1522-28.)

In any event, this Court need not decide whether the evidence regarding MK's death was intrinsic or extrinsic because Ortiz contends that the district court erred under rules that apply to all evidence, whether intrinsic or extrinsic—i.e., Rules 104 and 403 (the second prong of the Rule 404(b) test). *See Huddleston*, 485 U.S. at 688, 689-90 (noting that Rules 104, 402, 403 are "general strictures limiting admissibility" that apply to all evidence); *United States v. Kinchen*, 729 F.3d 466, 473 & n.5 (5th Cir. 2013) (noting that the Rule 404(b)'s requirements outlined in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), "essentially incorporate[] Rule 403's balancing test as its second prong").

First, the district court did not abuse its discretion in admitting the MK evidence under Rule 104.

72

Under the Federal Rules of Evidence, relevant evidence is generally admissible.  Fed. R. Evid. 402. [30]  And in situations where an evidence's relevance "depends on whether a fact exists," Rule 104 provides that "proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b).  In other words, the party offering the evidence must show proof sufficient so that the jury could reasonably find the preliminary fact by "a preponderance of the evidence."  *Huddleston*, 485 U.S. at 687 & n.5.  In determining whether such proof has been shown, the trial court considers "all the evidence in the case."  *Id.* at 690.

Ortiz contends that the district court erred under Rule 104 in admitting the MK evidence because he claims that evidence was relevant only if he poisoned MK's IV bag and there was insufficient proof that he did. Specifically, Ortiz claims that there is no evidence he tampered with MK's bag or that her IV bag came from Surgicare, as opposed to some other facility where she worked.  But the jury could have reasonably found that it was more likely than not that Ortiz poisoned MK's IV bag based on the trial evidence showing that: (1) Ortiz poisoned numerous IV bags at Surgicare in the summer of 2022, (*see* Part 1, *supra*); (2) MK worked at Surgicare on June 21, 2022, and

---

[30] Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401.

then, after work, went home and administered an IV bag to herself, (GX 175 at 26-27; ROA.1713-17); (3) MK died shortly after administering that bag, (ROA.1717-20); (4) a postmortem analysis revealed the unexplained presence of bupivacaine in MK's blood, (ROA.2203-05, 2207); (5) Baxter, the bag's manufacturer, received no complaints of tainted IV bags for the impacted lot numbers other than from Surgicare, (ROA.1981-82), and (6) there was no evidence of tainted IV bags at any of the other facilities where MK worked. (*See also* ROA.2931 (district court noting that the trial record supported the finding that Ortiz is responsible for MK's death).)  Thus, sufficient proof established the MK evidence's relevance, and Ortiz fails to show that the district court erred under Rule 104 by admitting it.

Second, the district court did not abuse its discretion in admitting the evidence under Rule 403.

Rule 403 provides that the trial court "may exclude relevant evidence if its probative value is substantially outweighed by the danger of . . . unfair prejudice[.]"  Fed. R. Evid. 403.  Determining whether probative value is substantially outweighed by the risk of unfair prejudice requires a "commonsense assessment of all the circumstances surrounding the [complained-of evidence]."  *Kinchen*, 729 F.3d at 473.  And in reviewing the trial court's decision to admit the evidence, this Court uses "a lens that gives

74

great deference to the district court's informed judgment in weighing the [relevant] factors." *Id.*; *see also United States v. Shows Urquidi*, <u>71 F.4th 357, 372</u> (5th Cir. 2023) (noting that "the standard for assigning error under Rule 403 is 'especially high' and requires a showing of a 'clear abuse of discretion'").

Here, the district court did not abuse its broad discretion in determining that the probative value of the MK evidence was not substantially outweighed by its risk of unfair prejudice. The probative value of the MK evidence was significant. Where much of the defense's trial strategy focused on undercutting the government's theory that the IV bag caused each hypertensive episode, the MK evidence provided unique and compelling evidence to counter that strategy. Unlike the other victims, MK was not undergoing surgery when the IV bag was administered. Therefore, the explanations the defense repeatedly offered for the other hypertensive episodes—physician error, medications administered during surgery, surgical pain, and/or waking up from anesthesia—did not apply to MK and clearly could not have caused her cardiac event. In this way, MK's case removed the noise and persuasively demonstrated that it was the IV bag that triggered the incident.

This strong probative value, moreover, was not outweighed—let alone substantially so—by the risk of unfair prejudice. First, contrary to Ortiz's assertions, the MK offense was of the same nature as the charged offenses.

Ortiz posits that MK's murder was "the worst act alleged in the case." (Brief at 64.) But it was not the worst *act*. It was the same act that Ortiz committed in the charged counts—secretly injecting an IV bag with dangerous chemicals and placing it where some unsuspecting person would use it. It is true that MK's death was the worst *result* of those actions because, unfortunately, MK, unlike the other victims, was not in a surgical setting where medical professionals were monitoring her and could respond quickly to the situation. But the fact that intervening actors were able to mitigate the harm caused by Ortiz to other patients does not change the fact that the criminal act in MK's case was the same: poisoning an IV bag with the intent that some unsuspecting person would use it.

Second, the MK evidence made up only a small portion of the trial and thus did not take the jury's focus away from the charged offenses. Specifically, in a trial transcript of about 1350 pages of testimony, (ROA.1434-2788), the testimony regarding MK consisted of less than 30 pages, (ROA.1710-29, 2204-05, 2207, 2227).[31]

---

[31] Ortiz claims that the "emotional force" of MK's husband's testimony recounting MK's death after she administered an IV bag was "incomparable," (Brief at 65), but the testimony regarding the other victims—including that of a mother taking her 18-year-old son in for a routine surgery only to be later told that he had experienced some unexplained complication and might not survive, (ROA.1861-64, 1942-43)—were no less compelling.

Third, the district court's jury charge mitigated any risk that the jury could have convicted Ortiz—not because it found him guilty of the charged offenses—but because it found him guilty of the uncharged MK offense. The district court cautioned the jury to consider "only the crimes charged" and emphasized that Ortiz was "not on trial for any act, conduct, or offense not alleged in Counts One through Ten of the indictment." (ROA.1112.) The court also instructed the jury that, though it had heard evidence of "acts of the defendant which may be similar to those charged in the indictment but which were committed on other occasions," the jury could "not consider any of this evidence in deciding if the defendant committed the acts charged in the indictment." (ROA.1112.) Rather, only if the jury found beyond a reasonable doubt from the other evidence in the case that the defendant committed the acts charged in the indictment, could it consider evidence of the similar acts to determine whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment or whether he had a motive or opportunity to commit the acts charged in the indictment. (ROA.1113.)[32]

---

[32] Ortiz argues that this instruction somehow shows prejudice because it limited consideration of the MK evidence to issues (intent, motive, opportunity) that he claims the MK evidence does not show. (Brief at 64.) But if the instruction limited the jury's use of the evidence to areas where it purportedly had no value, it is hard to see how the evidence's admission prejudiced Ortiz. In any event, contrary to Ortiz's assertions, the MK evidence did show motive and opportunity, as it, along with the other suspected poisonings, (1) linked the charged offenses (which occurred in August 2022) to the motivating event (the MEC investigation of Ortiz's May 19, 2022 incident), and (2) showed that the suspected poisonings occurred on or around days that Ortiz worked at Surgicare and paused while he

"Juries are presumed to follow their instructions," *Zafiro v. United States*, 506 U.S. 534, 540 (1993), and this Court has held that such limiting instructions "greatly minimize any risk of undue prejudice posed by the admission of extrinsic evidence." *United States v. Mayweather*, No. 21-30697, 2023 WL 195414, at *1 (5th Cir. Jan. 17, 2023) (citing *United States v. Garcia Mendoza*, 587 F.3d 682, 689 (5th Cir. 2009)).  Therefore, even if the MK evidence was extrinsic, the district court's instructions greatly minimized any risk of undue prejudice posed by its admission.

In sum, considering the court's limiting instruction, the MK evidence's brevity, and the fact that MK's poisoning was of the same nature as the charged offenses, Ortiz fails to show that the district court abused its wide discretion in finding that the MK evidence's strong probative value was not substantially outweighed by the risk of unfair prejudice.  *See Mayweather*, 2023 WL 195414, at *1 (holding that the district court did not err in admitting evidence of the defendant's prior offenses where the court provided a limiting instruction and the prior offenses were not greater in magnitude than the charged offenses); *United States v. Flores*, No. 22-30540, 2023 WL 5703612, at *4 (5th Cir. Sept. 5, 2023) (holding that the probative value of the defendant's

---

was on vacation in late July.  The MK evidence also showed intent because it evidenced a surreptitious poisoning—done so subtly that even an anesthesiologist did not notice when administering the bag to herself—which was inconsistent with an accidental tampering.

prior bad acts was not substantially outweighed by unfair prejudice where the prior bad acts did not occupy more of the jury's time than the charged offenses and were nearly identical and therefore not greater in magnitude than the charged offenses).

In any event, even assuming the district court erred in admitting the MK evidence (and it did not), the error was harmless.  Under the harmless-error analysis, this Court will not reverse "[u]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *United States v. Williams*, 620 F.3d 483, 492 (5th Cir. 2010).  Here, there is no reasonable possibility that the MK evidence contributed to Ortiz's convictions because, as shown above, (*see* Part 1, *supra*), even without the MK evidence, the evidence of Ortiz's guilt on each of the charged counts was overwhelming. *See Williams*, 620 F.3d at 493 (holding the admission of the complained-of evidence harmless "in light of the substantial evidence of [the defendant's] guilt presented at trial"); *United States v. Naidoo*, 995 F.3d 367, 376 & n.3 (5th Cir. 2021) (holding that any error in admitting the complained-of evidence was "harmless in light of the overwhelming evidence of [the defendant's] guilt").

3.    **The district court did not abuse its broad discretion in allowing toxicologist Dr. Hail to testify.**

**Standard of Review**

At trial—although Dr. Hail, the government's expert, sat prominently in the courtroom for days, often advising the government's counsel during trial—defense counsel first raised the issue that Dr. Hail had not been exempted from the rule of sequestration (Rule 615) only after the government called her to the stand.  (ROA.2369-70.)  The district court then found Dr. Hail exempt from the Rule, and defense counsel objected, arguing that it was too late for the court to make such a ruling, and moving to strike Dr. Hail as a witness.  (ROA.2370.)  Thus, with respect to the *timing* of the district court's exemption ruling, Ortiz preserved error, and this Court reviews the district court's exemption decision for an abuse of discretion.  *See Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1209 (5th Cir. 1993) (holding that this Court "will not upset [the district court's exemption] determination absent an abuse of that discretion").  The district court has "broad discretion to determine whether Rule 615 has been violated and, if so, what sanctions should be imposed," and the district court may, in its discretion, allow a witness to testify, even if it finds the Rule has been violated.  *Cruz v. Maverick County*, 957 F.3d 563, 570-71 (5th Cir. 2020).

However, Ortiz did not preserve the other arguments he now seeks to raise on appeal. Specifically, Ortiz did not preserve his contention that, even allowing for government's purportedly late exemption motion, the government failed to show that Dr. Hail was essential to the government's case and thus exempt from the Rule. In the district court, defense counsel acknowledged that experts are routinely exempted from the Rule as essential to a party's case, and defense counsel did not contend that the government failed to show that its expert Dr. Hail was essential under that routine analysis. Rather, defense counsel argued only that the government's motion and the court's exemption ruling came too late—that defense counsel had "detrimentally relied on the assumption" that the defense's expert witnesses were excluded by the Rule. (ROA.2380-82.)

Ortiz also did not preserve his contention that, regardless of any Rule 615 violation, the district court abused its discretion by not finding that the government violated a court order and by not striking Dr. Hail as a witness as a sanction for that purported violation.

For these unpreserved errors, this Court applies the plain-error standard of review. Under that standard, Ortiz must show (1) an error, (2) that is clear or obvious, rather than subject to reasonable dispute, (3) that affected his substantial rights, and (4) that seriously affects the fairness, integrity, and

81

public reputation of judicial proceedings. *Cervantes*, <u>706 F.3d at 616</u>. "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States*, <u>556 U.S. 129, 135</u> (2009).

<u>**Discussion**</u>

> **A.** **The district court did not abuse its broad discretion in exempting Dr. Hail from the Rule after she had already been present in the courtroom**.

The district court did not abuse its broad discretion in exempting Dr. Hail—one of the government's expert witnesses—from Rule 615's courtroom exclusion even though the government made its exemption motion later in the trial, after Dr. Hail had already been present during other witnesses' testimony.

Federal Rule of Evidence 615 ("the Rule") provides that, "[a]t a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony," but "this rule does not authorize excluding . . . any person whose presence a party shows to be essential to presenting the party's claim or defense." <u>Fed. R. Evid. 615(a)(3)</u>.

Ortiz argues that the district court erred in exempting Dr. Hail under subsection (a)(3) because, he claims, the government's showing and the court's ruling came too late and should have been made at the beginning of trial when defense counsel first invoked the Rule to exclude witnesses from the courtroom. However, the Rule's text says nothing about *when* the subsection-(a)(3) showing must be made. Rather, the Rule provides that it "does not

authorize excluding" "any person whose presence a party shows to be essential." Fed. R. Evid. 615(a)(3). Thus, by its plain terms, *if* the showing is made—whenever that may be—the Rule does not authorize exclusion of that person.

Additionally, the caselaw suggests that a party's subsection-(a)(3) showing need not be made at the beginning of trial when the Rule is invoked. In affirming the district court's finding of a Rule 615 violation in *Miller v. Universal City Studios, Inc.*, this Court emphasized that the party in that case did not seek an exemption under Rule 615(a)(3) *at any time* in the district court, either "before trial *or after the violation became known*." 650 F.2d 1365, 1374 (5th Cir. 1981) (emphasis added). In this way, this Court has indicated that a party can move for an exemption (and the district court can grant it) even after the witness has purportedly violated the Rule by remaining in the courtroom.

Finally, contrary to Ortiz's assertions, fairness does not dictate that a subsection-(a)(3) showing must be made at the beginning of trial when the Rule is invoked. To the contrary, if a person's presence in the courtroom is essential to a party's case, fairness dictates that she should be there, even if the showing is not made until later in the trial. Moreover, the lack of a timing requirement for the subsection-(a)(3) showing discourages gamesmanship by the non-offering party, as it encourages the non-offering party to raise a

potential Rule 615 violation as soon as it is known rather than sitting on it and raising it only when the party believes it has the best chance of getting the witness struck.  Further, the lack of a timing requirement does not encourage the offering party to delay in making the subsection-(a)(3) showing to gain any purported tactical advantage because, if the offering party's witness is present during the trial and the offering party is ultimately unsuccessful in showing that the witness's presence is essential, the offering party runs the risk of having its witness struck.  Thus, even without a timing requirement, the offering party is incentivized to make its subsection-(a)(3) showing sooner rather than later.

In short, considering the Rule's text, the caselaw, and the equities—as well as the broad discretion district courts have in determining whether the Rule has been violated—the district court here did not abuse its discretion in finding Dr. Hail exempt from the Rule even though the government did not move for that exemption until after she had already been present during the trial.

**B.    Even assuming a violation of the Rule, the district court did not abuse its discretion in allowing Dr. Hail to testify**.

In any event, even assuming Dr. Hail's presence in the courtroom prior to the district court's determination that her presence was essential constituted a bare technical violation of the Rule, the district court did not abuse its broad discretion in allowing Dr. Hail to testify.

84

<u>First</u>, Dr. Hail's presence in the courtroom did not violate Rule 615's main purpose, which is "to aid in detecting testimony that is tailored to that of other witnesses and less than candid." *United States v. Wylie*, <u>919 F.2d 969, 976</u> (5th Cir. 1990). Because Dr. Hail was an expert witness who did not testify to the facts of the case but rather gave her opinion based on the evidence (i.e., the medical records and testimony of the fact witnesses), there was no danger that her hearing the testimony of prior witnesses would color her recollection of witnessed events. *See Mayo v. Tri-Bell Indus., Inc.*, <u>787 F.2d 1007, 1013</u> (5th Cir. 1986) (holding that experts testifying solely to their opinion based on the facts or data in the case are "not witnesses whose recollections might have been colored by accounts of prior witnesses"). To the contrary, Dr. Hail's presence in the courtroom—far from suspect—actually benefited the search for truth because it better equipped her to base her expert opinion on a more accurate understanding of the facts. *See Polythane Sys., Inc.*, <u>993 F.2d at 1209-10</u>.

<u>Second</u>, Dr. Hail's presence in the courtroom was not a willful violation of the Rule. As the district court noted (and defense counsel acknowledged), expert witnesses are routinely exempted from the Rule in the Northern District of Texas. (<u>ROA.2382</u>.) Given this history, the prosecution was operating under the understanding that "the baseline rule is that an expert witness who is not a fact witness involved in the events is permitted to witness the trial

testimony." (ROA.2370.)  Moreover, the prosecution believed that defense

counsel was operating under that same understanding—i.e., that the parties'

experts were exempt from the Rule—because: (1) the defense noticed that its

expert Dr. Sweitzer's testimony would be "highly dependent on the testimony

provided by the government's witnesses," (ROA.384; *see also* ROA.688); and

(2) at the beginning of trial, although the defense sought clarification about

which case agents were exempt from the Rule, it did not seek clarification

regarding expert witnesses, (ROA.1433).  Further, consistent with this

understanding, the prosecution did not hide Dr. Hail's presence in the

courtroom.  Rather, Dr. Hail sat visibly in the gallery—close to the

government's counsels' table, often conferring with the prosecution team

during trial.  (*See* ROA.2369 (defense counsel stating that "Dr. Hail has been

present in the courtroom for the entire trial").)

Third, the district court found that the defense was not prejudiced by the

court's exemption of Dr. Hail from the Rule.  The defense claimed that it was

prejudiced because it had believed the district court had excluded the defense's

experts, so its experts had not been sitting in the trial, listening to audio feeds,

or reading transcripts.  (ROA.2380-81.)  However, the district court rejected

that claim, emphasizing that expert witnesses are routinely excluded from the

Rule in the Northern District of Texas, and if the defense had moved to

exempt their expert witnesses, the court would have exempted them. (ROA.2381-82.)

Additionally, to the extent the defense claimed that their decision whether to seek an exemption for their expert witness depended on whether the government sought an exemption for its expert witness, the district court rejected that argument too. (ROA.2381-82.) Indeed, it is hard to see how the defense's decision whether their expert needed to hear the trial testimony depended on whether the government's expert needed to hear it. Although the defense certainly could have undermined Dr. Hail's expert opinion if she had not been made aware of all the relevant facts, her knowledge or lack thereof would not have strengthened Dr. Sweitzer's opinion; only Dr. Sweitzer's awareness of the facts could have done that. Further, the defense tellingly *never* moved to exempt Dr. Sweitzer—not upon first seeing Dr. Hail in the courtroom during the trial and not after the government moved to exempt Dr. Hail—which undercuts Ortiz's claim that he would have moved to exempt Dr. Sweitzer if he had known the government was seeking to exempt Dr. Hail.

Moreover, defense counsel failed to explain why any purported prejudice (caused by their alleged assumption that Dr. Sweitzer was excluded) could not have been remedied by providing the trial transcript's daily rough drafts to Dr. Sweitzer or informing her of the relevant trial testimony. In short, the district

court saw the defense's argument as what it was—an attempt to capitalize on a perceived gotcha moment—and the court reasonably rejected the defense's prejudice claims.

Ortiz cites several portions of the prosecution's cross-examination of Dr. Sweitzer as purported evidence of prejudice. (Brief at 73-74.) But his argument relies on the faulty premise (rejected by the district court) that the defense did not have Dr. Sweitzer observe the trial testimony because it assumed Dr. Sweitzer was excluded by the Rule. In any event, a closer examination of the cited passages shows that the prosecutor was merely: (1) highlighting certain facts that Dr. Sweitzer did not factor into her analysis, regardless of how she received them, (*e.g.*, ROA.2657 (asking if Dr. Sweitzer "tr[ied] to figure out what happened by talking to the surgeons and the anesthesiologists involved" and eliciting that Dr. Sweitzer only reviewed the medical record for very specific questions); ROA.2676 (asking if Dr. Sweitzer heard any testimony *or looked at any documents* about when certain things were done); ROA.2670 (asking Dr. Sweitzer if she *reviewed* Dr. Erdman's testimony)); and (2) determining whether Dr. Sweitzer's opinion would change if she knew those facts, (*e.g.*, ROA.2641-43, 2673-74, 2691). Thus, even setting aside the fact that the district court rejected the defense's premise that Dr. Sweitzer did not observe the trial because defense counsel assumed (without

ever asking or moving for an exemption and despite the fact that experts are routinely exempted) that she was excluded, these passages do not show prejudice, as Dr. Sweitzer could have become aware of the facts through other means besides sitting in trial, and Dr. Sweitzer often testified that the trial testimony (even if she had heard it) would not have changed her opinion. (*E.g.,* ROA.2641-43, 2670-71, 2673-74, 2691.)

In sum, even if Dr. Hail's presence constituted a technical violation of the Rule, it (1) did not violate the Rule's purpose, (2) was not a willful violation, and (3) caused Ortiz no prejudice. As such, the district court acted well within its broad discretion in allowing Dr. Hail to testify. *See Cruz*, 957 F.3d at 572 (holding that, where the district court reasonably concluded that any alleged violation of the Rule was not willful or prejudicial, allowing the testimony was within the court's discretion).

### C. The district court did not plainly err in finding the government made a sufficient showing to exempt Dr. Hail from the Rule.

For the first time on appeal, Ortiz contends that—even setting aside the timing of the government's motion—the government failed to make the requisite showing under subsection (a)(3) that Dr. Hail's presence was essential to the government's claims. But he can show no error, let alone obvious error, in the district court's contrary conclusion.

In the district court, the government represented that Dr. Hail was an expert witness, who would not testify to the facts of the case but rather would give her expert opinion (that TY's, JE's, KP's and JA's hypertensive episodes were consistent with a poisoned IV bag) based on the evidence (i.e., the medical records and testimony of the fact witnesses).  (ROA.168-70 & Hail's Report; ROA.2370.)  As such, the government sufficiently showed that Dr. Hail fell within Rule 615(a)(3)'s exemption for persons whose presence is essential, and the district court did not err, let alone plainly err, in exempting Dr. Hail.  *See Polythane Sys., Inc.*, 993 F.2d at 1209 (holding that "[e]xpert witnesses clearly fall within Rule 615(3)'s exception" and that there is "little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case"); *Mayo*, 787 F.2d at 1013 (holding that experts "testifying solely as to their opinion based on the facts and data in the case" "were properly exempted"); *see also United States v. Reynolds*, 534 F. App'x 347, 365 (6th Cir. 2013) (noting that an expert witness is "a classic example" of the Rule 615(a)(3) exception and refusing to disturb the trial court's decision to exempt such a witness).

> **D.  The district court did not plainly err by not striking Dr. Hail's testimony as a sanction for violating a court order.**

For the first time on appeal, Ortiz alternatively argues that the district court should have sua sponte found that, even if Dr. Hail's presence did not

violate Rule 615, it violated the court's order invoking the Rule, and thus, the court should have excluded Dr. Hail's testimony as a sanction. (Brief at 75.) But this contention fails with Ortiz's Rule 615 argument.

The district court's order "invoked" the Rule. (ROA.1433.) The Rule does "not authorize excluding . . . any person whose presence a party shows to be essential to presenting the party's claim," Fed. R. Evid. 615(a)(3), and, as discussed above, the district court reasonably found that the government demonstrated that Dr. Hail's presence was essential. Thus, the Rule did not authorize Dr. Hail's exclusion, and the court's order invoking the Rule consequently did not order it. Thus, the district court did err, let alone plainly err, by not finding its order violated.

Similarly, even assuming Dr. Hail's presence violated the district court's sequestration order, the court had broad discretion in determining what, if any, sanction should be imposed. *See Cruz*, 957 F.3d at 570-71. The court was not required to strike Dr. Hail's testimony, *id.*, and, as discussed above, the court acted well within its discretion by not doing so, even assuming a violation of its order.[33]

---

[33] Finally, any violation of Rule 615 or the sequestration order was harmless. Because Dr. Hail was not a witness "whose recollections might have been colored by accounts of prior witnesses," her presence in the courtroom did not prejudice the defense. *Mayo*, 787 F.2d at 1013. Indeed, Ortiz claims harm from his expert's absence, not from Dr. Hail's presence. But any harm caused by Dr. Sweitzer's absence was, in the court's words, self-inflicted and did not arise from the government's purported Rule 615 violation. Similarly, any harm

**4.    The district court did not plainly err by not intervening during closing argument.**

**Standard of Review**

When reviewing claims that a prosecutor improperly commented on a defendant's decision not to testify, this Court must "first decide whether the prosecutor made an impermissible remark." *United States v. Lara*, 23 F.4th 459, 479 (5th Cir. 2022).  If the Court concludes the remark is impermissible, it must then determine whether the remark "casts serious doubt on the correctness of the jury's verdict." *Id.*  Here, because Ortiz failed to object at trial, he failed to preserve error.  Accordingly, as he concedes, he bears the burden of showing that the complained-of statement constitutes plain and reversible error under the plain-error standard of review.  *Id.*; (*see* Part 3, *supra* (discussing plain-error standard)).

**Discussion**

The district court did not err, let alone plainly err, by not sua sponte intervening when the prosecutor stated in his rebuttal closing argument that "only one person in this room knows what was actually used to adulterate

---

caused by the defense's failure to provide Dr. Sweitzer with trial transcripts or inform her of the trial testimony was self-inflicted and did not arise from any purported violation of the Rule or the court's order.  Further, Dr. Sweitzer's testimony actually undermines the defense's claim that her absence caused them prejudice, as Dr. Sweitzer repeatedly indicated that she did not need to hear the trial testimony; rather, she considered the written medical records to be more reliable than the witnesses' recollections of the events.  (*E.g.*, ROA.2641-43, 2670-71, 2673-74, 2691.)

those bags," while emphasizing that such information was immaterial to the issue of Ortiz's guilt.

Specifically, in the government closing argument—which comprises about 26 pages of trial transcript, (ROA.2816-30, 2867-77)—Ortiz complains of a single, isolated sentence made in the prosecution's rebuttal closing. In its closing, the defense had contended that, if there was bupivacaine in the IV bag attached to JA's arm, "shouldn't there [have] be[en] bupivacaine in [JA's] blood?" (ROA.2862.)  And in response, the prosecutor stated:

> [The defense argues,] [JA's] blood did not test positive for bupivacaine.  Well, [JA's] blood did test positive for ephedrine, which is a common anesthesia drug, but was not given to him during these procedures.  [KP's] blood did test positive for bupivacaine despite not having received any bupivacaine for about 36 hours.  *And you know, only one person in this room knows what was actually used to adulterate those bags.*  The dose [of bupivacaine] [JA] received was likely very small.

(ROA.2875 (emphasis added).)  Ortiz points to the prosecutor's statement that "only one person in this room knows what was actually used to adulterate those bags," contending that it commented on his failure to testify and thus violated his Fifth Amendment right to remain silent.  But Ortiz fails to show any error, let alone plain error, in the prosecutor's statement.

Under this Court's precedent, "[f]or there to have been a denial of one's Fifth Amendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or

the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999).  As for the first inquiry, "the prosecutor's intent is not manifestly impermissible if there is some other, equally plausible explanation for the remark." *Id.*  Regarding the second, "the question is not whether the jury might or probably would view the challenged remark in this manner, but whether it *necessarily* would have done so." *Id.* (emphasis added).  "The comment made by the prosecutor must be considered in the context of his entire argument." *Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir. 2000).

Here, considering the complained-of statement in context, it neither demonstrated a manifest intent to comment on Ortiz's silence nor was of such a character that the jury would naturally and necessarily construe it as commenting on Ortiz's silence.  First, there were other, equally (if not more) plausible explanations for the remark:  The overall point of the prosecutor's statement was that Ortiz's guilt did not hinge on exactly what he used to adulterate the bags.  Chemicals (ephedrine or bupivacaine, which were readily available to Ortiz) were found in JA's and KP's blood that should not have been there.  That (along with all the other evidence) showed that JA and KP were poisoned, and exactly what drugs in what doses Ortiz used to poison the

bags did not matter.  At most, the fact that bupivacaine was found in JA's bag but not in his blood suggested that the dose of bupivacaine JA received was likely very small, but it did not undermine the evidence that JA was poisoned. Thus, rather than commenting on Ortiz's failure to testify, the challenged remark simply acknowledged the limitations of the government's evidence (which could not show exactly what drugs in what doses Ortiz used to adulterate the bags), while emphasizing that those limitations did not undermine the proof of Ortiz's guilt.

Second, the jury would not have necessarily construed the remark as a comment on Ortiz's silence.  The comment comprised one sentence in a lengthy closing argument.  It did not directly reference Ortiz or his failure to testify.  And although it referenced (without naming him) Ortiz's knowledge about certain facts, it did so only in the context of emphasizing that those facts were immaterial to the proof of his guilt.  Therefore, even if the jury took notice of the isolated sentence and understood it as referring to Ortiz, the jury would not have necessarily construed it as commenting on Ortiz's silence, especially when the whole point of the prosecutor's argument was that those particular facts did not matter.

In this way, the prosecutor's comments here were analogous to those that this Court held to be proper in *Lucas v. Johnson*, <u>132 F.3d 1069</u> (5th Cir. 1998). In that case, the prosecutor stated:

> "The handwriting comparison on the match[book] with [the defendant] Lucas was inconclusive. We don't know that those are his matches; they might have been the girl's matches. She might have written in the matchbook; we don't know that. *Only one person does know that, and that's [the defendant]*."

*Id.* at 1079, n.6 (emphasis added). This remark, the Court held, was "neither a direct nor an indirect comment on [the defendant's] failure to testify" because "the overall point of the prosecutor's statements appear[ed] to be . . . that [the defendant's] guilt did not hinge on whether [the defendant] or the victim owned the matches." *Id.* at 1079. That fact, which only the defendant knew, was immaterial to the defendant's guilt. The same reasoning applies here.

Just as the prosecutor's remark in *Lucas* (expressly referring to the defendant as the only person who knew certain immaterial facts while emphasizing the immateriality of those facts) did not comment on the defendant's failure to testify, so too here, the prosecutor's remark (implicitly referring to Ortiz as the only person who knew certain immaterial facts while emphasizing the immateriality of those facts) likewise did not comment on

Ortiz's failure to testify.  Ortiz can show no error in the prosecutor's statement, let alone clear or obvious error.[34]

Ortiz argues otherwise, contending that *Madden v. Collins*, 18 F.3d 304 (5th Cir. 1994)—not *Lucas*—controls under this Court's rule of orderliness. (Brief at 80.)  But the rule of orderliness provides that "the earlier decision controls" only "to the extent [the] two panel decisions conflict."  *Nivelo Cardenas v. Garland*, 70 F.4th 232, 242 n.7 (5th Cir. 2023).  And *Madden* and *Lucas* do not conflict.

In *Madden*, the prosecutor stated:

> Then, also, the defense will argue that why in the world would someone who killed, murdered two people and stole this credit card sign their own name to the Texaco card?  I don't know that; you don't know why.  *There's only one person here that knows why, and there's only one person here that knows the answer to all of these questions.*

*Madden*, 18 F.3d at 309 (emphasis added).  This statement, the Court held, "undeniably direct[ed] the jury's attention to [the defendant]'s silence."  *Id.*  Importantly, however, in *Madden*—unlike in *Lucas* (and unlike the instant case)—the prosecutor referred to the defendant as the only person who knew a

---

[34] *See also Enoch v. Gramley*, 70 F.3d 1490, 1505-06 (7th Cir. 1995) (holding that the prosecutor's comment that "the knife, we submit to you, that is in evidence was probably the knife used, but *only one person knows that for sure*," taken in context—i.e., where ample evidence showed that the defendant killed the victim whether or not the knife he used was in evidence—"amount[ed] only to a comment on the strength, and limitations, of the physical evidence" and did not suggest an intent or calculation to draw the jury's attention to the defendant's decision not to testify).

fact that was *material* to his guilt or innocence, i.e., whether he signed the victim's credit card with his own name because he got sloppy and messed up or because he didn't kill the victim and had no reason to disassociate his name from the victim's possessions.

Thus, the *Madden* prosecutor—by highlighting that the defendant was the only person who knew certain facts material to the jury's deliberation—effectively directed the jury's attention to the defendant's failure to testify.  In contrast, the *Lucas* prosecutor—by referring to the defendant as the only person who knew certain immaterial facts that did not matter to the jury's determination—did not.  The two cases do not conflict, and as this Court has recognized, both constitute binding circuit precedent for determining whether a prosecutor improperly commented on the defendant's failure to testify.  *See Barrientes*, 221 F.3d at 780-81 (citing both *Lucas* and *Madden* as setting the relevant legal "backdrop"); *see also Cotton v. Cockrell*, 343 F.3d 746, 752 & n.1 (5th Cir. 2003) (citing *Lucas* approvingly).  Therefore, unable to cast *Lucas* aside, Ortiz can show no error in the prosecutor's remark, let alone clear or obvious error.

In any event, even assuming Ortiz could show a clear or obvious error, he cannot satisfy the third prong of the demanding plain-error standard, as he cannot show that the alleged error affected his substantial rights.  First, the

remark's prejudicial effect, if any, was weak. The complained-of statement consists of a single, isolated sentence in 26 pages of closing argument. The remark did not clearly reference Ortiz's failure to testify, and it did not ask the jury to infer guilt from Ortiz's decision not to testify, nor did it seek to limit the jury's mental processes based on that decision.[35] To the contrary, the prosecutor's statement focused the jury's attention on the government's evidence of poisoning, emphasizing that, in light of that evidence, the question of what exactly was used to adulterate the bags (i.e., the facts that "only one person" knew) did not actually matter to the jury's determination of guilt.

Second, the remark's prejudicial effect, if any, was cured by the district court's jury instructions, which admonished the jury that: (1) "[t]he law does not require a defendant to prove his innocence or produce any evidence at all, and no inference whatever may be drawn from the election of a defendant not to testify," (ROA.1107); and (2) in discharging its duty to determine the facts, the jury "must consider only the evidence presented during the trial," and "arguments made by the lawyers are not evidence," (ROA.1108). These

---

[35] *Cf. United States v. Johnson*, 127 F.3d 380, 398 (5th Cir. 1997) (holding that the prosecutor's statement, which focused the jury's attention on the fact that the defendant did not testify and argued that, in the absence of the defendant's testimony, the jury was precluded from theorizing in their own minds as to the defendant's version of the facts, was improper).

instructions were sufficient to cure any prejudice caused by the prosecutor's brief and isolated remark.

Third, the government presented overwhelming evidence of Ortiz's guilt, including (1) IV bag wrappers with holes in them and corresponding IV bags that tested positive for containing drugs that the bags should not have contained; (2) the testimony of the victims, their treating physicians, and the government's expert indicating that the victims experienced hypertensive episodes that were consistent with having received a poisoned IV bag and not otherwise explainable by the patient's underlying medical condition or the procedures and medications he/she received during surgery; (3) surveillance videos capturing Ortiz's placing IV bags in the warmer before each of the charged victim's hypertensive event—including a video showing that the IV bag used in TY's surgery was the same bag Ortiz placed in the warmer earlier that day—as well as Ortiz's efforts to avoid anyone seeing his drops or his subsequent checking on the placed bags; and (4) evidence showing that Ortiz had the ability, opportunity, and motive to commit the charged crimes. (*See* Part 1, *supra*.)

Accordingly, given the minimal prejudicial effect (if any) of the prosecutor's comment, the district court's curative instructions, and the overwhelming evidence of Ortiz's guilt, Ortiz cannot show a reasonable

probability that the trial's outcome would have been different had the prosecutor not made the isolated, one-sentence remark. As such, Ortiz fails to show that the alleged error affected his substantial rights. *See United States v. Bohuchot*, 625 F.3d 892, 901 (5th Cir. 2010) (holding that the prosecutor's comments did not affect the defendant's substantial rights where "the district court cautioned the jury through instructions that 'no inference or conclusion may be drawn from the defendant's decision not to testify'" and "the evidence of [defendant's] guilt was substantial"); *United States v. McMillan*, 600 F.3d 434, 452-53 (5th Cir. 2010) (finding any error harmless where the prosecutor's comments "were more an isolated remark than a call for the jury to focus on the fact that the defendants did not testify" and the court instructed the jury to draw no inferences from a defendant's election not to testify).[36]

---

[36] *See also Cotton*, 343 F.3d at 752 (holding that, given the overwhelming evidence of the defendant's guilt and the court's cautionary instruction, the prosecutor's statement had no substantial effect in the jury's determination of guilt); *Madden*, 18 F.3d at 310 (holding that the prosecutor's statement was harmless given that it was made in anticipation of a defense argument and there was substantial evidence of the defendant's guilt).

## **CONCLUSION**

This Court should affirm the judgment.

Respectfully submitted,

Nancy E. Larson
Acting United States Attorney

*/s/ Gail Hayworth*
Gail Hayworth
Assistant United States Attorney
Texas Bar No. 24074382
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
gail.hayworth@usdoj.gov

Attorneys for Appellee

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 22,585 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*/s/ Gail Hayworth*
Gail Hayworth
Date: September 11, 2025